**Dewey E. COLEMAN, Petitioner–Appellant,**

v.

**Henry RISLEY, Warden, Montana State Prison, and Michael T. Greeley, Attorney General for the State of Montana, Respondents–Appellees.**

No. 85–4242.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1986.

Decided Jan. 19, 1988.

436

Henry T. Greely, Stanford Law School, Stanford, Cal., for petitioner-appellant.

James M. Scheier, Asst. Atty. Gen., State of Mont., Helena, Mont., for respondents-appellees.

Before ALARCON, REINHARDT and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Dewey E. Coleman, a Montana state prisoner who has been sentenced to death, appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We affirm.

## I. FACTS

On July 4, 1974, Peggy Lee Harstad, twenty-one years old, disappeared while driving alone from Harlowton to Rosebud, Montana. The next day her car was found within a few miles of her home, near Rosebud. Several days later, a ranch hand discovered her purse inside a culvert about ten miles from her abandoned car. In the investigation which followed, an elderly couple reported that on the evening Harstad disappeared they had seen a black man and a white man hitchhiking between Roundup and Forsyth, Montana at about the time Harstad had been driving between those towns. The two men were identified as Dewey Eugene Coleman, a black man, and Robert Dennis Nank, a white man.

On July 9, 1974, representatives of the Rosebud County sheriff's office questioned Nank. He admitted being in the area where Harstad had last been seen alive, and hitchhiking through Forsyth, Montana on the evening of July 4th. In an interview with FBI agents about one month later, Nank also admitted seeing the Harstad vehicle abandoned on the road and finding a purse along the road where he and Coleman had been hitchhiking. By this time the FBI had reported a positive comparison between Coleman's fingerprint and a fingerprint which had been lifted from a paper found in Harstad's purse. Vacuumings taken from the Harstad vehicle revealed Negroid head hairs and two Negroid pubic hairs.

On August 29th, almost two months after her disappearance, Harstad's body was found on the north bank of the Yellowstone River, just west of Forsyth, Montana. Because of decomposition of her remains, a cause of death could not be determined.

Nank and Coleman were arrested in Boise, Idaho in October, 1974 and charged with deliberate homicide in the death of Peggy Lee Harstad. During questioning Nank gave a full confession implicating himself and Coleman in the kidnap, rape and murder of Harstad. Coleman denied any involvement in the crimes. The apartment where Nank and Coleman lived was searched, as was their car. Two motorcycle helmets and a rope Nank said had been used in the crimes were recovered. Coleman and Nank were charged with deliberate homicide, aggravated kidnapping, and sexual intercourse without consent. A conviction of aggravated kidnapping carried with it a mandatory death sentence. Mont. Code Ann. § 94-5-304 (1947) (repealed 1977).

On May 7, 1975, Nank entered into a written plea agreement with the State. He agreed to plead guilty to deliberate homicide and solicitation to commit sexual intercourse and to testify against Coleman in return for dismissal of the aggravated kidnapping charge; the dismissal of the aggravated kidnapping charge was not to occur until after Nank had testified at Coleman's trial. Coleman's counsel entered into plea bargaining discussions. Coleman insisted on maintaining his innocence, however, and was unable to make a plea agreement with the State.

On July 2, 1975, a pretrial hearing was held on a motion brought by Coleman's counsel seeking to obtain a court order authorizing the copying of Nank's medical records. Coleman was not present at the hearing. His counsel explained that Coleman had been taken to Billings, Montana for a sodium amytal examination to see if he could remember the events of July 4, 1974. During the course of the hearing, Coleman's counsel stated he wanted to enter into further plea negotiations with the State. The following colloquy occurred:

> Defense Counsel: I want to enter into further plea bargaining with the State and with the Court.... Also what I have to say today, I have not con-

firmed with my client, but I believe because of the shortness of time between now and the time of trial, it should be raised.... My client—well, also I want to proceed on the basis that this is plea bargaining and things I should say should not be held against my client at some later time. Is that understood?

State's Attorney: I don't go for that at all. I think we're either presenting an argument here. If we're going to hold a plea bargaining conference, let's do that later....

The Court: I think that what he's doing is laying a foundation to bring something up. Now go ahead.

Defense Counsel: That's correct. I'll go forward. I don't believe that my statements can be used against my client in any event. The purpose of the psychiatric examination was to place my client under sodium amytal to see if his recollection and memory could be refreshed, because in all communications with me, he could not tell me what happened. He continually asserted his innocence and it presented quite a problem in trying to defend him. That was the purpose, to send him to Dr. Harr to have him placed under sodium amytal. That investigation has been conducted and I believe on the basis of that examination, that my client will want to enter a plea of guilty.

The Court: Without the condition of—

Defense Counsel: Without the assertion of innocence. Now these statements I make are based on conversations I had with my client prior to the time he went up for the examination. That if the examination revealed certain things that refreshed his memory and indicated that the story that Nank was telling was in fact true, or substantially true, that then my position would be that we should go back to the Court and offer to enter a plea with the understanding that the death penalty not be imposed, and then if the memory is refreshed and his recollection of events is sustained after the sodium amytal has worn off, that then he would testify fully as to what his extent of participation was in the crime, and to avoid what I thought was the prosecution's most severe objection, and that is that he was entering a plea and saying he was innocent, and that this would allow him to get out. Now I know that the State indicated before that they thought he should be hung. I don't know what the State's position is. Now Mr. Coleman will be returning to Miles City, according to Dr. Harr, sometime around eleven o'clock. I intended to immediately confer with him. Doctor Harr has called me already this morning, and from the information I have received, it appears that my client's memory has been refreshed and there was participation on his part in the crime. Therefore, my function I believe, is to try to accomplish and make arrangements with the State and with the Court to save my man's life, and also it presents a personal problem and personal dilemma to me that would mean if we have to continue with the trial with my feelings of what Dr. Harr told me, and that if that's true, it will be very difficult to continue in the defense and to argue the case. Now that's a personal dilemma that I have.

The Court: That may be a personal dilemma, but it's an obligation that you'll have to go through with. So your client now makes the same proposition to the State as Nank has?

Defense Counsel: Yes, he would.

No agreement or understanding was reached at the July 2nd hearing. When court was convened the next day, Coleman was present. His counsel referred to the sodium amytal examination and stated that Coleman would plead guilty "under the same terms and conditions as has been accepted by the State with regard to Mr. Nank." The State refused to accept from Coleman the same plea bargain which had been made with Nank. The prosecutor stated he was concerned about Coleman challenging the voluntariness of his plea at a later time. He stated there were circum-

stances in Coleman's case which made it significantly different from Nank's. He stated these included the fact that claims had been made in Coleman's case that his attorney was incompetent and that a change of venue to avoid prejudice had not been a sufficient change to avoid such prejudice. He also pointed to Coleman's previous assertion of an insanity defense (which Coleman had later waived), and to the possibly unreliable sodium amytal procedure which had prompted Coleman to offer a guilty plea.

When Coleman's proposed plea bargain was rejected by the state, his counsel requested to be relieved. He stated that although he could defend Coleman on the aggravated kidnapping charge, there was "no way in the world I can state to the jury that he is innocent of deliberate homicide and that he's innocent of sexual intercourse without consent." The trial court denied the motion, but the Montana supreme court subsequently relieved Coleman's counsel and appointed new counsel to represent him. Coleman's new counsel took over his representation unaware of the proceedings which had taken place on July 2 and 3.[1]

Trial began in October 1975. Coleman and Nank both testified. They had met one another at the Veterans Hospital in Sheridan, Wyoming. Coleman was being treated for depression. Nank had a history of mental illness. They were discharged from the Veterans Hospital and traveled to Montana on Nank's motorcycle. They ran out of gas between Roundup and Forsyth during the evening hours of July 4, 1974 and decided to hitchhike. From this point on their stories differed.

Coleman testified that he and Nank had been unsuccessful in their attempt to hitchhike, but that Nank was able to obtain a ride for himself and headed toward Forsyth. Nank returned several hours later driving a car subsequently identified as Harstad's. He told Coleman he had killed a woman, and asked Coleman to hide a woman's purse which he had brought back; Coleman complied. Coleman denied any involvement in the death and maintained he did not report Nank to the authorities because he was afraid of retribution from Nank and was afraid he would be implicated in the crime.

Nank testified that when the Harstad vehicle stopped, both he and Coleman got into the car. As they proceeded toward Forsyth, Nank turned the ignition key off and maneuvered the vehicle to the side of the road. He tied Harstad's hands together with a yellow nylon rope, removed her clothing except for her blouse and attempted to have sexual intercourse with her but could not maintain an erection. Coleman then got in the back seat with Harstad and had sexual intercourse with her. Nank testified that thereafter he dressed the victim and they drove to the Yellowstone River. Nank carried Harstad over his shoulder to the side of the river. He put her down, and as they were talking, Coleman came from behind and hit Harstad several times on the head with his motorcycle helmet.[2] Coleman then took the rope from Harstad's hands and attempted to strangle her. Nank said Coleman asked him to help, but he was unable to do so. Both men then carried Harstad, who was unconscious, to a drainage area near the river where they dumped her body. When Harstad attempted to get up, Coleman held her feet and Nank held her head under the water until she was drowned.

## II. PRIOR COURT PROCEEDINGS

A jury convicted Coleman of deliberate homicide, aggravated kidnapping, and sexual intercourse without consent, inflicting bodily injury. He was sentenced to one hundred years for deliberate homicide and

1. The new counsel did not obtain a transcript of the July 2 and July 3, 1975 hearings until February 1982. *See Coleman v. Risley,* 663 P.2d 1154, 1158 (Mont.1983) (*Coleman IV*). Coleman's habeas corpus petition was filed in the United States district court in November 1981.

2. The State contended the crack in Coleman's motorcycle helmet was caused by striking Harstad on the head, and that the crack in the helmet was part of the evidence corroborating Nank's testimony. At Coleman's trial, a pathologist testified Harstad's skull had not been fractured.

forty years on the rape charge. He was sentenced to death for aggravated kidnapping under Montana's mandatory death penalty statute.[3] On appeal, the Montana supreme court held that the mandatory death penalty statute was unconstitutional. *State v. Coleman,* 177 Mont. 1, 579 P.2d 732, 741–42 (1978) (*Coleman I*). Coleman's death sentence was vacated and his case was remanded to the trial court for resentencing.[4] Coleman was then resentenced to death in 1978 under a new Montana death penalty statute which had been enacted in 1977. Mont.Code Ann. §§ 95–2206.6 through 95–2206.15 (now codified at Mont.Code Ann. §§ 46–18–301 through 46–18–310; hereinafter cited in precodification version, and reproduced at Appendix). Coleman's sentence was automatically reviewed by the Montana supreme court. Mont.Code Ann. §§ 95–2206.12 through 95–2206.15. The court upheld his convictions and sentences. *State v. Coleman,* 185 Mont. 299, 605 P.2d 1000 (1979) (*Coleman II*), *cert. denied,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980); *Coleman v. Sentencing Review Division of Supreme Court of Montana,* 449 U.S. 893, 101 S.Ct. 255, 66 L.Ed.2d 121 (1980) (vacating stay of execution of death sentence and denying certiorari).

Thereafter, Coleman filed a petition with the State court for post-conviction relief. His judgment and sentence were once again reviewed and affirmed by the Montana supreme court. *Coleman v. State,* 633 P.2d 624 (Mont.1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) (*Coleman III*).

A petition for writ of habeas corpus under 28 U.S.C. § 2254 was filed in the United States district court for the district of Montana in November 1981. The State provided Coleman with a list of all transcripts and proceedings that were recorded but not transcribed in the State court. It was at this time that Coleman's new counsel first learned of the July 2 and July 3, 1975 hearings during which the result of Coleman's sodium amytal test and plea proposals had been disclosed and his then counsel had requested to be relieved as his attorney. The federal habeas corpus proceeding was stayed to provide Coleman the opportunity to exhaust his State remedies for review of his convictions and death sentence in view of these hearings. The Montana supreme court denied Coleman's petition for post-conviction relief. *Coleman v. Risley,* 203 Mont. 237, 663 P.2d 1154 (1983) (*Coleman IV*).

Coleman then filed a motion for an evidentiary hearing on his habeas corpus petition in the district court. He sought a hearing on twelve of the thirty-seven issues raised in his petition, and filed a motion for summary judgment on the remaining issues. The State also filed a motion for summary judgment. On August 9, 1985, the district court granted the State's motion and entered judgment against Coleman. He appeals.

Coleman contends: (a) his resentencing under the 1977 death penalty statute violated the *ex post facto* clause of the Constitution; (b) Montana's death penalty statute unconstitutionally required him to bear the burden of proof of mitigating factors; (c) his jury panel was selected in an impermissibly discretionary manner; (d) his trial, conviction, and death sentence were the result of racial discrimination; and (e) his sentence was imposed in violation of due process of law.

## III. EX POST FACTO LAW

Coleman was convicted and first sentenced to death in 1975 under a mandatory death penalty statute subsequently held to

3. The statute provided that "[a] court shall impose sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as a result of the criminal conduct." Rev.Code Mont. § 94–5–304 (1947) (repealed 1977).

4. Coleman's sentence for sexual intercourse without consent, inflicting bodily injury was also vacated. The Montana supreme court concluded there was insufficient evidence to show Coleman had inflicted bodily injury upon Harstad in the course of committing sexual intercourse because she was murdered sometime after the rape incident. *Coleman I,* 177 Mont. 1, 579 P.2d at 742–43.

be unconstitutional in 1978 by the Montana supreme court in *Coleman I*, 177 Mont. 1, 579 P.2d at 741–42. In 1977, the Montana legislature passed a new death penalty statute, the constitutionality of which was upheld in *State v. McKenzie*, 177 Mont. 280, 581 P.2d 1205, 1228–29 (Mont.1978), *vacated on other grounds*, 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979). Coleman was resentenced in 1978 under this new statute. He contends the *ex post facto* clause of the Constitution was violated when he was resentenced to death under the 1977 statute.

To violate the *ex post facto* clause of the Constitution, a law must be retrospective and it must disadvantage the offender affected by it. *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981); *United States v. Crozier*, 777 F.2d 1376, 1383 (9th Cir.1985). Furthermore, "[e]ven if a retroactive change in the law is a disadvantage to the criminal defendant, it does not violate the [*ex post facto*] clause if the change is procedural rather than substantive." *United States v. McCahill*, 765 F.2d 849, 850 (citing *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977)).

During Coleman's trial, Nank testified on cross-examination that on the day Peggy Lee Harstad was murdered, he and Coleman burglarized a home in Roundup, Montana and stole some guns. The sentencing judge considered this circumstance at the time Coleman was resentenced to death under Montana's amended 1977 death penalty statute. Coleman claims he would not have cross-examined Nank concerning the Roundup burglary had he known this testimony would eventually be used against him at a sentencing hearing. Under the old death penalty statute Nank's testimony concerning the Roundup burglary would not have had any effect on whether Coleman was sentenced to death. His conviction of aggravated kidnapping mandated a death sentence. He argues that the new sentencing law changed the "rules of the game" to his detriment after his trial and before sentencing.

Coleman is correct that Montana's new sentencing law was enacted after his trial. But the new law did not change the "rules of the game." Nank's testimony regarding the Roundup burglary was admitted at Coleman's trial and was fully admissible at the sentencing hearing under Montana's new sentencing regime. Section 95–2206.7 of the Montana Code authorizes the sentencing judge to receive "evidence ... as to any matter the court considers relevant to the sentence, ... and any other facts in aggravation or mitigation of the penalty." Mont.Code Ann. § 95–2206.7. In evaluating mitigating circumstances, the judge considers, among other things, the defendant's "prior criminal activity." *Id.* § 95–2206.9(1). Coleman's argument that the new law disadvantaged him rests upon the unsubstantiated assumption that the circumstance of the Roundup burglary would not have been brought to the attention of the court at the sentencing hearing, *but for* Coleman's cross-examination of Nank at trial. Coleman has provided nothing to support this assumption. *See Dobbert*, 432 U.S. at 294, 97 S.Ct. at 2298–99 (discussed *infra;* rejecting petitioner's "speculation" that jury would have recommended life imprisonment had prior law still been in effect).

Coleman's counsel suggested at oral argument that Coleman's trial counsel would have cross-examined Nank differently and scrutinized his testimony about the Roundup burglary more effectively had the new sentencing law been in effect. Given that Nank and Coleman testified as to conflicting accounts of the events the day the murder occurred, the suggestion that Coleman's attorney had no motive to scrutinize Nank's recollection of the burglary which Nank said occurred on the day of the murder is unconvincing. Further, Coleman has not shown he was denied the opportunity to reexamine Nank at the sentencing hearing. *See* our discussion *infra* section VII, 3b. However, even if we were to accept Coleman's assumption, the Supreme Court's holding in *Dobbert* dictates rejection of his *ex post facto* claim.

In *Dobbert*, Dobbert committed crimes when Florida had an unconstitutional death

penalty statute which punished a defendant with death unless the jury recommended mercy. 432 U.S. at 288, 97 S.Ct. at 2296. By the time Dobbert was brought to trial, Florida had enacted a constitutional statute; the new law removed the presumptive death sentence, but permitted the judge to override the jury's recommendation of leniency. *Id.* at 290–91, 97 S.Ct. at 2297. At Dobbert's trial, the jury by a ten-to-two majority found sufficient mitigating circumstances to outweigh any aggravating circumstances and returned an advisory verdict recommending life imprisonment. *Id.* at 287, 97 S.Ct. at 2295. The trial judge, however, overturned this recommendation and sentenced Dobbert to death. Dobbert argued that the new law violated the *ex post facto* clause because (among other things) under the former death statute the jury's recommendation of life would not have been subject to the trial judge's nullification. The Court rejected this argument on two independent grounds, both present here: the new Florida law was procedural, and it was ameliorative. *Id.* at 292 & n. 6, 97 S.Ct. at 2298 & n. 6.

A. *Procedural Change*

The Court in *Dobbert* began its analysis by reiterating the "well settled" principle that the *ex post facto* clause does not " 'limit the legislative control of remedies and modes of procedure which do not affect matters of substance.' " *Id.* at 293, 97 S.Ct. at 2298 (quoting *Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)). As a corollary to this principle, the Court noted "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto.*" *Id.* The Court discussed two cases to support this proposition. *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898); *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). In *Thompson,* the Missouri supreme court reversed the defendant's conviction because of the inadmissibility of certain evidence in a case tried on circumstantial evidence. Prior to his retrial, the law was changed to make the evidence admissible and the defendant was again convicted. The *Thompson* Court held that the change which rendered the incriminating evidence admissible was procedural and did not violate the *ex post facto* clause because it "did not enlarge the punishment to which the accused was liable when his crime was committed, nor make any act involved in his offense criminal that was not criminal at the time he committed the murder of which he was found guilty." 171 U.S. at 387, 18 S.Ct. at 924. Similarly in *Hopt,* the Court held that a statute removing disqualification of certain classes of people who could be witnesses was procedural and hence did not violate the *ex post facto* clause. 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262. *See also Beazell,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (*passim;* new law on joint trial procedural). The Court in *Dobbert* concluded on the basis of the foregoing authorities that the change in Florida's sentencing law was procedural and therefore was not *ex post facto.* 432 U.S. at 293–94, 97 S.Ct. at 2298.

In the present case, as in *Dobbert, Thompson* and *Hopt,* Montana's new sentencing statute is procedural. The statute "simply altered the methods employed in determining whether the death penalty was to be imposed....", *Dobbert,* 432 U.S. at 293–94, 97 S.Ct. at 2298, and did not change the punishment prescribed, or the quantity or degree of proof necessary to establish guilt. *Id.* (citing *Hopt,* 110 U.S. at 589–90, 4 S.Ct. at 210). *See also McCahill,* 765 F.2d at 850–51 (law affecting bail pending appeal procedural); *Knapp v. Cardwell,* 667 F.2d 1253, 1262–63 (9th Cir.) (Arizona death penalty law enlarging ability to introduce mitigating factors held procedural), *cert. denied,* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982); *Ward v. California,* 269 F.2d 906 (9th Cir.1959) (*passim*) (state law allowing introduction of evidence of defendant's background and history and of any facts in aggravation or mitigation of death penalty was procedural; one judge denial of certificate of probable cause, per Pope, J.). Even if Montana's new statute disadvantaged Coleman, therefore, it is procedural and not *ex post facto.*

B. *Ameliorative Change*

The Court in *Dobbert* further held that Florida's new death penalty statute, viewed *in toto,* was ameliorative. The former statute established a presumption in favor of the death penalty and was unconstitutional. 432 U.S. at 294–97, 97 S.Ct. at 2298–2300. The new Florida law, in contrast, established extensive procedural protections and had been upheld in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Here, Coleman was first sentenced under a mandatory death penalty statute which was unconstitutional. Thereafter, he was sentenced under a new statute which established extensive procedural safeguards (Mont.Code Ann. §§ 95–2206.6 through 95–2206.15) and is constitutional. *Coleman II,* 185 Mont. 299, 605 P.2d 1016–17 (and discussion *infra* section IV).

Coleman attempts to distinguish *Dobbert* by arguing that whereas Dobbert was tried, convicted and sentenced under a constitutional statute, he was tried and convicted under an unconstitutional mandatory death penalty statute, but sentenced under a constitutional statute. Relying on *Dobbert,* we rejected an identical *ex post facto* challenge to the Arizona death penalty statute in *Knapp,* 667 F.2d at 1262–63. In *Knapp,* several of the appellants were tried, convicted and sentenced under an Arizona death penalty statute later declared unconstitutional. Thereafter, their sentences were vacated and they were resentenced to death under a constitutional statute. *Id.* at 1257–58. We rejected appellants' attempt to distinguish *Dobbert* as a "distinction without *ex post facto* implications," *id.* at 1262, because the new statute was "both procedural and ameliorative." *Id.* at 1263. The effect of the new Arizona statute, like the new Montana statute, was to "enlarge the ability of defendants to introduce mitigating circumstances at sentencing." *Id.* Thus, "it 'neither made criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided greater punishment, nor changed the proof necessary to convict.' " *Id.* (citation omitted).

C. *The Review Process*

Coleman also argues that the new statute violated the *ex post facto* clause because it changed the process by which a sentence of death was reviewed in Montana. Under Montana's death penalty statute in force at the time Coleman committed the acts of which he was convicted, and at the time he was tried and first sentenced to death, he had a statutory right to have his sentence reviewed by a Sentence Review Division. Mont.Code Ann. §§ 95–2502, 2211 (amended 1977). This review was designed to determine the appropriateness of the sentence with respect to the individual offender and particular offense, *McKenzie,* 171 Mont. 278, 557 P.2d at 1029, and gave a convicted person the "right to have his sentence reviewed for equity, disparity, or consideration of justice." *State ex rel. Greely v. District Court,* 180 Mont. 317, 590 P.2d 1104, 1110 (1979).

The new statute abolished review of death sentences by the Sentence Review Division and replaced it with automatic review by the Montana supreme court. *Coleman II,* 185 Mont. 299, 605 P.2d at 1006; Mont.Code Ann. §§ 95–2206.12 through 95–2206.15. Under the new law, the State supreme court reviews a death sentence to determine (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the sentencing judge's findings of the existence or nonexistence of aggravating and mitigating circumstances listed in the new statute; and (3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.* § 95–2206.15. Coleman contends this is a substantive change because the Montana supreme court's review is limited, whereas the review commission had wide discretion to reverse a death sentence "for equity, disparity, or consideration of justice." This argument proceeds on the false premise that the Montana supreme court's review is "limited." It also overlooks the fact that while nebulous considerations of "equity" and "justice" could have operated to a de-

fendant's advantage in reversing a death sentence under the old law, those vague terms could just as easily have worked to his disadvantage in upholding a death sentence arbitrarily imposed. *See Dobbert,* 432 U.S. at 294, 97 S.Ct. at 2299 (finality of jury determination of life or death under old law could operate equally to defendant's advantage or disadvantage; change in law to permit review by court not *ex post facto*).

Moreover, the Montana supreme court's review is not "limited" to a restricted list of mitigating circumstances. The court reviews a death sentence to determine whether the evidence supports the sentencing judge's findings of the existence or nonexistence of aggravating and mitigating circumstances specified in Mont.Code Ann. §§ 95–2206.8 and 92–2206.9. There is, in addition, a final all-encompassing subsection (8) that requires consideration of "[a]ny other fact ... in mitigation of the penalty." *Id.* § 95–2206.9(8). While this final aspect of the court's review is focused on facts which were presented to the sentencing judge, the Montana supreme court makes an additional independent review of the case to determine whether the sentence was imposed under influence of passion, prejudice, or other arbitrary factors, *id.* § 95–2206.15(1), and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.* § 95–2206.15(3). These review procedures, coupled with the review of mitigating factors, provide at least the same, if not greater, breadth of review as existed under the former statute, and provide a defendant with the added protection that his sentence review will not be limited to the potentially arbitrary application of a reviewing court's notions of "equity" and "justice."

We conclude, as did the district court and the Montana courts, that no *ex post facto* violation occurred by the application of Montana's 1977 death penalty statutes to Coleman in imposing the death sentence upon him.

## IV. BURDEN OF BRINGING FORTH EVIDENCE IN MITIGATION

In *Fitzpatrick v. State,* 638 P.2d 1002 (Mont.1981), the Montana supreme court held that Montana's death penalty statute did not impose upon the State the burden of proving the nonexistence of mitigating circumstances, but rather, placed the burden on the defendant "to bring forth the evidence pertinent to the question of mitigation." *Id.* at 1013. The court stated that "[t]his statute undoubtedly places the burden on the defendant to show that his life should be spared, but we find this to be constitutionally permissible." *Id.* (discussing *Coleman II,* 185 Mont. 299, 605 P.2d 1000 (1979), and *State v. Stewart,* 175 Mont. 286, 573 P.2d 1138, 1146 (1977)).[5] Coleman argues that "[b]y requiring the defendant to bear the burden of establishing the presence of mitigating circumstances, and by requiring the sentencing authority to weigh the 'substantiality' of the mitigating circumstances, the Montana statute prevents the kind of individualized attention to the appropriateness of the death sentence that the Constitution demands."

To resolve Coleman's contention, we must examine two lines of Supreme Court authority which have intersected only once before in this court. *See Harris v. Pulley,* 692 F.2d 1189, 1194–95 (9th Cir.1982) (in-

5. We do not read *Fitzpatrick* as stating that a defendant must prove mitigating circumstances beyond a reasonable doubt. *Fitzpatrick* does not impose such a standard, nor does it require the defendant to prove mitigating factors by clear and convincing evidence or by a preponderance of evidence. 638 P.2d at 1013. Rather, *Fitzpatrick* holds that the State does not bear the burden of proof and that the defendant bears the burden of "bringing forth the evidence pertinent to the question of mitigation." *Id. See McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 2420, 91 L.Ed.2d 67 (1986) (sentencing courts often hear evidence presented without "clear and convincing" burden requirement or other such burden). The transcript of the sentencing hearing (see *infra* section VII) does not indicate that the court required Coleman to prove mitigation beyond a reasonable doubt; the record in fact reveals no burden allocation. Coleman raised the issue of burden allocation both in the State courts and district court.

On burden of production generally, *see Lew v. Moss,* 797 F.2d 747, 751 (9th Cir.1986).

volving state death penalty statute relieving state from burden of proving non-existence of mitigating factors beyond a reasonable doubt), *reversed on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). These are cases involving the facial adequacy of a state's death penalty statute as measured by the eighth and fourteenth amendments, *see, e.g., Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and cases involving the allocation of the burden of proof in establishing guilt, *see, e.g., In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

A. *Facial Adequacy of Statute*

In *Gregg,* a plurality of the Court stated that the constitutional concerns expressed in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)—that a court not act in an arbitrary or capricious manner—are best satisfied "by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." 428 U.S. at 195, 96 S.Ct. at 2935. The Montana death penalty statute provides for a bifurcated sentencing procedure conducted by the judge who presided at the trial or before whom the guilty plea was entered. Mont.Code Ann. § 95-2206.6. The defendant may present any probative evidence regarding aggravating or mitigating circumstances. *Id.* § 95-2206.7. The Montana statute also satisfies the general criteria established in *Gregg, Proffitt,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), for constitutional state death penalty statutes: the statute requires the sentencing judge to find at least one aggravating circumstance, Mont.Code Ann. § 95-2206.10; the judge must consider mitigating circumstances and must find that no mitigating circumstance is sufficiently substantial to call for leniency, *id.* §§ 95-2206.7, 95-2206.9 and 95-2206.10; and the defendant receives prompt and extensive judicial review, *id.* § 95-2206.10 (and discussion *supra*). *See, e.g., Spaziano v. Florida,* 468 U.S. 447, 466, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984) (upholding similar statute). That the Montana statute does not require the State to prove the absence of mitigating circumstances, and permits the trial judge to weigh and balance mitigating and aggravating circumstances, does not violate the guidelines established in these cases. *See Proffitt,* 428 U.S. at 257-58, 96 S.Ct. at 2969 (upholding statute that did not impose a burden on state and permitted sentencing authority to balance factors in mitigation and aggravation); *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958 (allowing defendant to bring forth evidence on mitigation, but imposing no such burden on state); *Harris,* 692 F.2d at 1195 (interpreting *Proffitt* in similar fashion); *accord McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 2420, 91 L.Ed. 2d 79 (1986) (same).

B. *Allocation of Burden of Proof*

The Supreme Court's pronouncements on the proper allocation of the burden of proof in criminal cases do not alter this conclusion. In *Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the Court held that due process prevents conviction except upon proof beyond a reasonable doubt of every fact or element of the crime charged. *Id.* at 364, 90 S.Ct. at 1072. *See also Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). *Winship* and *Mullaney* emphasized society's interest in the reliability of jury verdicts:

> The requirement of proof beyond a reasonable doubt has [a] vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction....

421 U.S. at 699-700, 95 S.Ct. at 1890 (quoting *Winship,* 397 U.S. at 363, 90 S.Ct. at 1072); *see also Winship,* 397 U.S. at 372, 90 S.Ct. at 1076- 77 (Harlin, J. concurring).

In *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court refined the principles established in *Winship* and *Mullaney.* There, appellant was charged with second-degree murder which, under New York law, contained only two elements: intent to cause death; and causing death. *Id.* at 198, 97 S.Ct. at 2321. New York permitted the defendant to raise as an affirmative defense the mitigating circumstance of acting under extreme emotional disturbance, but the jury was instructed that the defendant bore the burden of proving the defense by a preponderance of evidence. *Id.* at 200, 97 S.Ct. at 2322. Appellant argued that placing the burden on a defendant to prove "mitigating factors" violated *Winship* and *Mullaney.* Specifically, he argued that *Mullaney's* "holding ... is that the State may not permit the blameworthiness of an act or the severity of the punishment authorized ... to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact ... beyond a reasonable doubt." *Id.* at 214, 97 S.Ct. at 2329. The Court held, however, that *Mullaney* and *Winship* only required the State to prove each element of the crime for which the defendant is charged:

> *Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. This is true even though the State's practice, as in Maine, had been traditionally to the contrary. Such shifting of the burden of persuasion with respect to a fact which the state deems so important that it must be either *proved* or *presumed* is impermissible under the Due Process Clause.

*Id.* at 215, 97 S.Ct. at 2329 (emphasis added).

*Winship, Mullaney* and *Patterson* teach that due process "requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged." *Patterson,* 432 U.S. at 210, 97 S.Ct. at 2327. *See also McMillan,* 106 S.Ct. at 2416. Under Montana law, circumstances affecting mitigation are not facts or elements of the crime for which a defendant is charged; rather, they are facts weighed by the sentencing judge after the defendant has been convicted. Mont.Code Ann. § 95-2206.6. *See, e.g., McMillan,* 106 S.Ct. at 2417 (noting this fundamental distinction); *id.* at 2420 & n. 8 (discussing *Proffitt*); *Patterson,* 432 U.S. at 226-27, 97 S.Ct. at 2335 (Powell, J., dissenting); *Foster v. Strickland,* 707 F.2d 1339, 1345 (11th Cir.1983), *cert. denied,* 466 U.S. 983, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984); *Ford v. Strickland,* 696 F.2d 804, 817-18 (11th Cir.) (en banc) (per curiam) (due process not violated when sentencing authority is permitted to weigh aggravating and mitigating circumstances after state has proven aggravating circumstances), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983); *Andrews v. Shulsen,* 600 F.Supp. 408, 423 (D.Utah 1984); *Richmond v. Cardwell,* 450 F.Supp. 519, 524-25 (D.Ariz. 1978), *later proceeding, Richmond v. Ricketts,* 774 F.2d 957 (9th Cir.1985). *Accord Harris,* 692 F.2d at 1195. Nor under Montana law is the existence of mitigating circumstances a fact which must be "proved or presumed" in obtaining a conviction or even in imposing sentencing. *Patterson,* 432 U.S. at 215, 97 S.Ct. at 2329. Montana only requires the sentencing judge to find one aggravating circumstance, Mont.Code Ann. § 95-2206.10, and then to consider mitigating circumstances. The statute comports with the general standards enunciated in *Gregg, Proffitt, Jurek,* and *Lockett* and does not transgress the specific limitations established in *Winship, Mullaney,* and *Patterson.*

Finally, in *Patterson* and recently in *McMillan,* 106 S.Ct. 2411, the Court has recognized that due process may limit a state's authority to define elements or facts necessary for a crime. *Id.* at 2416 (citing *Patterson,* 432 U.S. at 211 n. 12, 97 S.Ct. at 2327 n. 12). *See generally McGautha v. California,* 402 U.S. 183, 206 n. 16, 91 S.Ct. 1454, 1466-67 n. 16, 28 L.Ed.2d 711 (1971) (noting that aggravating circum-

stances could have been part of offense but instead were used as post-conviction enhancement). Several factors convince us that due process does not require Montana to disprove the existence of mitigating circumstances in order to impose a death sentence. *First,* as noted, the Court has approved of several death penalty statutes imposing no such burden on the state. *See, e.g., Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958. *Second,* the Montana death penalty statute establishes no presumptions and does not relieve the State of its burden of proving the defendant's underlying guilt. *See McMillan,* 106 S.Ct. at 2417. *Third,* mitigating circumstances as defined under Montana's death penalty statute permit the sentencing authority to exercise leniency. *See Patterson,* 432 U.S. at 203 n. 9, 97 S.Ct. at 2323–24 n. 9 ("the Due Process Clause did not invalidate every instance of burdening the defendant with proving an exculpatory fact"). They do not increase the punishment. *Id. Compare McMillan,* 106 S.Ct. 2411 (rejecting due process argument that state definition of element in *aggravation* in sentencing defendant must be proven beyond a reasonable doubt); *id.* at 2421–26 (Stevens, J., dissenting).

We therefore reject Coleman's argument regarding the allocation of the burden under Montana's death penalty statute and the trial court's weighing and balancing of mitigating and aggravating circumstances.

## V. JURY SELECTION

Following a challenge by the defendant three days before trial, the trial court dismissed the first jury panel and ordered a second panel drawn. Each name on the jury list was assigned a number, the numbers were placed in a box, and 200 were drawn. The court then directed the court clerk to obtain a panel of sixty jurors by telephoning persons drawn from the box to see if they would be available to serve on a jury within the next three days. Sixty-one of the prospective jurors indicated they would be available and sixty appeared for Coleman's trial. *Coleman I,* 177 Mont. 1, 579 P.2d at 746–47. It was from this panel that Coleman's trial jury was chosen.

Coleman contends that the sixty persons making up his jury panel were selected in an impermissibly discretionary manner. He alleges that potential jurors were asked whether they could appear for his trial and were allowed to excuse themselves on grounds not revealed to him. He further alleges that the system by which his panel of sixty potential jurors was selected had the disproportionate effect of placing mainly white, affluent residents from the west side of Billings on the panel. He argues that this system was controlled, not random, and resembled the so-called "key man" system of jury selection.[6]

Coleman contends that he is entitled to an evidentiary hearing on this issue. To obtain an evidentiary hearing, Coleman "must show that (1) he has alleged facts which, if proved, would entitle him to relief, and (2) an evidentiary hearing is required to establish the truth of his allegations." *Harris,* 692 F.2d at 1197; *see also Bashor v. Risley,* 730 F.2d 1228, 1233 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

### A. *Lack of Showing of Distinctive Group*

Trial by a jury of one's peers contemplates that an impartial jury will be drawn from a fair cross-section of the community. *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). The sixth amendment does not guarantee a randomly selected jury, *United States v. Wellington,* 754

6. Coleman's argument that his jury panel was selected using the key man system is without merit. The key man system of jury selection involves the selection of particular persons to make up a pool from which a jury is then chosen at random. It is not unconstitutional on its face. *Castaneda v. Partida,* 430 U.S. 482, 497, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); *United States v. Nelson,* 718 F.2d 315, 319 (9th Cir. 1983). Here there is nothing to suggest the jury panel was chosen using the key man system. The initial 200 jurors were selected at random. *Cf. Castaneda,* 430 U.S. at 497, 97 S.Ct. at 1281. The panel of sixty potential jurors were in essence volunteers, a fact which standing alone does not render the composition of a panel unconstitutional. *Nelson,* 718 F.2d at 319.

F.2d 1457, 1468 (9th Cir.), *cert. denied sub nom., Utz v. United States,* 474 U.S. 1032, 106 S.Ct. 592, 593, 88 L.Ed.2d 573 (1985), nor does it require that the jury contain representatives from every group in the community. *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986); *Thiel,* 328 U.S. at 220, 66 S.Ct. at 985. A fair cross-section challenge to the constitutionality of the jury venire requires a showing:

(1) That the group alleged to be excluded is a 'distinctive' group in the community;

(2) That the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) That this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*United States v. Miller,* 771 F.2d 1219, 1228 (9th Cir.1985) (quoting *Duren,* 439 U.S. 357 at 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579).

Coleman contends that as a result of the jury selection process, persons from the lower socioeconomic areas of Billings were excluded from his panel of prospective jurors. He has not alleged any facts, however, from which it could be concluded that persons from the lower socioeconomic areas of Billings, Montana formed a distinctive group in the community, or that if such a group existed it consisted of a sufficient number of persons so that its systematic exclusion from jury panels would support a fair cross-section challenge under the sixth amendment. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *see also Taylor v. Louisiana,* 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975). *See United States v. Kleifgen,* 557 F.2d 1293 (9th Cir. 1977) (*passim*); *United States v. Potter,* 552 F.2d 901, 904–05 (9th Cir.1977). Having failed to demonstrate the existence of a "distinctive" group, Coleman's claims that such a group was underrepresented in jury venires or was systematically excluded in the jury selection process also fail.

B. *Method of Selection of Available Jurors*

Coleman challenges the clerk's dismissal of 139 of the 200 potential jurors drawn from the box. There is nothing in the record, however, to suggest that the jurors who were excused by the clerk were excused for any reason other than their inability to serve in a jury trial which was to commence in three days. *Coleman I,* 177 Mont. 1, 579 P.2d at 746. Coleman does not contend, nor does the record reveal, that the 200 names from which the 60 members of his panel were chosen do not represent a fair cross-section of the community.

The method of jury selection in Coleman's case was similar to that which occurred in *United States v. Anderson,* 509 F.2d 312 (D.C.Cir.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). There, 200 to 300 jurors were selected for jury service. The defendant did not contend that these jurors were not representative of a fair cross-section of the community. The jurors were told that the trial would be lengthy and the court asked how many jurors would be able to serve. Sixty-eight jurors indicated they would be available, and sixty of these were selected for the panel. *Id.* at 321. On appeal the defendant contended the jurors were composed of volunteers and thus did not represent a cross-section of the community. *Id.* In rejecting this contention, the court concluded that the underlying complement of jurors represented a fair cross-section of the community and "[n]either the panel nor the trial jury became any less so by reason of the technique the judge employed." *Id.* at 322. The court went on to state, "the judge did not exclude anyone or any cognizable group. The sole criterion he employed was ability to serve longer; the panel from which the jury was drawn was distinguished only by that quality." *Id.; see also United States v. Branscome,* 682 F.2d 484, 485 (4th Cir.1982); *United States v. Kennedy,* 548 F.2d 608, 611 (5th Cir.), *reh'g denied,* 554 F.2d 476 (5th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).

Coleman did not present any affidavit or other evidence to suggest jurors were dismissed for any reason other than unavailability. His challenge to the sixty-person jury panel "consists exclusively of counsel's statements, unsworn and unsupported by any proof or offer of proof." *Frazier v. United States,* 335 U.S. 497, 503, 69 S.Ct. 201, 205, 93 L.Ed. 187 (1948). These "conclusory allegations do not provide a sufficient basis to obtain a hearing in federal court." *Harris,* 692 F.2d at 1199.

Finally, Coleman argues in his reply brief that the trial judge improperly disqualified two jurors because of their opposition to the death penalty. He has failed to present any showing that would justify an evidentiary hearing on this issue. *Maggio v. Williams,* 464 U.S. 46, 50, 104 S.Ct. 311, 314, 78 L.Ed.2d 43 (1983) (per curiam).

## VI. RACIAL DISCRIMINATION

Coleman contends he was tried, convicted, and sentenced to death as a result of pervasive racial discrimination. He points to the fact that Nank, a white man, was permitted to plead guilty to crimes which did not carry the death penalty, whereas Coleman, a black, was denied the same bargain. He also points to the trial judge's reference to him as a "black boy." He contends he was entitled to a hearing on these contentions.

### A. *The Plea Bargain*

The State permitted Nank to plead guilty to charges which did not carry the death penalty because he admitted his involvement in Harstad's murder and assisted the State in its investigation and prosecution of Coleman. On the other hand, Coleman maintained his innocence. When he first offered to plead guilty to non-capital charges, he insisted on maintaining his innocence as a condition of such a plea. The State was under no duty to accept Coleman's offer. The prosecution may refuse to bargain altogether, or cut off negotiations at any time. *United States v. Herrera,* 640 F.2d 958, 962 (9th Cir.1981) (prosecution of defendant on original indictment upheld notwithstanding prosecution's acceptance of co-defendant's plea bargain).

When Coleman finally offered to accept the same deal accepted by Nank, he did so only after he had undergone a sodium amytal procedure which the State regarded as questionable. Before then, Coleman's former counsel had claimed he was ineffective due to his lack of experience. Coleman had also contended that a change of venue had not been sufficient to eliminate prejudice against him. The State was concerned about the voluntariness of the plea. Moreover, the State already had Nank's agreement to testify against Coleman. Nank had pursued precisely the course which Justice Blackmun suggested should have been pursued by one of the defendants in *Burger v. Kemp,* — U.S. —, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (Blackmun, J., dissenting). There, in commenting that the defendant's lawyer had been remiss in not offering the defendant's testimony against his co-defendant in exchange for a life sentence, Justice Blackmun stated: "[T]he prosecutor might have decided that ... he would permit [the defendant] to plead to a life sentence in exchange for his testimony against [his co-defendant] and pursue the death sentence against [the co-defendant]." *Id.* at 3133 n. 12. Here, this is what the prosecutor did. He allowed Nank to plead to a life sentence in exchange for his testimony against Coleman, and pursued the death sentence against Coleman.

The record reveals no evidence of racial prejudice. Despite the absence of this evidence, the dissent insists "[t]he key inquiry here must be as to the prosecutor's motives in repeatedly and vigorously refusing to accept, or even consider accepting, Coleman's guilty plea...." (Reinhardt, J. dissent at page 13). However, as the Supreme Court stated in *McCleskey v. Kemp,* — U.S. —, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), "[T]he policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, often years after they were made." *Id.* at 1768 (foot-

notes and citations omitted). The Court further stated, "Our refusal to require that the prosecutor provide an explanation for his decisions ... is completely consistent with this Court's longstanding precedents that hold that a prosecutor need not explain his decisions unless the criminal defendant presents a prima facie case of unconstitutional conduct with respect to his case." *Id.* at 1769 n. 18 (citations omitted). Coleman has not set forth any facts which would support a prima facie case of unconstitutional conduct. As the dissent notes, Coleman makes "a concrete claim of unequal treatment on the basis of race." (Reinhardt, J. dissent at page 468). This may be so, but he presents no facts to support the claim.

We conclude that the State had no obligation to accept Coleman's plea bargain offer. *See Hererra,* 640 F.2d at 962; *accord United States v. Pleasant,* 730 F.2d 657, 663–65 (11th Cir.) (involving offer made and withdrawn when not initially accepted), *cert. denied,* 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984). Neither the State's acceptance of Nank's plea offer nor Coleman's death sentence alters this analysis. *See Brooks v. Estelle,* 697 F.2d 586, 588 (5th Cir.), *stay denied,* 459 U.S. 1061, 103 S.Ct. 1490, 74 L.Ed.2d 643 (1982); *McMillin v. United States,* 583 F.2d 1061, 1063 (8th Cir.), *cert. denied,* 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 709 (1978).

B. *"Black Boy" Reference*

Coleman points to the trial court's reference to him as a "black boy" to support his allegation of racial discrimination. The use of the term in reference to Coleman was first made during the trial by Coleman's own counsel during cross-examination of a witness. The court's use of the phrase occurred in chambers in ruling on a motion for dismissal or judgment of acquittal at the close of the government's case. At that point in the proceedings the following colloquy occurred:

> Prosecution: May the record show that the prosecution resists the motion.
>
> The Court: Well, I treat this as a real serious motion.
>
> Prosecution: In what regard?
>
> The Court: Well, I'm not going to grant the motion, but I say it has some merit.
>
> Prosecution: I frankly don't think it has any. We could have gotten to the jury on circumstantial evidence alone, Your Honor, and I'm confident of that.
>
> The Court: Well, all you've shown is the opportunity for this black boy to do it. You've shown plenty of opportunity.

We have expressed concern about the influence race may have in the imposition of the death penalty. *Harris,* 692 F.2d at 1198 n. 4. "The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence." *Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986). We do not agree with the State that the court's reference to Coleman as a "black boy" was "charitable;" however, when placed in context and viewed in light of the entire trial transcript, it does not establish Coleman's claim of racial discrimination. *See United States v. Herbert,* 698 F.2d 981, 984 (9th Cir.) (defendant must show prejudice stemming from comment), *cert. denied,* 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983); *United States v. Price,* 623 F.2d 587, 592–93 (9th Cir.) (same), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *James v. State,* 270 Ark. 596, 605 S.W.2d 448, 451 (1980) (in chambers reference to defendant as "boy" not prejudicial); *People v. McGowen,* 269 Cal.App.2d 740, 743, 75 Cal. Rptr. 53, 54–55 (1969) (no prejudice from unobjected to comment). *Compare Berry v. United States,* 283 F.2d 465, 467 (8th Cir.1960) (repeated racial comments made in jury's presence held prejudicial), *cert. denied,* 364 U.S. 934, 81 S.Ct. 380, 5 L.Ed. 2d 366 (1961); 34 A.L.R.3d 1313, 1320, 1328–30 & n. 19 (1970 & Supp.1986) (discussing cases). *Cf. Harris,* 692 F.2d at 1197 (evidentiary hearing required when facts in dispute and if proved entitled defendant to relief).

## VII. SENTENCING HEARING

Coleman argues that the sentencing hearings and the trial court's "FINDINGS,

CONCLUSIONS, JUDGMENT AND ORDER" ("Findings") dated July 10, 1978, violated due process. Before evaluating his contentions, we examine these proceedings and the court's Findings.

A. *The June 14th Hearing*

By its decision in *Coleman I,* the Montana supreme court affirmed Coleman's convictions on all counts. His sentence to serve one hundred years on Count I for deliberate homicide was affirmed. His death sentence for aggravated kidnapping and his sentence to serve forty years for sexual intercourse without consent, inflicting bodily injury, were vacated. The case was remanded to the trial court for resentencing. The remand was received by the trial court on June 2, 1978. On that day the judge who had previously sentenced Coleman to death notified counsel of record that Coleman's sentencing hearing would be held on June 14, 1978, and that the hearing would be conducted "in accordance with section 95-2206.06 through 95-2206.-11, RCM, as amended."

At the beginning of the June 14th hearing, the court stated that it "had set down for hearing today the matter of mitigation of punishment, intending to reserve for a subsequent date the sentencing." Defense counsel had filed a motion that day challenging the constitutionality of applying the newly amended 1977 death penalty statutes to Coleman's case. The State had not responded to this motion. The court stated: "Of course the first question that arises in the Court's mind, is should the Court [proceed] with the hearing at this time on the matter of mitigation, and of course on one count the Court feels that it may as well proceed, but I'd like to hear from you [defense counsel]." Coleman's counsel suggested that the State might want an opportunity to respond to his motion, and stated:

> I would suggest that the Court continue, and I'm not making this in the form of a formal motion, but I am suggesting that the Court continue this matter in regard to sentencing.... In addition, Your Honor, and as another point which has some bearing upon the Court's determination as to how to proceed, is that we have to present here at this time, no mitigating factors at all. It would be a matter of simply argument. There is a pre-sentence investigation report. I take the view that the situation is primarily one of law, to be resolved as to how the Court should proceed, and then I take the view that unless [the State] wishes to present witnesses, that at the time of sentencing is just simply a statement by [the State's attorney] pointing out what he thinks relevant and a statement pointing out what I think is relevant, and the Court decides if that's the way we are to proceed.

The court stated:

> Well, the Court has two matters to sentence on, and there is always a possibility that after the Court has considered [defense counsel's] brief, it might rule favorably on [defense counsel's] motion, and in that event there would be no necessity for the Court to make any finding [of aggravating or mitigating circumstances] or anything else under the—under the existing statute.... So I think we are just going to proceed particularly with the announcement that you don't intend to present any mitigating circumstances, and particularly because there is another count upon which this Court was called upon to reimpose sentence. I'll call then—or ask for responding briefs to the brief that has now been submitted by the defendant. The Court has received —I called for and have received a presentence report, which I now cause to be filed in accordance with the law. The reporting officer, Mr. Thomas Lofland, is present in court. The defendant has received a copy of this pre-sentence investigation. The significant part of it relative to mitigating circumstances is that the defendant has never been convicted of any felony prior to this charge. Now if there are any matters which either the State or the defense wish to clarify with reference to this report, Mr. Lofland is present and you may call him to the stand and you may make any inquiries that you feel are pertinent.

Neither side elected to call the reporting officer, Mr. Lofland, as a witness. The court then stated:

> Now with the announcement that the defense does not intend to produce any—call any witnesses to establish any mitigating circumstances, the Court of course has before it all matters during the course of the trial, heard the testimony relating to the aggravating circumstances and also some to mitigating circumstances.[7] Does counsel for the State now wish to make any statement relative to aggravating circumstances?

In response, the State attempted to call Coleman as a witness, but he declined to testify. The court then stated that it would "render its findings of fact and will go up on the record that is present in the absence of any mitigating circumstances presented by the defendant at this hearing." It was agreed that the State would file a brief in which it would point out the places in the trial transcript which it believed contained references to aggravating and mitigating circumstances, and the defense would have an opportunity to respond to that brief. The court asked the State if it wanted to make proposed findings of fact, and the State responded that it would do so. The court also invited the defense to prepare proposed findings. The hearing was then adjourned.

B. *The July 10th Hearing*

The court set July 10, 1978 as the date for Coleman's sentencing. On that date, at the beginning of the hearing, the court handed counsel for Coleman and the State an unsigned copy of its Findings. Coleman's attorney did not raise an objection to this procedure. After resolving a preliminary matter, the court stated:

> Well, I want you to know that I have considered all of—everything that you have submitted and have given it thought, and that this isn't just a matter that the Court takes lightly.... The court has set this time for sentencing of the defendant. Since the sentencing hearing, the Court has received copies of briefs and has considered the motion of the defendant to quash and having studied and considered the matter, has prepared its findings as required by law. Before pronouncing sentencing, [sic] does counsel have anything to say to the Court?

Defense counsel then read into the record a statement he had prepared on Coleman's behalf. He asked the court to consider that Coleman had never "been in any trouble before," that the crimes of which he had been convicted were inconsistent with his "whole history as shown by the records in this case," and that reports from people who had known Coleman in Great Falls, Montana where he had worked were favorable. The State responded, arguing among other things, that Coleman had initiated the attempts to kill Harstad, that Harstad had been killed to "destroy the evidence" of her kidnapping and sexual assault, that according to the pre-sentence report Coleman had feigned homosexuality to convince the court he did not rape the victim, and that Coleman's guilt had been determined beyond a reasonable doubt by the jury. The court then stated:

> THE COURT: In pronouncing sentence I do want the parties to know that this is a decision that is extremely agonizing for the Court to make. I have not looked at the points that have been raised lightly, but many of the arguments raised by the defense, of course have been considered heretofore, and the jury have found from the factual standpoint that the defendant was guilty beyond a reasonable doubt, and I do not disagree with that conclusion of the jury. The one mitigating circumstance is that the defendant has not prior to this time been convicted of any felony, but in view of the enormity of the crime committed, and the Court's feeling that this one circumstance does not overcome the aggravated circumstances, I have made find-

7. At his trial, Coleman testified to his previous clean criminal record, military service, psychological problems, and community service.

> ings to this effect, written findings as required by law. Also I have made conclusions and judgment which have been furnished to the defendant and the State at this time, and I will only at this time read the Court's conclusions and judgment.

The court then read its conclusions and judgment by which Coleman was sentenced to death.

C. *The Court's Findings*

The court's written Findings reviewed the evidence of the Harstad murder and kidnapping and concluded as to aggravating circumstances:

> 1. That the aggravating circumstances set forth in Section 95-2206.8, paragraph (7) exists for the reason following:
>
> That the offense of aggravated kidnapping was committed by the defendant and it resulted in the death of the victim, Miss Peggy Harstad.

The Findings also discussed the mitigating circumstances listed in Mont.Code Ann. § 95-2206.9. As to the first factor, that "the defendant has no significant history of prior criminal activity," *id.*, the court found:

> 2. That the State has been unable to prove by means of record checks that the defendant has any other history of criminal activity. The only other criminal act which appears in the trial record in this cause is aggravated burglary of a home in Roundup, Montana, where certain guns were stolen by the defendant and Robert Nank on July 4, 1974. By reason of the foregoing, the credit in mitigation allowed by Section 95-2206.9(1) is not appropriate to this defendant.

As to the remaining mitigating circumstances listed in the Montana Code, *id.* § 95-2206.9(2) to (8), including whether "any other fact exists in mitigation of the penalty," *id.* (8), the court found:

> 3. That there is no evidence appearing, either in the record of the trial held in this cause or the special sentencing hearing accorded, supporting a finding of any of the circumstances in mitigation under the other numbered paragraphs of Section 95-2206.9, mainly paragraphs (2) through (8).

The court found, among other things, that the offenses were not committed while the defendant was under the influence of any mental or emotional disturbance, the defendant was not a minor, and was a willing participant in the crimes.

In its Conclusions, the court stated:

> 2. That none of the mitigating circumstances listed in Section 95-2206.9 R.C.M. are sufficiently substantial to call for leniency. That the only mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity.

1. *Consideration of Mitigating Circumstances*

Coleman first argues that the trial court failed to consider mitigating circumstances dealing with his personal history and characteristics. Although he did not present any evidence as to mitigating circumstances at the sentencing hearing, *see Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986) (similar decision at death sentence hearing); *Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985) (*passim,* same); *Williams v. Oklahoma,* 358 U.S. 576, 583, 79 S.Ct. 421, 425, 3 L.Ed.2d 516 (1959) (same), the pre-sentence report listed several factors which Coleman argues militated in favor of leniency, including: his community service, clean record, and alleged psychological disorders. The trial court stated that it had considered all of the evidence and materials presented in rendering its Findings. *See also Coleman II,* 185 Mont. 299, 605 P.2d at 1019 (rejecting contention that trial court did not give "proper consideration to evidence when making its findings").

State court findings of fact arrive at a federal habeas corpus proceeding with a "presumption of correctness." *Wainwright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983) (per curiam). This presumption applies both to state trial and appellate court findings of fact, *id.* (involving state appellate court's

interpretation of trial court proceedings in imposing death sentence), and may only be overcome by "'convincing evidence.'" *Kennick v. Superior Court,* 736 F.2d 1277, 1281 (9th Cir.1984) (quoting 28 U.S.C. § 2254(d)).

The record reveals that the trial court considered all of the evidence and arguments presented regarding mitigation, but found that there was no evidence of mitigating factors sufficiently substantial to call for leniency. At the June 14th hearing, the court stated that it had received the pre-sentence report and noted that "the significant part of it relative to mitigating circumstances, is that the defendant has never been convicted of any felony prior to this charge." The trial court then agreed to accept a brief from the State and from Coleman's counsel specifically discussing the relevant aggravating and mitigating circumstances. *Coleman III,* 633 P.2d at 632. At that hearing and again at the later July 10th hearing, the court stated several times, without challenge, that it had read and considered all materials submitted. The court's Findings similarly stated it had reviewed "all matters submitted, together with the evidence produced at trial, and ... [observed] the defendant's demeanor during trial and while testifying...." Finally, at the July 10th hearing, Coleman's attorney reviewed for the court the circumstances from his client's personal history favoring leniency, and the State argued in rebuttal. In light of the trial court's repeated and unchallenged statements that it had received and considered all evidence presented, its specific reference to the presentence report, its acceptance of written briefs and oral argument regarding mitigating circumstances, and Coleman's decision to proceed on the basis of the written record, *see Williams v. Oklahoma,* 358 U.S. at 583, 79 S.Ct. at 425 (and cases cited *supra* with full cite to this case), we conclude that the trial court considered all of the mitigating circumstances presented and concluded these factors were not sufficiently substantial to call for leniency.[8]

Coleman maintains, however, that the trial court's failure to discuss his personal history and characteristics in its Findings indicates the court did not consider these factors in sentencing. In a series of cases, the Eleventh Circuit has rejected the same argument. *Johnson v. Wainwright,* 778 F.2d 623, 629 (11th Cir.1985); *Funchess v. Wainwright,* 772 F.2d 683, 693 (11th Cir.), *reh'g denied en banc,* 776 F.2d 1057 (1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986); *Raulerson v. Wainwright,* 732 F.2d 803, 805–08 (11th Cir.), *reh'g denied,* 736 F.2d 1528 (11th Cir.), *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984); *Palmes v. Wainwright,* 725 F.2d 1511, 1523 (11th Cir.), *reh'g denied,* 729 F.2d 1468 (11th Cir.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *Dobbert v. Strickland,* 718 F.2d 1518, 1523–24 (11th Cir.) (*Dobbert II*), *reh'g denied,* 720 F.2d 1294 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). In *Dobbert II,* the court held:

> The fact that the sentencing order does not refer to specific types of non-statutory 'mitigating' evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered. Whether particular evidence,

8. The dissent argues that "it is clear from the record and from the written findings that the judge failed to give any consideration whatsoever to ... Coleman's underprivileged and harsh childhood and adolescence, his military service, his good reputation in his neighborhood, his community service, and his psychological disorders." (Reinhardt, J. dissent at page 498). Further: "The record before us reveals that the court simply was unaware of or failed to consider Coleman's character and background." *Id.* at 499. Finally, the dissent claims the majority is speculating "as to what the sentencing judge actually considered." *Id.* at 502. This is not the case. The record affirmatively establishes that the sentencing judge read and considered the pre-sentence report. That report contained all of the circumstances the dissent argues the court should have considered. To suggest that the court must have been unaware of, or failed to consider, portions of a report which the court stated it had read and considered, not only speculates as to errors of omission the court may have committed, but flies directly in the face of the record. On the record before us, we cannot speculate that the sentencing judge omitted to do that which he tells us he did.

> such as the fact that Dobbert had a difficult childhood, is mitigating depends on the evidence in the case as a whole and the views of the sentencing and reviewing judges. What one person may view as mitigating, another may not. Merely because the Florida courts, operating through a properly drawn statute with appropriate standards to guide discretion, do not share petitioner's view of the evidence reveals no constitutional infirmity. *See Proffitt v. Florida,* 428 U.S. at 258–59, 96 S.Ct. at 2969–70.

718 F.2d at 1524.

In *Funchess,* 772 F.2d 683, the trial judge's "Findings of Fact" were virtually identical to those made here. The judge in *Funchess* did not refer to the non-statutory mitigating factors, and stated "that sufficient aggravating circumstances exist ... and this Court further finds that there are insufficient mitigating circumstances to outweigh the aggravating circumstances." 772 F.2d at 693 n. 11. The Eleventh Circuit rejected Funchess' argument that the trial judge's "failure to discuss any aspect of the non-statutory mitigating circumstances is absolute proof that the trial judge failed altogether to consider these factors:"

> During the second resentencing hearing, Funchess presented evidence relating to certain non-statutory mitigating circumstances. The trial court considered this evidence but obviously was not persuaded that it justified the establishment of any non-statutory mitigating factors. Consequently, the trial judge did not include a detailed discussion regarding these alleged circumstances in his findings of fact. This court has on previous occasions held that '[t]he fact that the sentencing order does not refer to specific types of non-statutory 'mitigating' evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered.' [*Raulerson,* 732 F.2d at 807]. Accordingly, appellant's argument on this matter is without merit.

*Id.* at 693 (footnotes omitted).

We agree with the Eleventh Circuit that a trial judge's failure to discuss a defendant's personal history in its findings does not indicate that these factors were not considered. Montana's death penalty statute authorizes the trial judge to consider a defendant's personal history and characteristics, and lists as a mitigating circumstance "[a]ny other fact exist[ing] in mitigation of the penalty." Mont.Code Ann. §§ 95–2206.7 and 95–2206.9(8). That the trial judge did not refer to evidence of personal history in his Findings only indicates he found that this evidence did not mitigate the penalty and was not "sufficiently substantial to call for leniency." *Id.* § 95–2206.10. Indeed, the trial judge's comments at the July 10th hearing and his Findings expressly stated that this was his view. We must therefore reject Coleman's argument as inconsistent with the trial judge's own comments, a fair reading of the record, and the analysis enunciated by the Eleventh Circuit which we find persuasive.

2. *Discussion of Coleman's Personal History*

Coleman argues that even if the trial court considered all of the evidence presented and found it insufficient to justify leniency, the due process clause nevertheless *requires* the sentencing authority to specifically discuss this evidence in its findings. We disagree.

The Supreme Court has emphasized that death, in its finality, is qualitatively different from any other punishment. *See, e.g., Gardner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). The Court has recognized that although sentencing will often involve the exercise of discretion, "that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980) (citation omitted); *see also Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964 (state death penalty statute may not preclude sentencing authority from considering defendant's character). In *Lockett,* the Court held violative of due process an Ohio statute which only permitted consideration of

three mitigating circumstances. The Court reasoned that the sentencer must not be "precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record ... that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2964 (emphasis in original). Similarly, in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Court overturned a death sentence because the trial judge held it was precluded under Oklahoma law from considering the petitioner's violent background as a mitigating circumstance. *Id.* at 109, 102 S.Ct. at 873–74. The Court concluded "it was clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence." *Id.* at 113, 102 S.Ct. at 876 (emphasis in original). The Court noted that "the Oklahoma death penalty statute permits the defendant to present evidence 'as to any mitigating circumstances'.... *Lockett* requires the sentencer to listen." *Id.* at 115 n. 10, 102 S.Ct. at 877 n. 10 (citation omitted). *See also Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986).

While *Lockett* and *Eddings* hold that the sentencing authority may not impose restrictions, as a matter of law, on the evidence presented by the defendant in mitigation, "[n]either of these cases establishes the weight which must be given to any particular mitigating evidence, or the manner in which it must be considered; they simply condemn any procedure in which such evidence has no weight at all." *Barclay v. Florida*, 463 U.S. 939, 961 n. 2, 103 S.Ct. 3418, 3430–31 n. 2, 77 L.Ed.2d 134 (1983) (Stephens and Powell, J. concurring); *Johnson*, 778 F.2d at 629; *Raulerson*, 732 F.2d at 805–08; *Palmes*, 725 F.2d at 1523. The Court in *Eddings* emphasized that the error in that case was the trial court's self-imposed *legal* restrictions on the consideration of evidence presented in mitigation. 455 U.S. at 113–15, 102 S.Ct. at 876–77. The Court carefully noted, however, that once the state courts admit evidence presented in mitigation, the "sentencer, and the [state court of appeals] on review, may determine the weight to be given relevant mitigating evidence." *Id.* at 114–15, 102 S.Ct. at 876–77. The due process clause only precludes these courts from "giv[ing] it no weight by excluding such evidence from their consideration." *Id.* at 115, 102 S.Ct. at 877. *See also Skipper*, 106 S.Ct. at 1670–71; *Spaziano*, 468 U.S. at 467, 104 S.Ct. at 3166 (federal court does not ask whether it agrees with state courts, only whether decision is "irrational or arbitrary"); *Raulerson*, 732 F.2d at 806–08.[9]

The Court's approval of various death penalty statutes demonstrates that the due process clause does not impose the requirement that Coleman would have us adopt. In *Jurek*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, the Court upheld a Texas statute which required the jury to answer three general questions regarding mitigating and aggravating circumstances;[10] if the jury was unanimous, it could simply answer "yes" or "no" to these inquiries.

9. In *Raulerson*, the court rejected an argument similar to that presented by Coleman on facts virtually identical to those here:

> A careful examination of *Eddings* reveals that the Constitution prescribes only that the sentencer hear and consider all the evidence a defendant chooses to offer in mitigation. There is no requirement that the court agree with the defendant's view that it is mitigating, only that the proffer be given consideration.
>
> . . . . .
>
> In summary, *Lockett* stands for the proposition that the sentencer must *consider* all mitigating evidence. After so doing, it then is generally free to accord that evidence such weight in mitigation that it deems fit.

*Id.* at 807–08 (emphasis in original).

10. The questions were:

> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

428 U.S. at 269, 96 S.Ct. at 2955.

*Id.* at 269 & n. 5, 96 S.Ct. at 2955 & n. 5. The statute imposed no requirement that the jury provide findings discussing mitigating factors which it had rejected. *See Martin v. Maggio,* 711 F.2d 1273, 1286–87 (5th Cir.1983) (*affirming, Martin v. Blackburn,* 521 F.Supp. 685, 715 (E.D.La.1981)), *reh'g denied,* 739 F.2d 184 (5th Cir.), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 447, 83 L.Ed.2d 373 (1984). The Court emphasized that the Texas statute provided for prompt judicial review, and was constitutional because it assured "that sentences of death will not be 'wantonly' or 'freakishly' imposed...." *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958 (citation omitted). Similarly, in *Gregg,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, the Georgia statute required the sentencing authority to consider the list of aggravating circumstances provided in the statute and to consider any mitigating evidence presented by the defendant; if the verdict was death, the judge or jury was required to specify the aggravating circumstances found. *Id.* at 166, 197, 96 S.Ct. at 2922, 2936. The statute imposed no obligation on the sentencing authority to discuss mitigating factors presented but found insufficient to justify leniency. *See id.* at 163–67 & nn. 4–10, 96 S.Ct. at 2920–22 & nn. 4–10 (quoting Georgia statute); *id.* at 197, 96 S.Ct. at 2936. The Court noted that the possibility of arbitrariness was reduced by requiring the state appellate court to examine whether the sentence was "excessive" and whether the evidence supported the jury's or judge's findings. *Id.* at 166–67, 206–07, 96 S.Ct. at 2922, 2940–41. The Court has approved other sentences in which the trial judge has made findings but not discussed factors dealing with a defendant's personal history considered by the judge but rejected. *See Baldwin,* 105 S.Ct. at 2731; *Spaziano,* 468 U.S. at 466–67, 104 S.Ct. at 3165–66 (involving Florida statute, which, like Montana's, required judge to list findings); *Proffitt,* 428 U.S. at 247, 250, 253, 96 S.Ct. at 2964, 2965, 2967 (same, noting state appellate review).

The record in this case does not indicate that the trial court imposed any restrictions on the introduction or consideration of evidence in mitigation. Rather, as noted, the court considered the evidence and materials presented and concluded that the factors in mitigation did not outweigh the seriousness of Coleman's offense. On appeal, the Montana supreme court found that the trial court had followed the Montana death penalty statute, *Spaziano,* 448 U.S. at 467, 104 S.Ct. at 3166, and evaluated the record to determine whether the evidence supported the trial court's Findings. Mont.Code Ann. § 95–2206.13. *See Gregg,* 428 U.S. at 207, 96 S.Ct. at 2941. The Montana supreme court weighed the evidence and found no error:

> [The pre-sentence] report indicated the defendant had no record of criminal activity and had been an accepted member of the community where he lived prior to July 4, 1974, the date of the commission of this crime. The evidence in this case supporting the finding of the aggravating circumstance established that the defendant had been a deliberate, voluntary participant in the kidnapping and subsequent rape and murder of the victim. The evidence further established that the death of the victim occurred after a sexual assault, not in a moment of passion, but over a period of time with the defendant first bludgeoning, then attempting to strangle, then finally drowning the victim in an effort to effectuate a deliberate decision to kill Peggy Harstad. Against the record of this brutal crime, we cannot say that the defendant's lack of prior criminal activity of record is a factor sufficiently substantial to call for leniency.

*Coleman II,* 185 Mont. 299, 605 P.2d at 1019.

Due process requires that the state trial and appellate courts listen. *Eddings,* 455 U.S. at 115 n. 10, 102 S.Ct. at 877 n. 10. The Montana courts have listened and rendered their judgment. "Whether or not 'reasonable people' could differ over the results here, we see nothing irrational or arbitrary about the imposition of the death penalty in this case." *Spaziano,* 468 U.S. at 467, 104 S.Ct. at 3166.

3. *Consideration of Roundup Burglary*

Coleman next argues that the trial court's consideration of Nank's trial testimony implicating Coleman in the Roundup burglary violated due process. His argument is twofold: (a) that uncorroborated testimony about an unconvicted crime may not be used to demonstrate prior criminal activity; (b) that he never had notice of or an opportunity to contest this testimony. *See Skipper,* 106 S.Ct. at 1671 n. 1.

a. *Nank's Testimony*

The Montana death sentence statute permits the court to consider in mitigation whether the "defendant has no significant history of prior criminal activity." Mont. Code Ann. § 95-2206.9. In *Coleman II,* 185 Mont. 299, 605 P.2d at 1019-20, the Montana supreme court held that this statute permitted the trial court to consider the Roundup burglary in sentencing. We have long held that the due process clause does not preclude the sentencing judge from considering evidence of prior criminal conduct not resulting in a conviction. *See, e.g., United States v. Morgan,* 595 F.2d 1134, 1136 (9th Cir.1979); *United States v. Miller,* 588 F.2d 1256, 1266-67 (9th Cir. 1978) (citing authorities from this court), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *Farrow v. United States,* 580 F.2d 1339, 1359-60 (9th Cir. 1978) (en banc); *United States v. Weston,* 448 F.2d 626, 628-34 (9th Cir.1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972); *United States v. English,* 421 F.2d 133 (9th Cir.1970) (per curiam) (*passim*). In *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) (*Williams*), the Court upheld the trial court's consideration, in imposing the death sentence, of some thirty burglaries allegedly committed by the defendant, even though he had not been convicted of these crimes. *Id.* at 244, 69 S.Ct. at 1081. *See also McMillan,* 106 S.Ct. at 2420 (discussing *Williams*); *Williams v. Oklahoma,* 358 U.S. at 583-84, 79 S.Ct. at 425-26 (consideration of prior record in death sentence); *see also United States v. Wondrack,* 578 F.2d 808, 809-10 n. 1 (9th Cir. 1978).

In *Morgan,* 595 F.2d 1134, we noted three due process limitations on a court's use in sentencing of crimes for which a defendant has not been convicted. *First,* a court may not consider evidence obtained in violation of the principles underlying *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Morgan,* 595 F.2d at 1136. *Second,* a court may not consider false information. *Id.* (citing *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)). *Third,* a court may not consider information derived solely from a pre-sentence report " 'unless it is amplified by information such as to be persuasive of the validity of the charge there made.' " *Id.* (quoting *Weston,* 448 F.2d at 634). In *United States v. Ibarra,* 737 F.2d 825 (9th Cir.1984), we expanded upon the second and third limitations expressed in *Morgan* and held that the challenged information is " 'false or unreliable' if it lacks 'some minimal indicium of reliability beyond mere allegation.' " *Id.* at 827 (citation omitted); *see also United States v. Hull,* 792 F.2d 941, 942-43 (9th Cir.1986) (applying this standard to evidence of unconvicted crimes; noting abuse of discretion standard to trial court's determination). Contrary to Coleman's contention, our cases have never established any *per se* rule preventing consideration of uncorroborated testimony in imposing sentence. Rather, the controlling inquiry is whether the evidence is minimally reliable. *Id.* at 942. *Accord United States v. Whitten,* 706 F.2d 1000, 1007 (9th Cir.1983) (evidence for conviction), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). *See also United States v. Florence,* 741 F.2d 1066, 1069 (8th Cir.1984) (judge may consider uncorroborated hearsay; citing *Farrow,* 580 F.2d at 1360); *United States v. Papajohn,* 701 F.2d 760, 763 (8th Cir. 1983) (same); *United States v. Ray,* 683 F.2d 1116, 1120 (7th Cir.) (same; citing authorities), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982); *State v. Koon,* 298 S.E.2d 769, 773 (S.C.1982) (death penalty context) (disapproved on other grounds in *Skipper,* 476 U.S. 1, 106 S.Ct.

1669, 90 L.Ed.2d 1); *Alvord v. State,* 322 So.2d 533, 538 (Fla.1975) (same), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed. 2d 1226 (1976). *See McMillan,* 106 S.Ct. at 2420 (citing *Williams,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed.2d 1337, a death penalty case, and noting that evidence is often considered in discretion of judge without burden allocation or standard of proof).

Nank's testimony regarding the Roundup burglary satisfied this standard. The trial judge observed Nank while he testified and heard his testimony first hand. *See United States v. Cruz,* 523 F.2d 473, 476 (9th Cir.1975), *cert. denied,* 423 U.S. 1060, 96 S.Ct. 797, 46 L.Ed.2d 651 (1976). The trial judge also observed Coleman as he testified at the trial and heard him deny any involvement in the burglary. At the July 10th hearing, Coleman's counsel generally denied any involvement by Coleman in prior criminal activities. But he did not challenge the reference to Coleman's participation in the Roundup burglary in the pre-sentence report or in the trial court's unsigned Findings which were distributed at the beginning of the July 10th hearing. Coleman's counsel declined to call Nank to testify at the sentencing hearing and subject him to further cross-examination.[11] In addition, the Montana supreme court determined that Nank was corroborated on several points. *Coleman I,* 177 Mont. 1, 579 P.2d at 748 (including Negroid pubic hairs found in the Harstad vehicle and Coleman's fingerprints in the car and purse).

*Presnell v. Georgia,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (per curiam), cited by Coleman, does not change our conclusion. There, the jury sentenced the defendant to death. Although the jury did not find that the defendant had committed the necessary aggravating element of forceable rape, the Georgia supreme court sustained the conviction because the evidence would have supported that finding. *Id.* at 15–16, 99 S.Ct. at 236. The Court reversed because the jury did not convict the defendant of forceable rape and the sentence could not be sustained on a theory not accepted by the jury. *Id.* at 16–17, 99 S.Ct. at 236–37. Unlike the Georgia supreme court in *Presnell,* the trial judge here was authorized to enter sentence and determine the existence or non-existence of aggravating or mitigating circumstances. Mont.Code Ann. §§ 95–2206.6 and 95–2206.-10. *See Spaziano,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (*passim*) (upholding statute permitting trial court to enter sentencing in death penalty). The trial judge, like the jury, found that Coleman had committed aggravated kidnapping. Once the court found this aggravating circumstance, the court determined that Coleman was not entitled to mitigation credit for his otherwise clean record, because of his participation in the Roundup burglary and the enormity of his offense. We find nothing irrational or arbitrary about the trial court's weighing of these factors, *see id.* at 467, 104 S.Ct. at 3166, nor may we substitute our judgment for that of the Montana courts. *Id.*

b. *Notice and Opportunity*

The Supreme Court has stated that to comply with due process, notice must "apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" *Memphis Light, Gas & Water v. Craft,* 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978) (footnote omitted). The record reveals Coleman received adequate notice to prepare for the sentencing court's consideration of the Roundup burglary. The sentencing judge notified counsel for Coleman and the State that the sentencing hearing would be held on June 14th in accordance with Montana's death sentence statute. This statute authorizes the court to consider evidence proffered at trial (and probative on the sentence the defendant should receive) without reintroduction at sentencing. Mont.Code Ann. § 95–2206.7. Both Nank and Coleman had testified at trial concerning the Roundup burglary. Further, the pre-sentence report discussed the Roundup burglary and the report was furnished to Coleman's counsel

11. We discuss *infra* text following this subsection Coleman's argument that he had no opportunity to contest Nank's testimony regarding the Roundup burglary.

at the June 14th hearing. Coleman's counsel referred to the contents of this report at the June 14th hearing. Finally, Coleman's counsel received the trial court's unsigned Findings (which referred to the Roundup burglary) at the beginning of the later July 10th hearing. At no time did Coleman's counsel indicate a desire to reexamine Nank, challenge his testimony other than by oral argument, request a continuance to recall Nank, or take any other steps to attack the claim that Coleman participated in the Roundup burglary. *See Gorham v. Wainwright,* 588 F.2d 178, 180 (5th Cir.1979); *see also In re Acequia, Inc.,* 787 F.2d 1352, 1360 (9th Cir.1986) (civil context; discussing notice requirements and counsel's failure to request continuance).

For similar reasons, the record does not support Coleman's claim that he had no opportunity to challenge Nank's testimony. We agree with the Montana supreme court that Coleman "at the first hearing, did not testify in mitigation, declined to examine the officer who prepared the pre-sentence report, and was given an opportunity to submit both further briefs on sentencing and his proposed findings and conclusions." *Coleman III,* 633 P.2d at 632. We note also that at the second hearing Coleman again declined the opportunity to challenge Nank's testimony. *See also Coleman II,* 185 Mont. 299, 605 P.2d at 1018.

4. *Distribution of Trial Court's Findings*

Coleman contends that the trial court's preparation of its unsigned Findings before the July 10th hearing violated due process. This argument, however, ignores the trial court's statement at the June 14th hearing:

> Now the announcement that the defense does not intend to produce any—call any witness to establish any mitigating circumstances, the Court has before it all matters during the course of the trial, heard the testimony relating to aggravating circumstances and also some mitigating circumstances....

The court then indicated it would "render its findings of fact and will go up on the record that is present in the absence of any mitigating circumstances presented by the defendant at this hearing." The court also requested proposed findings from the parties. Given the court's statement that it would prepare its Findings, we find unpersuasive the argument that the court's preparation of those findings for the July 10th hearing violated due process. The court did exactly what it said it was going to do, and did so without any objection from Coleman.

5. *Reliance on Undisclosed Information*

Coleman finally argues that he had no knowledge of the statements made by his former counsel at the July 2, 1975 hearing,[12] and that these statements prejudiced the trial court when it pronounced sentence on July 10, 1978.

The record does not support Coleman's contention that he did not know about his counsel's statements of July 2. Coleman was present at the hearing on July 3, 1975. As the Montana supreme court found, Coleman's counsel referred to the sodium amytal examination at that hearing, and indicated Coleman was willing to plead guilty and reconduct the examination before the court. *Coleman IV,* 663 P.2d at 1158–59, 1160. These statements correspond to what was said at the July 2nd hearing—that in the context of the plea bargain, the sodium amytal examination refreshed Coleman's memory and he was therefore ready to plead guilty. According to Coleman's former counsel, Coleman had previously "blocked out" his alleged participation in the Harstad murder until he had taken the sodium amytal examination and was willing to repeat the examination before the court. In addition, Coleman cannot now claim undisclosed knowledge of his counsel's attempt to withdraw, because his counsel repeated this request at the July 3rd hearing:

> I believe there are certain professional and certain ethical positions both as an

12. The contents of that hearing are discussed *supra* in the statement of facts.

individual and as an attorney, and I have indicated to Mr. Nank—or to Mr. Coleman, that if I have to continue in this case if we have to try this case, then there is no way in the world I can state to the jury that he is innocent of deliberate homicide and that he's innocent of sexual intercourse without consent.... Now—however, I want the record to be clear that I feel that because of my moral and professional, ethical decisions, that I should be relieved....

The only thing I can do ... is attack fully the question of whether they can establish aggravated kidnapping.

Further, Coleman has not alleged any facts demonstrating the trial court relied on his counsel's statements in sentencing Coleman. A sentence will be vacated on appeal only if the information presented to the court is (a) false or unreliable, and (b) demonstrably made the basis for the sentence. *United States v. Messer,* 785 F.2d 832, 834 (9th Cir.1986) (citing authorities). In the context of a request for a writ of habeas corpus, "a motion must be denied unless it affirmatively appears in the record that the court *based* its sentence on improper information." *Farrow,* 580 F.2d at 1359 (emphasis in original); *United States v. Perri,* 513 F.2d 572, 574 (9th Cir.1975). *See Gardner,* 430 U.S. 349, 353, 97 S.Ct. 1197, 1202, 51 L.Ed.2d 393 (involving reliance by sentencing judge on undisclosed information). The Montana supreme court carefully reviewed the record and found "no indication that the sentencing judge considered defense counsel's statement or the sodium amytal examination results in sentencing Coleman." *Coleman IV,* 663 P.2d at 1160. *See Goode,* 464 U.S. at 85, 104 S.Ct. at 382 (even if sentencing record in death penalty hearing is ambiguous, federal court should defer to state appellate court factual findings in death sentence case). Our independent review of the sentencing hearing transcript and the trial court's Findings fully supports this conclusion.

Coleman in effect urges adoption of a *per se* rule requiring reversal whenever a judge hears inherently prejudicial information and subsequently (here three years later) enters a death sentence. He constructs this argument around our holding in *Lowery v. Cardwell,* 575 F.2d 727 (9th Cir.1978). In *Lowery,* the defendant was charged with first degree murder and pleaded not guilty. In a trial in which the judge served as the trier of fact, the defendant testified during examination by her counsel and denied shooting the victim. Her counsel immediately requested a recess and a meeting with the judge outside of the defendant's presence. The defendant's counsel moved to withdraw from the case; he did not explain the reason, and the trial court denied the motion. *Id.* at 729. In closing argument, the defendant's counsel did not refer to his client's claims of innocence. The trial judge found the defendant guilty. We reversed, stating: "[I]f, under these circumstances, counsel informs the fact finder of his belief [that his client's defense is based on false testimony] he has, by that action, disabled the fact finder from judging the merits of the defendant's defense." *Id.* at 730. We emphasized in *Lowery* that the "judge, and not a jury, was the fact finder." *Id.* In the present case, a jury, not a judge, was the finder of fact. The jury never heard Coleman's counsel's comments, and found Coleman guilty of murder and aggravated kidnapping nonetheless. Although the trial judge heard these comments in a plea bargaining context and sentenced Coleman three years later, the sentencing occurred only *after* the jury had found Coleman guilty beyond a reasonable doubt.

Coleman maintains, however, that the trial judge was the fact finder at sentencing and that *Lowery* should be extended to this case. Acceptance of this argument would contradict the requirement, repeatedly expressed in our case law, that to warrant reversal the judge must actually rely on improper information in sentencing. *See, e.g., Messer,* 785 F.2d at 834. This rule is sound and should not be disturbed. A trial judge will often be exposed to, and even consider in sentencing (*see United States v. Mills,* 597 F.2d 693, 699 (9th Cir. 1979)) evidence and accusations which would be wholly inadmissible in a trial on a

defendant's guilt or innocence. *See, e.g., Williams,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (death sentence context); *United States v. Wright,* 593 F.2d 105, 109 (9th Cir.1979) (illegally seized evidence). The prosecution may attempt to introduce, at sentencing, information which is prejudicial, unreliable or simply false. *See, e.g., Townsend,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690; *Weston,* 448 F.2d 626. To hold that a judge may not sentence the defendant because of exposure to such prejudicial information would be unwarranted, especially where, as here, the judge presided over an extensive trial and heard all of the testimony and evidence presented to the jury which found Coleman guilty. *See, e.g., United States v. Montecalvo,* 545 F.2d 684, 685 (9th Cir.1976) (involving motion for recusal), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2184, 53 L.Ed.2d 229 (1977); *Commonwealth v. Wilson,* 381 Mass. 90, 407 N.E.2d 1229, 1248–49 (1980) (due process challenge in death penalty case); *accord United States v. Bunch,* 730 F.2d 517, 519 (7th Cir.1984) (recusal motion). To further conclude that a *violation* of due process has occurred at a sentencing hearing, even though the record reveals no reliance on the prejudicial information, would represent an inappropriate extension of *Lowery* to a different context. The concerns underlying *Lowery*—a defendant's counsel informing the trier of fact at trial of his client's deception—are not present here; nor would an extension of *Lowery* comport with our case law dealing with sentencing or the rationale underlying those cases.[13]

AFFIRMED.

## APPENDIX

95–2206.6. Sentence of death—hearing on imposition of death penalty. When a defendant is found guilty of or pleads guilty to an offense for which the sentence of death may be imposed, the judge who presided at the trial or before whom the guilty plea was entered shall conduct a separate sentencing hearing to determine the existence or nonexistence of the circumstances set forth in 95–2206.8 and 95–2206.9 for the purpose of determining the sentence to be imposed. The hearing shall be conducted before the court alone.

95–2206.7. Sentencing hearing—evidence that may be received. In the sentencing hearing, evidence may be presented as to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. Evidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

95–2206.8. Aggravating circumstances. Aggravating circumstances are any of the following:

(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

(3) The offense was deliberate homicide and was committed by means of torture.

(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

13. Coleman's other contentions regarding the trial court's *sua sponte* amendment of the information to include the kidnapping count, and the trial court's special interrogatory concerning whether the kidnapping had caused the victim's death, are without merit. *Coleman I,* 177 Mont. 1, 579 P.2d at 745–46, 751.

(6) The offense was deliberate homicide as defined in subsection (1)(a) of 94–5–102 and the victim was a peace officer killed while performing his duty.

(7) The offense was aggravated kidnapping which resulted in the death of the victim.

95–2206.9. Mitigating circumstances. Mitigating circumstances are any of the following:

(1) The defendant has no significant history of prior criminal activity.

(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) The defendant acted under extreme duress or under the substantial domination of another person.

(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(5) The victim was a participant in the defendant's conduct or consented to the act.

(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

(8) Any other fact exists in mitigation of the penalty.

95–2206.10. Consideration of aggravating and mitigating factors in determining sentence. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 95–2206.8 and 95–2206.9 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 95–2206.8 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.

95–2206.11. Specific written findings of fact. In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances set forth in 95–2206.8 and 95–2206.9. The written findings of fact shall be substantiated by the records of the trial and the sentencing proceeding.

95–2206.12. Automatic review of sentence. The judgment of conviction and sentence of death are subject to automatic review by the supreme court of Montana as provided for in 95–2206.13 through 95–2206.15.

95–2206.13. Review of death sentence—priority of review—time for review. The judgment of conviction and sentence of death are subject to automatic review by the supreme court of Montana within 60 days after certification by the sentencing court of the entire record unless the time is extended by the supreme court for good cause shown. The review by the supreme court has priority over all other cases and shall be heard in accordance with rules promulgated by the supreme court. The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration.

95–2206.14. Transcript and records of trial transmitted. The clerk of the trial court, within 10 days after receiving the transcript, shall transmit the entire record and transcript to the supreme court.

95–2206.15. Supreme court to make determination as to the sentence. The Supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:

(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating

circumstances enumerated in 95–2206.8 and 95–2206.9; and

(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration.

REINHARDT, Circuit Judge, dissenting:

TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 466

II. THE EQUAL PROTECTION CLAIM .......... 467
- A. Introduction .......... 467
- B. Law .......... 468
  - 1. General Equal Protection Principles .......... 468
  - 2. Equal Protection Challenges of Plea Bargaining .......... 470
- C. Facts .......... 472
  - 1. The Evidence Available .......... 472
  - 2. The Plea Bargaining Hearings .......... 474
- D. Discussion .......... 477
- E. Evidentiary Hearing on the Equal Protection Claim .......... 482
- F. Conclusion .......... 484

III. THE CAPITAL SENTENCING PROCEEDINGS .......... 484
- A. Introduction .......... 485
- B. Facts .......... 486
  - 1. Coleman's First Sentencing .......... 486
  - 2. The 1977 Death Penalty Statute .......... 486
  - 3. The Resentencing of Coleman .......... 488
- C. Constitutional Deficiencies of Coleman's Sentencing .......... 491
  - 1. The Right to Present Argument at the Time of Sentencing .......... 491
  - 2. Mitigating Circumstances .......... 496
    - a. Character and Background as Mitigating Factors 496
      - (i) General Rule .......... 496
      - (ii) Specific Mitigating Circumstances in Coleman's Case .......... 497
      - (iii) The Trial Court's Failure to Consider Coleman's Character and Background .......... 498
      - (iv) The Errors in the Majority's Analysis .......... 499
      - (v) Even were it Only "Unclear Whether the Trial Court Considered the Mitigating Factors, Reversal Would be Required .......... 501
      - (vi) The Constitution Requires the Court to Specify the Mitigating Factors Considered .......... 502
    - b. Consideration of Unadjudicated Offense .......... 504
      - (i) Introduction .......... 504
      - (ii) The Judge Based Coleman's Sentence in Part on an Unadjudicated Offense .......... 504
      - (iii) Unconstitutionality of Relying on Unadjudicated Offenses .......... 505
      - (iv) Notice .......... 508
- D. Conclusion .......... 509

Page

IV. THE DEATH PENALTY STATUTE ........................ 509
A. Introduction ........................................... 509
B. Burden of Proof on Mitigating Circumstances ........... 509
C. Retroactive Application of 1977 Death Penalty Statute ... 514
D. Summation ............................................. 518

V. THE CRUEL AND UNUSUAL PUNISHMENT CLAIM ...... 519
A. Arbitrary and Extraneous Factors ..................... 519
B. Unreliability of the Evidence ......................... 522

VI. CONCLUSION ............................................ 522

## I. INTRODUCTION

The State of Montana is planning to hang Dewey Coleman, a black man who in all likelihood would not be facing execution if he were white. For reasons that are entirely arbitrary and meritless, and have every appearance of being pretextual, the state refused even to consider a plea bargain from Coleman identical in every respect to the one it accepted from his white codefendant, Nank. This, notwithstanding the fact that Nank was a hardened criminal while Coleman had not been arrested previously and had a record of community service. No court has been willing to afford Coleman a factual hearing on his claim of racial discrimination, despite the clear constitutional mandate to do so.

Coleman's sentencing hearing was little more than a sham and would hardly have been adequate were the issue whether a Little Leaguer should be suspended for one game. His attorney decided to rely solely on oral argument and so advised the sentencing judge well in advance of the sentencing. Yet the judge arrived at the sentencing hearing with his Findings, Conclusions, Judgment and Order of Execution in final form and distributed them to the parties before counsel could speak. Thereafter, in the words of the Montana Supreme Court, Coleman's attorney was permitted to "read into the record a prepared statement...." Furthermore, it appears from the court's own findings that at the time of sentencing the judge was unaware of either the existence or the legal significance of most of the critical mitigating circumstances the Constitution required him to consider. In addition, the judge based the death sentence in part on his finding that earlier on the day of the capital offense Coleman, along with Nank, had committed a lesser unrelated crime—a crime for which he had not been charged, tried, or convicted.

Equally important, the Montana death penalty statute is unconstitutional on its face and as applied to Coleman for a number of reasons. Under the statute the burden of proof was placed on Coleman to show that he had not committed an unadjudicated offense. Perhaps even more important, the burden was placed on him to show that the mitigating circumstances outweighed the single aggravating circumstance; for, under Montana law, the burden of persuasion on the issue of life or death falls on the accused, not the prosecution. Next, the statute under which Montana seeks to execute Coleman did not even exist when he was first tried, convicted, and sentenced. Every other court that has considered the question has held that the state may not execute a defendant in that circumstance.

Finally, even were one to accept blindly Montana's wholly unpersuasive arguments that race played no part in its decision to execute Coleman, one would still be forced to conclude that the state based its decision to take his life, and spare his codefendant's, on factors that were unrelated to the degree of his criminal culpability or to his individual character or background and, thus, are constitutionally impermissible, and that the quality of the evidence is not such as to afford that degree of reliability that is constitutionally necessary before the state may take a person's life.

Montana insists that all of its actions were lawful. Although, regrettably, the majority of this panel has decided to acquiesce in those actions, I find it impossible to do so. Because I believe that we must not lend the approval of the federal courts to the state's discriminatory and unconstitutional conduct, and because I am persuaded that at the very least Coleman is entitled to an evidentiary hearing, I dissent.

This case obviously presents numerous serious constitutional questions. The Montana Supreme Court has considered Coleman's pleas on four occasions. All four encounters have resulted in extended opinions and strong dissents concerning a number of important legal issues. *State v. Coleman (Coleman I),* 177 Mont. 1, 579 P.2d 732 (1978); *State v. Coleman (Coleman II),* 185 Mont. 299, 605 P.2d 1000 (1979), *cert. denied,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980); *Coleman v. State (Coleman III),* 633 P.2d 624 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982); *Coleman v. Risley (Coleman IV),* 203 Mont. 237, 663 P.2d 1154 (1983). I will consider here only the legal issues that in my opinion present the most egregious constitutional violations. I have divided those issues into four general categories: those stemming from Coleman's equal protection claim regarding the prosecution's actions; those relating to his constitutional challenge to the sentencing procedure followed in his case; those pertaining to due process problems presented by the death penalty statute on its face and as applied; and those stemming from Coleman's eighth amendment claim. Reversal on the first category of issues would require, at the very least, a remand to the United States District Court so that Coleman could be afforded the hearing that he has thus far been denied. Reversal on the second category would require vacation of the death penalty, although the state would be allowed to consider anew all forms of punishment permitted under the state statute. Reversal on the third or fourth category of issues would bar imposition of the death penalty altogether.

The review we must afford in a capital case is much stricter than in ordinary criminal proceedings. As the Supreme Court has explained, "although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of *any colorable claim of error.*" *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983) (emphasis added). The Court reinforced the point in *Burger v. Kemp:* "Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." — U.S. —, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987).

## II. THE EQUAL PROTECTION CLAIM

### A. *Introduction*

Coleman claims that the prosecution conducted its plea bargaining on an arbitrary and discriminatory basis. He insists that the state should have allowed him to plead guilty and thus avoid the death sentence just as it did his white codefendant, Nank. According to Coleman, racial considerations motivated the arbitrary and unequal treatment.

Coleman presents us today not with a general argument about the discriminatory effect of capital punishment but with a concrete claim of unequal treatment on the basis of race. He does not argue that Montana's death penalty scheme tends to have a disproportionate impact on blacks in general. *Compare McCleskey v. Kemp,* — U.S. —, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). He claims, instead, that in his specific case Montana would not have imposed the death penalty on him had he been white. He points to factual circumstances in the record that clearly raise a substantial question as to the state's discriminatory intent, the most significant being the fact that Montana did not treat him in a similar fashion to his similarly situated white codefendant. Unlike the defendant in *McCleskey,* Coleman offers "evidence specific to his own case that would support an inference that racial considerations

played a part in his sentence." *Id.* at 1766–67.[1]

Coleman made more than enough of a showing of unequal and arbitrary treatment to be entitled to a hearing before the United States District Court. That court, however, rejected his claim summarily, as does the majority here. I would, at the very least, remand Coleman's petition on this issue and direct the district court to give his claim the consideration it so clearly deserves.

B. *Law*

1. *General Equal Protection Principles*

There are several reasons why we should give special consideration to Coleman's equal protection claim. First, Coleman is alleging racial discrimination by the state and, as the Court has declared, "[t]he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Second, Coleman is charging discrimination within the judicial system, which, the Court has declared, "is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure all others.'" *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 1718, 90 L.Ed. 2d 69 (1986) (quoting *Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 308, 25 L.Ed. 664 (1880)). Recently, the Court has reiterated this point: "Because of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *McCleskey v. Kemp,* 107 S.Ct. at 1775 (citation and footnote omitted). Finally, because the case involves capital punishment we must examine carefully the equal protection claim. "The risk of racial prejudice infecting a capital sentencing proceeding," the Supreme Court has said, "is especially serious in light of the complete finality of the death sentence." *Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986) (plurality).

Coleman's equal protection claim is not based upon a facial challenge to the validity of a specific Montana statute but, rather, to the state's administration and application of its laws. The equal protection clause of the fourteenth amendment, of course, does not exclude this type of challenge. It prohibits not only unequal laws but also unequal application and administration of laws. "Though the law itself be fair on its face and impartial in appearance," the Court declared many years ago, "yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886).

To succeed in his equal protection challenge of his death penalty Coleman must prove discriminatory purpose. The Court has imposed that requirement on all claims it has considered under the equal protection clause. *See, e.g., Wayte v. United States,* 470 U.S. 598, 608–09, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (selective prosecution claim); *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (claim of sex discrimination against state law giving veterans an absolute lifetime preference in government employment); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) (racial discrimination claim against zoning plan); *Washington v. Davis,* 426 U.S. 229,

1. The issue in *McCleskey* was a narrow one. The majority described it succinctly: "This case presents the question whether a complex statistical study that indicates a risk that racial considerations enter into capital sentencing determinations proves that petitioner McCleskey's capital sentence is unconstitutional under the Eighth or Fourteenth Amendment." *Id.* at 1761. The Court held, despite vigorous dissents, *id.* at 1781–1806, that it does not.

239–40, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (racial discrimination claim against employment test). Recently, the Court has specifically applied "the basic principle that a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" in a capital punishment case. *McCleskey v. Kemp,* 107 S.Ct. at 1766 (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967)) (footnote omitted). Like the defendant in *McCleskey v. Kemp,* "to prevail under the Equal Protection Clause," Coleman "must prove that the decision-makers in *his* case acted with discriminatory purpose." *Id.* (emphasis in original).

A finding of discriminatory purpose requires an examination of all the relevant surrounding circumstances and an inference of discrimination from them. "Necessarily," the Court said in *Washington v. Davis,* "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts...." 426 U.S. at 242, 96 S.Ct. at 2049. The Court reiterated this point in *Arlington Heights v. Metropolitan Housing Development Corp.:* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564. The person alleging discriminatory intent must point to behavior—sometimes verbal but usually non-verbal—that suggests the existence of a discriminatory motivation.

Coleman does not have to show that racial discrimination was the dominant motivation underlying the prosecution's actions, let alone the only motivation. Evidence that racial discrimination played any part whatsoever in the state's decision is sufficient. In *Arlington Heights v. Metropolitan Housing Development Corp.,* the Court explained:

> *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.... [R]acial discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been *a motivating factor* in the decision, this judicial deference is no longer justified.

429 U.S. at 265–66, 97 S.Ct. at 563 (footnotes omitted) (emphasis supplied).

While claimants often point to a pattern of official discrimination to support their equal protection claims, *see, e.g., McCleskey v. Kemp,* — U.S. —, 107 S.Ct. 1756, 95 L.Ed.2d 262; *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547; *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870; *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, they of course may rely on the facts of their own case to show discriminatory intent:

> "a consistent pattern of official racial discrimination" is not "a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions." [*Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. at 266 n. 14, 97 S.Ct. at 564 n. 14]. For evidentiary requirements to dictate that "several must suffer discrimination" before one could object, *McCray v. New York,* 461 U.S. [961, 965, 103 S.Ct. 2438, 2440, 77 L.Ed.2d 1322] (Marshall, J., dissenting from denial of certiorari), would be inconsistent with the promise of equal protection to all.

*Batson v. Kentucky,* 106 S.Ct. at 1722. In fact, as *McCleskey* clearly tells us, in determining whether racial considerations have affected a prosecutor's decision to seek the death penalty, the court must look primarily to the facts and circumstances surrounding the specific prosecutorial decision involved.

In *Arlington Heights v. Metropolitan Housing Development Corp.,* the Court identified some of the circumstantial evidence that is relevant when discriminatory intent is at issue:

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

429 U.S. at 267, 97 S.Ct. at 564 (citations omitted). *Arlington*'s enumeration of relevant evidentiary sources is, of course, not exhaustive. *Id.* at 268, 97 S.Ct. at 565. But the listing suggests that we must undertake a broad and deep examination of the specific circumstances of Coleman's case in order to decide whether the imposition of the death penalty violated the equal protection clause. The key inquiry here must be as to the prosecutor's motives in repeatedly and vigorously refusing to accept, or even consider accepting, Coleman's guilty plea—and our examination must be—I would remind my colleagues—a "sensitive" one. *Id.* at 266, 97 S.Ct. at 564.

2. *Equal Protection Challenges of Plea Bargaining*

There is wide prosecutorial discretion regarding plea bargaining, and the Court has explicitly rejected the contention "that a criminal defendant has an absolute right to have his guilty plea accepted by the court." *Lynch v. Overholser,* 369 U.S. 705, 719, 82 S.Ct. 1063, 1072, 8 L.Ed.2d 211 (1962). *See also Santobello v. New York,* 404 U.S. 257, 263, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); *North Carolina v. Alford,* 400 U.S. 25, 34–35, 91 S.Ct. 160, 166, 27 L.Ed.2d 162 (1970). Though recognizing the risks associated with the prosecutors' discretion in conducting plea bargaining in death penalty cases, the Court in *McCleskey* once again reminded us of the importance of such discretion:

As we have noted, a prosecutor can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case.... Of course, "the power to be lenient [also] is the power to discriminate," K. Davis, *Discretionary Justice* 170 (1973), but a capital-punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice." *Gregg v. Georgia,* 428 U.S. [153,] 200 n. 50, 96 S.Ct. 2909, 2937–38 n. 50, 49 L.Ed.2d 859 [(1976)].

*McCleskey v. Kemp,* 107 S.Ct. at 1777.

It is equally true that the judiciary's deference to prosecutorial discretion in plea bargaining is by no means absolute, and that courts must ensure that racial considerations play no part in the plea-bargaining process. In *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), Justice Stewart—writing for the Court—stated:

There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise.

*Id.* at 365, 98 S.Ct. at 669 (footnote omitted). *Bordenkircher,* quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), reiterated the fundamental limitations that the equal protection clause imposes on the prosecutor's conduct of plea bargaining. "Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as *race,* religion, or other arbitrary classification.'" 434 U.S. at 364, 98 S.Ct. at 668 (quoting *Oyler v. Boles,* 368 U.S. at 456, 82 S.Ct. at 506) (emphasis supplied). *Wayte v. United States,* restates the principle that the exercise of prosecutorial discretion on the basis of race is unconstitutional:

[A]lthough prosecutorial discretion is broad, it is not "'unfettered.' Selectivity

in the enforcement of criminal law is ... subject to constitutional constraints." *United States v. Batchelder,* 442 U.S. 114, 125 [99 S.Ct. 2198, 2205, 60 L.Ed.2d 755] (1979) (footnote omitted). In particular, the decision not to prosecute may not be " 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification ...' " [*Bordenkircher v. Hayes,* 343 U.S. at 364, 98 S.Ct. at 668 (quoting *Oyler v. Boles,* 368 U.S. at 456, 82 S.Ct. at 506).]

470 U.S. at 608, 105 S.Ct. at 1531.

Recently, in *McCleskey,* in the context of a challenge to a prosecutor's decision to seek the death penalty, the Court, citing the applicable portion of *Wayte,* reaffirmed the principle that racial considerations must play no part in a prosecutor's exercise of his discretion, noting that it "has repeatedly stated that prosecutorial discretion cannot be exercised on the basis of race." 107 S.Ct. at 1775 n. 30 (citing *Wayte v. United States, United States v. Batchelder,* and *Oyler v. Boles*). *See also United States v. Lee,* 786 F.2d 951, 957 (9th Cir.1986). The decision to reject a guilty plea and compel a defendant to submit to trial on a capital charge is thus indisputably subject to the same constitutional rule as all other prosecutorial decisions: the decision may not be influenced in any measure by the race of the defendant.

The most recent Supreme Court opinion reviewing a challenge to prosecutorial discretion based on the prosecutor's specific conduct in the particular case is *Batson.* In *Batson,* the Court held that the state's exercise of its traditional privilege to strike individual jurors through peremptory challenges is subject to the constraints of the equal protection clause. 106 S.Ct. at 1718–19. Defendants are entitled, the Court ruled, to a reversal of their convictions if they can show that the prosecution exercised its peremptory challenges in a discriminatory manner. *Id.* at 1725. By the same token, a showing that the prosecution's decision to reject Coleman's plea and to seek a capital sentence instead was racially motivated would necessitate reversal of his death penalty.

In a recent noncapital punishment case, *United States v. Moody,* 778 F.2d 1380 (9th Cir.1985), we reiterated the previously established limitations on a prosecutor's discretion in plea bargaining. The defendants in *Moody* claimed that the prosecution engaged in impermissible discrimination by affording a plea bargain to their coconspirator and not to them. In rejecting defendants' claim, we stated:

> We have held that a defendant who relies on contentions of impermissibly selective prosecution must demonstrate "that he was selected for prosecution on the basis of an impermissible ground such as *race,* religion or exercise of the constitutional rights."

*Id.* at 1386 (emphasis supplied) (quoting *United States v. McWilliams,* 730 F.2d 1218, 1221 (9th Cir.1984) (per curiam)). While we concluded that the defendants in that case did not show "that the government was motivated by considerations of race, religion, or any other impermissible ground," *id.,* we nonetheless, made it clear that if the prosecution bases its plea bargaining decisions on the race of the defendants, the courts will intervene. The Montana Supreme Court's decision in *Coleman I,* 177 Mont. 1, 21, 579 P.2d 732, 744–45 (1978) is contrary to the rule we announced and cannot stand.[2]

When reviewing a state's decision to reject a defendant's plea and seek the death

2. In rejecting Coleman's appeal, the Montana Supreme Court erroneously held that the prosecution and trial court have absolute discretion in deciding whether to accept a guilty plea. *Coleman I,* 177 Mont. 1, 21, 579 P.2d 732, 744–45 (1978). The court concluded that the United States Supreme Court's opinions on plea bargaining do not impose any limitations on the state prior to the time it has decided to accept a plea—that the decisions serve only to establish rules governing when the state must comply with a bargain it has previously made and when the state cannot enforce such a bargain. "These cases," the Montana Supreme Court insisted, "do not require the trial court or the prosecution to accept a guilty plea. The acceptance of a guilty plea to a charged offense is within the discretion of the trial court." *Id.* The Montana Supreme Court, without any further explanation or discussion, dismissed Coleman's claim that the plea bargaining in his case was racially motivated.

penalty, we must keep in mind generally the importance of preserving the prosecution's traditional discretion. Yet at the same time we must make certain that racial considerations played no part in the exercise of that discretion in the particular case. If Coleman can show that racial considerations were a factor in the prosecutors' decision not to accept his proffered plea, he is entitled to prevail on his equal protection claim.

C. *Facts*

1. *The Evidence Available*

In this case, there were two defendants: Dewey Coleman and Robert Dennis Nank. At the time of the arrest, Coleman was 27 years old. A black man, originally from Missouri, Coleman had never been arrested before and had no history of violent behavior. He had served in the United States Navy and, upon his discharge, played a substantial role in community service programs in his neighborhood. Coleman testified that he was homosexual. He had been treated for depression at a Veteran's Administration hospital shortly before the crime occurred. He had met codefendant Nank only one month prior to Peggy Harstad's murder.

Nank, a white man, had a history of violence including attacks on both his mother and his sister. He had a long list of prior arrests and several felony convictions. In addition, Nank admitted to a pattern of sexual deviance involving women.

The only direct evidence available in this case was the testimony of the two accused. They only agree on how the story began. The motorcycle Coleman and Nank were riding ran out of gas on the highway when they were en route to Forsyth, Montana. They then tried, without immediate success, to hitchhike to a gas station. At this point, the two accounts diverge.

Nank's testimony presented the remaining facts as follows: Peggy Harstad, the victim, a white Montana resident, stopped and gave Nank and Coleman a ride. While driving down the road, Nank reached over, turned the key off, and steered the car to a stop. Nank forced Harstad into the back seat and, while Coleman drove, disrobed her and tried without success to rape her. After Nank's failed attempt, Coleman raped Harstad while Nank physically restrained her and held on to her foot. (Nank testified that he had a foot fetish.) The two took her to the Yellowstone River where Nank and Coleman drowned her, Nank holding her head down in the water while Coleman held her legs. Earlier Coleman had beaten her with his motorcycle helmet and tried, with Nank's help, to strangle her with a yellow rope. After the murder, Coleman and Nank drove the victim's car toward Forsyth until they ran out of gas. They walked the rest of the way to Forsyth and bought gasoline. Nank then hitched a ride to where the motorcycle was and rode it back to Forsyth to fetch Coleman.

Coleman, on the other hand, gave the following account: After their initial failure to get a ride, Nank suggested that he might be more successful in getting one without Coleman, pointing out that few black people lived in Montana. Coleman withdrew from sight and Nank hitched a ride. Coleman waited by the highway for Nank to return. Several hours later Nank appeared, driving a car, wet, upset, and acting strangely. Nank told Coleman to abandon the motorcycle and get in the car. When he did, Nank told Coleman that he had killed a woman. Nank drove the car until it ran out of gas. They then walked to Forsyth. On the way, Nank gave Coleman a purse, which Coleman opened, looked through, and then threw away. At Forsyth, they bought gasoline and, after Nank retrieved their motorcycle, continued on their way. Nank warned Coleman that if he ever told anyone about the murder, Nank would kill him too.

The prosecution presented no direct evidence, other than Nank's testimony, concerning Coleman's actions. But the prosecution contended that the following five points corroborated Nank's story: (1) a crack in Coleman's motorcycle helmet, (2) strands of Harstad's hair found in a rope in the apartment of the two men, (3) Cole-

man's fingerprints on the car and on a paper in Harstad's purse, (4) negroid head and pubic hairs found in Harstad's abandoned car, and (5) the presence of Coleman and Nank in the vicinity on the day of the crime. *Coleman I,* 177 Mont. 1, 28, 579 P.2d 732, 748 (1978).

Justice Morrison, in his dissent in *Coleman III,* 633 P.2d 624, 633 (1981) (Morrison, J., dissenting), *cert. denied* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982), pointed out that not one of the five facts reliably corroborated the disputed parts of Nank's story. The victim's hair in the rope, Coleman's fingerprints on the car and on the paper within the victim's purse, negroid head hair in the car, and the fact that the two were seen together on the road about the time of the victim's disappearance, Justice Morrison reasoned, were fully consistent with Coleman's testimony. 633 P.2d at 635. The crack in the motorcycle helmet, according to Justice Morrison, was meaningless. He noted that there was no testimony that a motorcycle helmet would crack if used to strike someone and no testimony that the helmet could have cracked without fracturing the victim's skull; he also noted that there was unrebutted testimony that there was no evidence of any injury to the head. 633 P.2d at 635–36. The only evidence tending to corroborate Nank's as opposed to Coleman's version is the fact that two negroid pubic hairs were found in the victim's car. Justice Morrison insisted, however, that the state's expert testimony on the pubic hairs "was to [sic] speculative to be received in evidence, and once received, could not be relied upon as sufficiently corroborative to sustain a conviction." 633 P.2d at 637.

Justice Morrison noted that Nank's testimony should be viewed with suspicion in light of the "strong motive for lying." *Id.* at 634. Before making his confession, Nank demanded that law enforcement officials provide him some assurance that he would not be executed. The level of corroboration required under these circumstances, according to Justice Morrison, was certainly not met by the thin circumstantial evidence introduced by the prosecution.

After reviewing the evidence, Justice Morrison concluded:

> A defendant is here sentenced to die where there is practically no credible evidence connecting the defendant to the commission of the crime. There are strong reasons to believe that the defendant did not commit the crime for which the death penalty was imposed. And yet this Court is authorizing the imposition of that irrevocable sanction. I implore the federal courts to examine this record, and upon finding it to be as wanting as I do, to intervene and prevent this gross injustice.

*Coleman III,* 633 P.2d at 641 (Morrison, J., dissenting). Justice Shea agreed with Justice Morrison that Coleman's conviction should have been reversed. "Although dismissal is the proper ruling," Justice Shea added, "even in the event of a failure to dismiss, the evidence of corroboration of accomplice Nank's testimony is so thin that a death penalty should not be imposed." *Id.* at 641 (Shea, J., dissenting).

More important, both before and after the prosecution presented its witnesses, the trial judge expressed skepticism about the strength of the prosecution's case. During pretrial proceedings, the judge urged the prosecution to take Coleman's guilty plea, in part because proving his guilt would be very difficult on the basis of the evidence available. At the close of the government's case, Coleman moved for dismissal or judgment of acquittal. The judge told the prosecution that he would treat Coleman's motion "as a real serious motion". The judge said that the motion had some merit and added: "Well, all you have shown is the opportunity for this black boy to do it. You have shown plenty of opportunity."[3]

It seems beyond dispute that the prosecution did not have a strong case against Coleman, either at the time it refused to

3. *See infra* text accompanying note 13 for discussion of the significance of the racial aspect of this comment.

consider accepting his plea or afterwards. Its case was based on the testimony of an accomplice and was at best sparsely corroborated by the limited circumstantial evidence available. Nank's testimony was shot through with inconsistencies and retractions from his earlier accounts. At trial he discarded his own previous stories as lies. *Coleman III,* 633 P.2d at 633–37 (1981) (Morrison, J., dissenting). In addition, Nank's prior felony convictions served further to undermine his credibility.

2. *The Plea Bargaining Hearings*

On May 7, 1975, the state accepted Nank's offer to plead guilty to the noncapital charges of deliberate homicide and solicitation to commit sexual intercourse without consent. Nank agreed, in addition, to testify against Coleman at trial. The state, in return, agreed to dismiss the charge of aggravated kidnapping against Nank and, thus, spare him the possibility of capital punishment.

Coleman, through his counsel, offered a plea bargain similar to that of Nank's less than two weeks later. On May 23, defense counsel presented the offer to the court in writing. Even in its initial form, Coleman's offer differed from Nank's only in that Coleman wanted to assert his innocence. The state refused to accept his plea.

When the original trial judge, Judge Coate, urged the state to accept Coleman's plea, the prosecution forced him to recuse himself. It filed a peremptory challenge along with a signed affidavit for disqualification. Rosebud County Attorney Forsythe thus stated the prosecution's objection:

> I feel that I am being forced by the Judge and by defense attorneys, they are attempting to force me to plea bargain when I have the constitutional authority and the sole constitutional authority to plea bargain on behalf of the State. I feel that in many respects decisions on motions are fixed in advance and I don't feel that I can have a fair trial, Judge.

Following Judge Coate's automatic disqualification, the case was assigned to Judge Martin. Upon taking the case, Judge Martin noted: "I understand, of course, that the State declined to even consider a conditional negotiated plea, is that right?" The prosecution immediately replied: "That is right."

During the pretrial hearings that took place on July 2 and 3, 1975, with Judge Martin presiding, the issue of plea bargaining arose again and was discussed extensively. First, the state objected to any discussion of plea bargaining, urging that the court limit the hearing to arguments on Coleman's motion to copy and inspect medical reports of Nank. "If we're going to hold a plea bargaining conference," Special Prosecutor Overfelt declared, "let's do that later, but let's not get these things all mixed up in one big mish-mash." The court nevertheless allowed defense counsel to present his plea offer in open court.

Coleman's counsel, Monaghan, stated that his client was now willing to enter a plea of guilty to the charges of deliberate homicide and sexual assault without asserting his innocence. The judge then asked: "So your client now makes the same proposition to the State as Nank has?" Counsel answered in the affirmative and added that Coleman would waive his right against self-incrimination and testify against his codefendant, just as Nank had done. The judge made the following comment: "I think the State's in a tough position if they don't accept [the plea]".[4]

Again the state reacted by objecting generally to the court's participation in the plea bargaining. The presiding judge retorted: "I think counsel has the perfect right to come to the Court if they want to and talk about [plea bargaining]." Rosebud County Attorney Forsythe, on behalf of the state, then stated his objections to entering into any plea agreement with

4. In fact, it appears that Coleman may have offered to plead to an even more serious charge than did Nank. In addition to pleading guilty to the charge of deliberate homicide, Coleman apparently offered to plead to sexual assault, while Nank pled to solicitation to commit sexual intercourse without consent. The parties and the court, however, treated the plea offers as being identical.

Coleman. He said that a plea would be vulnerable to attack for lack of voluntariness. Because of Coleman's repeated claims of racial discrimination, Forsythe opined, his plea would appear to have been offered only because of his belief that he could not get a fair trial.

Forsythe added that the state also had problems with the plea because it lacked "a factual basis." He did not explain his statement further. After the judge responded by pointing out that due process does not invalidate a guilty plea that lacks a factual basis, Forsythe retreated to his lack-of-voluntariness argument, saying: "My immediate reaction to that, is that it doesn't make much of a difference. An essential part of the plea is, is it voluntary."

A little later, Special Prosecutor Overfelt expressed concern about the many objections that Coleman could raise after pleading guilty. The court responded: "That's the thing you're going to bring up and take care of when he enters his guilty plea. It establishes clearly that he can't bring these [objections] up again." Overfelt reacted to the judge's suggestion by complaining that the state could not decide on the plea offer on such short notice. The court then suggested that the state give the offer some thought. Overfelt refused.

In a further effort to overcome the state's resistance, defense counsel Monaghan told the court that his client would plead guilty, make a full disclosure, expressly waive his rights, and agree to be fully bound by his plea. Monaghan made the following observation: "the State has accepted a plea from Nank under tremendously difficult circumstances I think, and they're willing to say that's voluntarily [sic] and it will continue, but when I come in, they raise every objection there is ..."

The court agreed with Monaghan's assessment and commented to the prosecution: "Of course I pointed out in a previous hearing that after you put on those 60 witnesses, and if the defendant takes the stand and says he made the same offer to the State as did Nank and they want to hang me and let Nank go, what is the jury going to do, and if the jury goes adverse, what is the appellant [sic] court going to do. That's the serious question that I tried to point out beforehand, and just so you can think it over and I want you to." Clearly, the point that the court tried to make to the prosecution on more than one occasion was that the state's behavior during plea bargaining gave the impression that the state was discriminating against Coleman.[5]

The next day—July 3, 1975—defense counsel, in the presence of Coleman, restated the plea offer. Specifically, Monaghan stated: "I think to simplify the situation, I would say that we would make an offer to plead guilty under the same terms and conditions as has been accepted by the State with regard to Mr. Nank." After Coleman himself voiced his agreement to the offer, Monaghan declared that Coleman's plea was at least as reliable as Nank's, that it would include a complete disclosure of all the facts, and that it would provide the state with some protection in case of a possible retraction by Nank later down the line:

> I have stated before that I believe that Nank's plea is subject to as many technical or more technical problems than what I am trying to do on behalf of my client, and if they get a full voluntary complete disclosure of all the facts from Mr. Coleman which fully implicates Mr. Nank in every respect, as much as Mr. Nank has implicated Mr. Coleman, they then have what they want to protect themselves against an effort at some later date to where Mr. Nank could come in and assert that all of his plea and his bargaining was all under duress and that he didn't understand what he was doing, and so I think this is a benefit to the

5. In a prior hearing, the court had said with respect to Coleman's then potential equal protection claim:

> If the jury is not receptive to that type of argument, I think the appellate court would give that argument very close attention under the statute that provides that a charge may be dismissed in the interest of justice. That is where that statute would apply.

> State that they will now have concrete testimony against Mr. Coleman and against Mr. Nank, in the event that anyone should take this up on appeal and the court should set aside what has been agreed and what has been set up, so it's not a one way street in that regard....

The defense made every conceivable effort to assure the state of the validity of the plea:

> [O]f course with all the questioning, whatever the State wants to know to assure itself that—you know, that nothing would be held back and I would try to reveal everything that I know as far as this case, to assist the State in making its inquiries and to assist the Court in making its inquiries if I didn't cover things well enough, and I would expect that the Court would do these things, to assure that there is no trick, no dodge or nothing on the part of the defendant to get of things at a later date, and that's our position.

Monaghan went further:

> Your Honor, within my own capabilities I have tried to tell Mr Coleman everything that he is waiving by doing this. And I say that if there is any question in your mind, he's willing at this time to be sworn and to be questioned fully before anything ever goes further as to what he's waiving. I have tried to explain to him that he's waiving his rights against self incrimination, that he's waiving his right to confront the witnesses against him, that he's waiving his right to require the State to prove every fact beyond a reasonable doubt, that he's waiving his right to testify in his own defense. In other words, I have specifically as I possibly can, tried to explain to Mr. Coleman that when he comes in he has lost every right, and that he knows that his guilty plea may eventually result in a sentence by the Court of 140 years, and I don't know anything further, but when I say full disclosure of facts, a full questioning of the Court. It's not my decision to tell you that he understands everything that I have told him. If he is to get on the stand and everybody is to question him and then there is a record as to whether he understands, and I would not expect the Court or the prosecutors to accept the fact that I say that I have told him. I know that he would get up there and everybody would ask these questions.

Forsythe once again objected to plea bargaining in the presence of the court, citing the Standards of Ethics of the American Bar Association. Forsythe retreated from this position only after the court admonished him: "You just be careful on this young man. You're going to be held in contempt of this Court if you're accusing this Court. Now what the Court is trying to do is be fair and don't come in here and tell me that. Get that straight in your mind."

Forsythe then mentioned two other objections he had not advanced on the previous day or in any earlier plea bargaining discussions. First, he stated that he believed that Coleman was the more culpable of the two men.[6] Second, he pointed out that Nank had begun to cooperate with the state earlier and had provided the state with evidence.

Perhaps perceiving the weakness of these new-found objections, Forsythe immediately retreated, once again, to reasserting his basic complaints about the unreliability of a guilty plea by Coleman. In utter frustration, if not amazement, the judge asked: "Why are you satisfied with Nank's then? You have done that with Nank, and now you won't be satisfied with exactly the same thing with Coleman?"

At this point, Forsythe made the following remarkable statement:

> I think that the—what I'm trying to drive for here, is that one of these cases—at least one of these cases must be tried before a jury, with every witness being examined and cross examined and all of the evidence being considered in open court. To have both men go to prison on a guilty plea where their rights

6. This rather casual suggestion did not constitute a significant part of the prosecution's argument and Forsythe offered no explanation or support for it.

are formally read to them and they waive their rights without any real critical examination of the testimony, and the evidence, is what we feel is dangerous and we feel that it's particularly dangerous on the basis of the existing record.

(The prosecution ultimately appears to have carried this view to the extreme by concluding that since it was necessary for one of the defendants to be subjected to trial in order to create a record, once the record was created that defendant might just as well be executed.) The prosecution also said that Coleman might raise a claim of ineffective assistance of counsel at a later time.

Forsythe then complained that the record showed a motion for change of venue due to prejudice and that it might give the impression that the change in venue was not sufficient to remove the prejudice. The judge retorted that the court had already ruled on the issue and had made its order. He also made it clear to Forsythe that he thought that the argument was entirely improper.

Forsythe next protested that Coleman had undergone a sodium amytal test which purported to refresh his recollection and that the results of such a test were "highly questionable."[7] The judge rejected the prosecution's protestations, pointing out that Coleman would take the stand and that the prosecution could question him thoroughly in order to establish that the plea was being entered into knowingly, intelligently and voluntarily.

Forsythe simply replied that, in any case, the prosecution's "major objection" was that the record, read as a whole, might support an allegation by Coleman "[t]hat any plea taken from him would be coerced, and that he believed up until July 23rd [sic] that he was an innocent man and that's the only reason that he would plead to any charge, and that would be to avoid the death penalty." The judge responded that the Supreme Court in *North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), had said that under the due process clause a guilty plea could be accepted even if the defendant thought he was innocent and was pleading guilty only to avoid a more severe sentence. Finally, the judge wearied of attempting to reason with the prosecution, declaring: "There is no use in arguing this matter if you're not going to accept the offer. If you're not going to accept the offer, say so, and then that's the end of the matter." To which Forsythe replied: "We don't accept the offer, Your Honor."

D. *Discussion*

The most striking fact about the prosecution's adamant refusal even to consider any offer of a plea from Coleman is that—wholly aside from considerations relating to equal treatment and fairness—there were compelling tactical reasons for it to accept a plea. The case against Coleman was obviously one that would be extremely difficult to prove. Both trial court judges urged the prosecution to accept Coleman's plea, at least one after expressing serious doubts as to the strength of the prosecution's case and warning that Coleman might well be acquitted. The case against Coleman was entirely dependent on the testimony of codefendant Nank, a convicted felon, an admitted murderer, and a witness with the strongest possible motive to lie. (The weakness of the case is evidenced by the fact that two Montana Supreme Court Justices ultimately concluded that Coleman's conviction should be reversed due to insufficiency of the evidence.) Ignoring the urging of the two trial judges, the prosecution declined to accept Coleman's plea, and instead decided to take the risk of going to trial. From the prosecutors' standpoint, the practical consequence of

7. The majority places great emphasis on the sodium amytal test and the fact that the defense counsel changed Coleman's plea to withdraw the assertion of innocence as a result of it, apparently for the purpose of establishing Coleman's guilt conclusively. *See* majority opinion, at 438–39. Yet as the prosecution pointed out, the result of such a test is "highly questionable." *Cf. Lindsey v. United States,* 237 F.2d 893 (9th Cir.1956) (excluding from evidence a recording of and psychiatric testimony supporting an interview conducted under the influence of sodium pentothal, a precursor of sodium amytal).

this decision was that on the one hand Coleman might escape punishment entirely and on the other the state might obtain a sentence of death that would be subject to serious constitutional challenge and might ultimately be set aside; whereas, accepting the plea would have assured the prosecution of a certain conviction and a sentence that would have resulted in Coleman's incarceration for life.[8]

Further, the prosecution's decision to gamble all in order to have a chance to seek the death penalty is particularly remarkable if one considers the extraordinary nature of capital punishment in Montana. Montana has not executed anyone in recent history. Bureau of Justice Statistics, *Capital Punishment* (1985). The last execution took place over forty years ago in 1943. U.S. Bureau of the Census, *Prisoners in State & Federal Prisons & Reformatories* (1943) (In that year, a black male between the ages of 20 and 24 was executed for the crime of murder.). The death penalty, thus, constitutes a most unusual type of punishment in that state.

The prosecution's conduct during the plea bargaining hearings strongly supports an inference of discrimination. Its explanations for its obduracy were wholly unpersuasive; the fact that the prosecution continually changed the justifications it gave for refusing to plea bargain suggests strongly that the explanations were pretextual. Throughout the proceedings, the prosecution seems to have been groping continually for new excuses or rationalizations and to have had no objective basis for its decision.

Turning to the specific explanations for its conduct advanced by the prosecution, the first was that Coleman's contemporaneous assertion of innocence would render the plea involuntary. However, as the initial judge pointed out early in the discussions, a declaration of innocence does not make a plea involuntary. The Supreme Court had previously validated guilty pleas even when the defendant refused to make an express admission of guilt. In *North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), the court explained:

> while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.

The Court went further and stated that a guilty plea was valid even if the defendant insisted on asserting his innocence:

> Nor can we perceive any material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt.

*Id.* Montana's concerns about the voluntariness of the plea, therefore, had no legal merit. Nor, obviously, can the prosecution claim as an excuse, a mistake of law. As soon as the prosecution raised the issue, the trial judge advised it as to the applicable rule. Nevertheless, the prosecutors insisted on reasserting their erroneous theory.

Subsequently, after Coleman in an attempt to meet the prosecution's objections agreed not to insist on asserting his innocence, the prosecutors offered a string of inconsistent, unsupported, meritless reasons for not accepting his plea. The prose-

8. Nank was actually sentenced to 140 years in prison: 100 years for deliberate homicide and 40 for soliciting sexual intercourse without consent. Coleman could have been sentenced to at least as long a term of confinement had his plea been accepted. *See supra* note 4. Coleman ultimately received 140 years in prison on the noncapital charges, although the sentence was subsequently modified to 120 years following appeal.

In addition, as the defense attorney pointed out, Coleman's testimony would have provided the state with an important weapon against Nank, were Coleman's white codefendant to decide to retract his confession and plea at a later date.

cution first claimed that Coleman's prior allegations of racial discrimination would render any plea made by him vulnerable to constitutional attack. In effect, then, the prosecution argued that having once suggested a possible claim of equal protection, Coleman had forfeited his right to equal treatment. The argument that a black who raises an issue of racial bias is thereafter disqualified from plea bargaining and accordingly must be subjected to trial on a capital charge (and then, apparently, executed if found guilty) is perverse and dangerous as well as unconstitutional. In the end, the prosecution's argument attaches the ultimate penalty—death—to the legitimate assertion of a constitutional right. I find it difficult to believe that the prosecution could have advanced this argument in good faith. To the contrary, like several of its other arguments, this one appears to provide only the thinnest of disguises for its true underlying discriminatory motivation.

The prosecution next claimed that the plea could not be accepted because it lacked a factual basis. At this point in the proceeding, however, Coleman had agreed to admit his guilt and disclose on the record all the facts relating to the commission of the crimes. The prosecutor raised no specific questions as to the nature of the factual admissions that Coleman would make and offered no explanation as to why those admissions would not provide a factual basis for the plea. The simple fact is that Coleman's plea clearly did not present any factual basis problem. Furthermore, the judge pointed out to the prosecutors that they were once again advancing an erroneous legal argument. He specifically reminded them that a factual basis is not required for a guilty plea.[9]

The prosecution then expressed concern about the many objections Coleman could raise after pleading guilty. The objections the prosecution referred to were "that he was under the influence of so many drugs at the time this was going on," that he was insane, or other similar "stuff". However, as the trial judge patiently explained, Coleman could agree during the plea bargaining process not to raise any of these objections after the plea was accepted. In fact, Coleman did shortly thereafter expressly agree to waive all possible objections. Moreover, as the judge had also previously noted, the plea taken from Nank was subject to many of the same kind of objections and yet was readily accepted by the prosecution.

The prosecution then said, without further explanation, that Coleman was the more culpable of the two men. It had not previously advanced this contention and did not attempt to offer any support for it. (Nor does the state rely on this point in its brief before us.) Instead, without waiting for the judge to respond, the prosecution quickly returned to what it called its "major objection"—voluntariness—but not before also arguing that Nank had begun to cooperate with the state earlier in the case and had provided inculpatory evidence. Unfortunately, the prosecutor failed to advise the court (by this time, the second judge) that Coleman had offered to plead guilty to the same charges as Nank less than two weeks after Nank's plea. Neither the court nor the prosecutors treated these two objections seriously or ever adverted to either of them again. Rather, the prosecution concentrated almost entirely on its voluntariness objection. This objection appeared in many forms and guises throughout the plea bargaining discussions and served as the predominant and underlying theme of all the exchanges among the court and the parties.

The prosecution also offered two rather odd theories—one voluntariness-related, one not. The prosecution argued that Coleman had previously filed a motion for change of venue due to prejudice and that the record might give the impression that the change in venue might not have been sufficient to remove the prejudice. As is obvious, the change of venue issue provides a far greater risk to the prosecution

9. As we said in *Rodriguez v. Ricketts*, "the due process clause does not impose on a state court the duty to establish a factual basis for a guilty plea absent special circumstances." 777 F.2d 527, 528 (9th Cir.1985) (citations omitted).

on an appeal from a conviction after trial than on an appeal from a guilty plea. Equally odd, the prosecutors contended that it would be too risky to accept Coleman's guilty plea because a question had previously been raised as to the competence of Coleman's counsel. The prosecutor failed to explain why it would be more risky to have Coleman represented by incompetent counsel at a successful noncapital plea bargaining session than at a capital punishment trial and capital sentencing proceeding that might result in an order for Coleman's execution.

Zealously pursuing its voluntariness theme, the prosecution also purported to fear that Coleman might claim that his plea was a result of his having submitted to a sodium amytal test—a test the prosecution claimed was unreliable. Aside from the fact that Coleman could have waived that objection, and that shortly thereafter he agreed to take the stand and do so, this objection was, like so many others, patently frivolous. Coleman had been attempting vigorously to plead guilty for some time prior to the date on which he took the sodium amytal test. Thus, the decision to plead guilty could not possibly have been a product of that test. At most, the test could have affected Coleman's willingness to acknowledge his guilt, not his willingness to plead, and acknowledgment of guilt is, as discussed above, not a necessary condition to a valid plea.

After the judge explained why the sodium-amytal-test objection lacked merit, the prosecution retreated to what it called its "major objection"—another version of its voluntariness argument. Rosebud County Attorney Forsythe explained that the record, read as a whole, might support an allegation by Coleman "[t]hat any plea taken from him would be coerced, and that he believed up until July 3rd that he was an innocent man and that's the only reason that he would plead to any charge, and that would be to avoid the death penalty." The judge correctly pointed out to the prosecution that the fact that a defendant pleads guilty in order to avoid a capital sentence does not taint the plea. At the time of the prosecutor's objection it was well established that even if the accused offers the plea only to avoid capital punishment, the plea may nevertheless be voluntary. Several years earlier, the Supreme Court had held that "a plea of guilty is not invalid merely because entered to avoid the possibility of the death penalty." *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970). The prosecutor's "major objection", consequently, had no legal merit and the trial judge so advised him.

Essentially, the prosecutor's explanations for its refusal to plea bargain with Coleman consisted of expressions of concern that any plea might be subject to subsequent legal attack, a concern that was clearly unmeritorious. The two trial judges involved in this case so advised the prosecution and both urged acceptance of Coleman's plea.

Under these circumstances, the prosecution's motivations are, at the very least, highly suspect. A black defendant received life or death treatment unequal to that received by his similarly situated white codefendant. The prosecution offered frivolous and inconsistent explanations for that difference in treatment. When the trial judge would patiently point out legal errors in their explanations, the prosecutors would switch grounds and try to put an end to the plea bargaining. The prosecutors were consistent in only one respect. They were unyielding in their determination to try the black defendant on capital charges and then seek his execution. In my opinion, these facts, standing alone, give rise to an extremely strong inference of discriminatory motivation.[10]

There are other circumstances, as well, that strongly support the conclusion that the prosecution was influenced by factors relating to Coleman's race. There can be

10. In its opinion, the majority simply lists some of the explanations offered by the prosecution and then states that "[t]he record reveals no evidence of racial prejudice...." Maj.op. at 451. Despite the patent lack of merit in the prosecution's explanations, the majority does not even bother to comment on them.

little doubt that from the very outset of the proceedings through the imposition of the second death sentence, the prosecutors' conduct was overzealous by any standards. Rather than listing various examples, it should suffice to note the facts regarding the decision to seek the death sentence the second time. The prosecutors decided to try to apply the 1977 death penalty statute to Coleman, although the Montana Supreme Court, in *Coleman I,* had indicated strongly that it did not expect Coleman to be resentenced to death. 177 Mont. at 23 & 33, 579 P.2d at 746 & 751. *See generally, Coleman II,* 185 Mont. 299, 337–40, 605 P.2d 1000, 1022–23 (1979) (Shea, J., dissenting), *cert. denied,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980). (This fact is not changed by that court's subsequent upholding of the prosecution's actions. *Coleman II,* 185 Mont. at 313–24, 605 P.2d at 1010–15.) The prosecution invoked the 1977 death penalty statute even though Coleman had been tried, convicted, and originally sentenced prior to its enactment and no court had ever approved an order of execution under those circumstances. *See* section IV.A.3. In seeking Coleman's execution, the prosecution clearly sought to stretch the law to, if not beyond, every conceivable limit.[11]

Any examination of the prosecutor's motivations must include a recognition of the fact that Coleman's case involved a violent sexual crime allegedly committed by a black defendant against a white female victim. The crime took place and was tried in a part of the country where the proportion of black individuals in the community is extremely small.[12] Little knowledge regarding the practical operations of our prosecutors' offices is required in order to understand that concern over community sentiments may well have influenced the prosecutors' decision to treat Coleman differently than Nank. As the trial judge said to the prosecutor during one of the discussions over Coleman's attempt to plead to identical charges, "I think we are losing perspective because of your zeal, inexperience and probably because of the public pressure in the background."

The fact that Coleman's own attorney and the trial judge referred to the then 28 year old Coleman as "this black boy" shows how pervasive was the feeling in the community that Coleman was different in kind from his white codefendant. Coleman's attorney was apparently the first to use the term "this black boy"; he did so during cross-examination of a witness. The court, in turn, referred to Coleman as "this black boy" in chambers, in ruling on a motion for dismissal or judgment of acquittal at the close of the government's case.[13]

Respondent suggests that we take the court's reference to Coleman as "charitable." Respondent's suggestion is offensive and the majority properly refuses to accept it. But after disagreeing with respondent's characterization of the court's use of the phrase, the majority goes on to say that "when placed in context and viewed in light of the entire trial transcript, [the reference] does not establish Coleman's claim of racial discrimination." Maj. op. at 468.

**11.** The 1977 death penalty statute was enacted not only after the crime was committed but, in addition, after Coleman was tried and sentenced. As far as I am aware, the statute has not been applied under similar circumstances to anyone else in the State of Montana, and all the other states that have faced the issue have declined to apply a new death penalty statute to an individual who was tried and sentenced under a prior unconstitutional statute. (*See infra* section IV.A.3, for full discussion of why retroactive imposition of the death penalty in this case violates the due process clause.) The record shows that the prosecution was at all times well aware of the *ex post facto* and due process problems that such retroactive application gives rise to.

**12.** The percentage of black people in the total population of the State of Montana has never exceeded 0.5%. *See* Bureau of the Census, *State and Metropolitan Area Data Book* 6 (1979); Bureau of the Census, *State and Metropolitan Area Data Book 509* (1986).

**13.** After noting that the motion was "a real serious motion" that had "some merit", the judge made the following comment about the government's case: "Well, all you've shown is the opportunity for this black boy to do it. You've shown plenty of opportunity."

I agree with my colleagues that the remark does not "establish" the claim of racial discrimination; no one ever suggested that, standing alone, it did. However, the two references assist a court in making the requisite "sensitive inquiry", *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564, as to why Coleman was not treated in the same manner as his white codefendant. The simple answer is that he was generally regarded in the community, and in the legal system, as a "black boy".

Finally, Coleman's claim of discrimination must be viewed in the context of our nation's long history of racial discrimination in capital cases. In deciding when the death penalty should be imposed, our legal system has historically shown less concern for black defendants (and black victims) than for their white counterparts. As Professors Samuel R. Gross and Robert Mauro have concluded, "there is a considerable body of published research on racial patterns in capital punishment, and most of it indicates that racial factors have been influential in determining who has been sentenced to die and who has been executed." Gross and Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization,* 37 Stan.L.Rev. 27, 45 (1984).[14]

In *McCleskey,* the Court held that statistics alone are insufficient to warrant invalidation of a state's capital punishment laws. In so concluding, however, the Court did not say that statistics are wholly irrelevant in deciding individual capital punishment cases; nor did it say that we must shut our eyes to history and current reality alike when we evaluate the motives underlying a prosecutor's decision to seek the death penalty in a specific case. Decisions are made in the context of societal attitudes, and we must recognize the existence of those attitudes when we look to reasons underlying individual judgments. This is not to say that we must commence each capital punishment case with the assumption that a black defendant was singled out for the death penalty because of his race. But where, as here, the record reveals a dramatic difference in the treatment of white and black codefendants, where the prosecution's explanations for that difference are highly suspect if not patently pretextual, and where the prosecution has stretched the law to, if not beyond, its limits in order to seek capital punishment for the black and not the white, we are obliged to remedy the impermissible effect that racial prejudice had upon Montana's decision to seek the death penalty and to refuse acceptance of Coleman's plea.

E. *Evidentiary Hearing on the Equal Protection Claim*

Were I required, on the basis of the record before us, to decide the issue whether the state acted in a discriminatory manner in rejecting Coleman's plea and imposing the death penalty, I would have no hesitation in saying that it did. However, we need not reach that ultimate question here. Coleman was entitled, at the least, to a full and fair hearing on the issue in the district court. Yet, no hearing was held and his petition was rejected summarily.

When, at the time of his first appeal, Coleman urged that racial bias was the cause of the prosecution's refusal to accept his guilty plea, the Montana Supreme Court, as explained *supra* at note 2, erroneously held that the prosecution had absolute discretion to reject Coleman's plea regardless of any racially-biased motivation

**14.** In his dissent in *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), Justice Brennan stated: "Although research methods and techniques often differ, the conclusions being reached are relatively clear: Factors crucial, yet without doubt impermissibly applied, to the imposition of the death penalty are the race of the defendant and the race of the victim." *Id.* at 67, 104 S.Ct. at 888 (Brennan, J., dissenting). *See also Furman v. Georgia,* 408 U.S. 238, 255, 92 S.Ct. 2726, 2734, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring) ("we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, *feeding prejudices against the accused* ... if he is a member of a suspect or unpopular minority...."); *id.* at 364, 92 S.Ct. at 2790 (Marshall, J., concurring) ("Studies indicate that while the higher rate of execution among Negroes is particularly due to a higher rate of crime, there is evidence of discrimination."). *See also* Baldus study, discussed in *McCleskey v. Kemp,* — U.S. —, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

for its decision. *Coleman I,* 177 Mont. at 21, 579 P.2d at 744–45. Accordingly, the court failed to make any factual determination regarding the prosecutors' alleged discriminatory motivation. Thus, we have no state court factual finding that we presume to be correct under 28 U.S.C. § 2254 (1982).

Coleman raised the issue again in his *habeas* petition. The district court granted summary judgment for the state, making the following conclusory statement regarding the equal protection claim: "[Coleman's] claim that he was treated differently because he is black is nothing more than idle speculation unsubstantiated by any facts." The court, however, failed to discuss, and appears to have been wholly unaware of, the single most important fact in the case: i.e., that Coleman made a plea offer that was identical to the one the prosecution had accepted from his similarly situated white codefendant. Inexplicably, the district court focused exclusively on the initial plea offer made by Coleman—at a time when he was still insisting on asserting his innocence. It did not even mention the critical July 2 and July 3 hearings. As a result, it mistakenly concluded that Coleman and Nank did not make the same plea offer.[15] As a result of this crucial error, the district court failed entirely to discuss the attempts by Coleman to plead on the same terms as Nank. Apparently because of its ignorance of the actual nature of Coleman's plea offer, the court summarily rejected his equal protection claim without the benefit of a factual hearing.

I am aware that, in deciding that a general claim of unequal treatment based solely on statistical evidence was inadequate to raise an inference of discrimination, the Court recently stated that, "the policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of ... requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.'" *McCleskey v. Kemp,* 107 S.Ct. at 1768 (citing *Wayte v. United States,* 470 U.S. at 607, 105 S.Ct. at 1530, and quoting *Imbler v. Pachtman,* 424 U.S. 409, 425–26, 96 S.Ct. 984, 992–93, 47 L.Ed.2d 128 (1976)) (footnotes omitted). When viewed as a statement of general principle, the Court's comment is certainly unassailable. Significantly, however, the Court quickly sought to put its statement into its proper perspective and thus to forestall sweeping or overbroad constructions of its opinion. Speaking for the Court, Justice Powell explained that the justices did not intend to preclude questioning of prosecutors where the facts of the specific case warranted an inference of unconstitutional conduct. He said that the Court's "longstanding precedents ... hold that a prosecutor need not explain his decisions *unless the criminal defendant presents a prima facie case of unconstitutional conduct with respect to his case.*" *Id.* at 1769 n. 18 (citing *Batson* and *Wayte*) (emphasis supplied).

Under *McCleskey,* while we must be careful to refrain from forcing the prosecution to explain its every decision to seek the death penalty, we must be willing to do so when the factual circumstances in the individual case show that racial discrimination may have constituted a motivating factor. In short, where the defendant establishes a prima facie case of racial discrimination, we have an obligation to conduct a hearing and probe the motives of the prosecution. In such a case, "the trial court must undertake a 'factual inquiry' that 'takes into account all possible explanatory factors' in

15. The district court's full discussion of this issue was as follows:

> Petitioner claims that, because he is black, he was denied the same plea bargaining opportunity as that afforded his white codefendant. Petitioner argues that the only difference between him and Nank was the color of their skin. Such is not the case. Nank confessed to the crime shortly after his arrest and cooperated with law enforcement authorities. Petitioner maintained his innocence.
>
> A defendant may plead guilty while maintaining his innocence, especially to avoid a death sentence. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). However, neither the trial court nor the prosecution are required to accept a guilty plea under such circumstances. The acceptance of a guilty plea is within the discretion of the court. The petitioner's claim that he was treated differently because he is black is nothing more than idle speculation unsubstantiated by any facts.

the particular case." *Batson v. Kentucky,* 106 S.Ct. at 1722 (quoting *Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972)).

Here, at the very least, a strong inference of discrimination exists. Accordingly, rather than dismissing Coleman's petition summarily, the district court should have conducted an evidentiary hearing to probe into the motives of the prosecution in refusing to consider his plea offer. *Cf. Batson v. Kentucky,* 106 S.Ct. at 1725.

F. *Conclusion*

We have been told by the Supreme Court that we must undertake a "sensitive inquiry" in cases such as this, and that we must be closely attuned to the abiding evils of racial discrimination. Sensitivity to racial discrimination requires a recognition of the subtlety of its forms and manifestations. Today, unlike in the first half of this century, racial discrimination most frequently manifests itself in covert rather than overt forms. No longer do prosecutors or judges proudly proclaim their biases openly on the record. No longer does society as a whole encourage, or even tolerate, official discrimination against blacks. Nevertheless, no-one would seriously suggest that racial discrimination has been eradicated from our society. Discrimination still exists but it has become more difficult to recognize. Proof no longer comes wrapped in nice little packages with red ribbons and tinkling bells. Sensitivity, as the Court has told us, is the key to understanding the nature and existence of discrimination today. Once a sensitive inquiry is undertaken and one looks beyond the literal language of the written record and examines with some understanding and awareness all the facts and circumstances surrounding the case of this 28 year-old "black boy", it is clear that race played a significant part in the state's decision to execute Dewey Coleman.

Nevertheless, the majority here affirms the district court's summary judgment order. It says only that it sees "no evidence of racial prejudice". Maj. op. at 450. As a result, difficult as it may be to understand, no court—state or federal—has ever made a factual inquiry into Coleman's equal protection claim. The majority is willing to resolve his life or death discrimination claim simply by accepting blindly the state's pretextual explanations of its motives. It sees no need for any court to make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 266, 97 S.Ct. at 564. Sadly, the majority has chosen to ignore not only the Supreme Court's warnings regarding our duties in relation to racial discrimination cases but also its directive that in capital cases, "the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983).

Notwithstanding my two colleagues' votes to permit Coleman's execution, it is inconceivable to me that he will be allowed to die without a federal court either simply vacating his death sentence or ordering a hearing on his claim that race was a motivating factor underlying the state's decision to execute him. I strongly believe that we have passed the point in our history where the courts of the United States will permit a black person to be executed in such flagrant disregard of the principles of equal treatment under law.

## III. THE CAPITAL SENTENCING PROCEEDINGS

The inadequacies of the sentencing proceeding in which Coleman was ordered hanged require a reversal of his death penalty. Coleman was deprived of his right to present oral argument on the nature of the mitigating circumstances and on the question whether those circumstances were sufficient to overcome the statutory aggravating circumstances. In short, he was not allowed to present his arguments on the ultimate question whether capital punishment was the appropriate penalty in his case. Conversely, the sentencing court did not comply with its constitutional duty to listen to the defendant at the time of sen-

tencing. Moreover, the record reveals that the judge failed entirely to recognize or consider all but one of the mitigating facts and circumstances the Constitution requires the sentencer to take into account. Further, he improperly based his decision in part on an unadjudicated offense. For these reasons, the sentence cannot stand.[16]

A. *Introduction*

The Supreme Court has emphasized the importance of the proceeding that leads to the imposition of the death penalty. A capital punishment hearing differs substantially from other sentencing proceedings. The difference, the Court has explained,

> rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.

*Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality). *See also Sumner v. Shuman,* — U.S. —, 107 S.Ct. 2716, 2720, 97 L.Ed.2d 56 (1987); *Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986) (plurality); *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 771 (1983); *Zant v. Stephens,* 462 U.S. 862, 884–85, 103 S.Ct. 2733, 2746–47, 77 L.Ed.2d 235 (1983); *Lockett v. Ohio,* 438 U.S. 586, 602–04, 98 S.Ct. 2954, 2963–64, 57 L.Ed.2d 573 (1978) (plurality); *Gardner v. Florida,* 430 U.S. 349, 358–59, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977) (plurality); *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality); *Furman v. Georgia,* 408 U.S. 238, 286–291, 92 S.Ct. 2726, 2750–53, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); *id.* at 306, 92 S.Ct. at 2760 (Stewart, J., concurring). The sentencer must allow defense counsel to present oral argument on the mitigating and aggravating circumstance and on whether the death penalty should be imposed. The sentencer must then "listen" to the argument and decide whether to impose a capital sentence after giving careful consideration to the mitigating and aggravating circumstances in the case. *Eddings v. Oklahoma,* 455 U.S. at 115 n. 10, 102 S.Ct. at 877 n. 10 (citing *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973).

It is of "vital importance to the defendant and to the Community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. at 359, 97 S.Ct. at 1205. Accordingly, more than in any other punishment proceeding, in capital cases the judicial system must take extraordinary precautions to assure that the punishment is based on the particularities of the offense committed and the individual circumstances of the offender.[17] In fact, the Montana Supreme Court vacated Coleman's first death penalty because the statute pursuant to which it was imposed failed to comport with the constitutional imperatives of *Woodson,* as well as those of *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) and *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637

16. In *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Supreme Court decided that the state trial court had failed to consider relevant mitigating evidence and, therefore, reversed the death penalty. The Court, nonetheless, left open the possibility of resentencing. It stated: "The resulting death sentence cannot stand, although the State is of course not precluded from again seeking to impose the death sentence, provided that it does so through a new sentencing hearing at which petitioner is permitted to present any and all relevant mitigating evidence that is available." *Id.* at 1673 (citing *Eddings v. Oklahoma,* 455 U.S. 104, 117, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982)). *See also Hitchcock v. Dugger,* — U.S. —, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987).

17. *Sumner v. Shuman,* — U.S. —, 107 S.Ct. 2716, 97 L.Ed.2d 56; *Hitchcock v. Dugger,* 107 S.Ct. at 1824; *Eddings v. Oklahoma,* 455 U.S. at 115, 102 S.Ct. at 877; *Lockett v. Ohio,* 438 U.S. at 603, 98 S.Ct. at 2964 (plurality); *Roberts (Harry) v. Louisiana,* 431 U.S. at 636, 97 S.Ct. at 1995 (per curiam); *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991 (plurality); *Gregg v. Georgia,* 428 U.S. at 197, 96 S.Ct. at 2936; *Proffitt v. Florida,* 428 U.S. at 252–53, 96 S.Ct. at 2966–67; *Jurek v. Texas,* 428 U.S. at 271–72, 96 S.Ct. at 2956; *Roberts (Stanislaus) v. Louisiana,* 428 U.S. at 334–35, 96 S.Ct. at 3006–07.

(1977) (per curiam). *Coleman I,* 177 Mont. 1, 15–16, 579 P.2d 732, 741–42 (1978). The Montana statute under which Coleman was first sentenced provided for automatic imposition of the death penalty and did not require consideration of the particularities of the case and of the accused prior to the imposition of capital punishment. The second sentence must be set aside because of equally serious constitutional violations.

B. *Facts*

1. *Coleman's First Sentencing*

The statute under which Montana sentenced Coleman the first time originally provided that "[a] court shall impose the sentence of death following conviction of aggravated kidnapping if it finds the victim is dead as a result of the criminal conduct unless there are mitigating circumstances." Rev.Code Mont. § 95–5–304 (1947). Apparently in response to the Supreme Court's condemnation of unbridled discretion in the imposition of capital punishment,[18] the Montana legislature in 1974 amended this section by striking the phrase "unless there are mitigating circumstances." The legislature thus made the death penalty statute mandatory. "Under this statute, if the court finds ... that the victim of an aggravated kidnapping died as a result of the crime, the convicted defendant must be sentenced to die." *Coleman I,* 177 Mont. at 16, 579 P.2d at 742. In 1975, the trial court sentenced Coleman pursuant to the 1974 mandatory death penalty scheme. In *Coleman I,* the Montana Supreme Court held that statute unconstitutional because of the absence of a "provision for the trial court to consider any mitigating circumstances" and ordered that a new and lawful sentence be imposed. *Id.*

2. *The 1977 Death Penalty Statute*

In 1977, the Montana legislature repealed the unconstitutional death penalty statute under which Coleman had been originally tried and sentenced—1977 Mont. Laws § 16, ch. 338—and enacted a new death penalty statute codified at the time as Rev.Code Mont. §§ 95–2206.6 to 95–2206.15 (1977) and currently codified as Mont.Code Ann. §§ 46–18–301 to 46–18–310 (1985).[19] Section 95–2206.6 provides that the sentencing judge must conduct a hearing to determine if any statutory aggravating circumstances exist under section 95–2206.8 and if any statutory mitigating circumstances exist under section 95–2206.9. Mont.Code Ann. §§ 46–18–301, 46–18–303, & 46–18–304 (1985). The statute clearly contemplates a full fact-finding hearing. Mont.Code Ann. § 46–18–302 (1985).[20] In addition, it requires that both the state and

**18.** In *Furman v. Georgia,* the Supreme Court invalidated death penalty statutes from Georgia and Texas for constituting "cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S. 238, 240, 92 S.Ct. 2726, 2727, 33 L.Ed.2d 346 (1972) (per curiam). Five justices filed separate opinions in support of the judgment. Two justices decided that capital punishment *per se* constituted cruel and unusual punishment. *Id.* at 257–306, 92 S.Ct. at 2735–60 (Brennan, J., concurring); *id.* at 314–74, 92 S.Ct. at 2764–96 (Marshall, J. concurring). The three other justices in the majority, however, decided the case exclusively on the basis of the limitations that the fourteenth and eighth amendments impose on the application of the death penalty. *Id.* at 256, 92 S.Ct. at 2735 (Douglas, J., concurring) (The eighth amendment mandates "legislatures to write penal laws that are even-handed, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups."); *id.* at 310, 92 S.Ct. at 2763 (Stewart, J., concurring) ("[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."); *id.* at 313, 92 S.Ct. at 2764 (White, J., concurring) (The statutes constitute cruel and unusual punishment because "as [such statutes are] administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice."). Following *Furman,* Montana, along with "a number of other States," *Woodson v. North Carolina,* 428 U.S. at 298, 96 S.Ct. at 2988 (plurality), passed mandatory death penalty statutes apparently in an attempt to deal with the problem of unbridled discretion in capital punishment.

**19.** In 1978, the Revised Code of Montana was amended and completely reorganized as the Montana Code Annotated. The two codifications, however, are identical for the purposes of this opinion.

**20.** This section provides:

*Evidence that may be received.* In the sentencing hearing, evidence may be presented as

the defendant "be permitted to present argument for or against sentence of death." *Id.*

The Montana legislature enacted the 1977 statute in an attempt to meet the constitutional requirement that the trial court give careful consideration to "the character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991. The legislature provided for a flexible and open-ended hearing which would enable the trial court to give both the offender and the offense the thorough individual consideration that the Constitution requires.

Section 95–2206.8 sets forth the aggravating circumstances. Mont.Code Ann. § 46–18–303 (1985).[21] The statutory aggravating circumstance relevant to this case appears in subsection (7): "The offense was aggravated kidnapping which resulted in the death of the victim." Section 95–2206.9 defines the mitigating circumstances. Mont.Code Ann. § 46–18–304 (1985).[22] Among the mitigating circumstances the statute lists is the one set forth in subsection (1), that "[t]he defendant has no significant history of prior criminal activity." In addition, subsection (8) of the statute includes a catchall provision: "Any other factor that exists in mitigation of the penalty."

Section 95–2206.10 specifies the effect to be given aggravating and mitigating circumstances when the trial court decides

to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, and mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. Evidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

Mont.Code Ann. § 46–18–302 (1985).

**21.** *Aggravating circumstances.* Aggravating circumstances are any of the following:

(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

(3) The offense was deliberate homicide and was committed by means of torture.

(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

(5) The offense was deliberate homicide and was committed as part of a scheme or operation which, if completed, would result in the death of more than one person.

(6) The offense was deliberate homocide as defined in subsection (1)(a) of 45–5–102 [formerly 94–5–192] and the victim was a peace officer killed while performing his duty.

(7) The offense was aggravated kidnapping which resulted in the death of the victim.

(8) The offense was attempted deliberate homicide, aggravated assault, or aggravated kidnapping committed while incarcerated at the state prison by a person who has been previously:

(a) convicted of the offense of deliberate homicide; or

(b) found to be a persistent felony offender pursuant to part 5 of this chapter and one of the convictions was for an offense against the person in violation of Title 45, chapter 5, for which the minimum prison term is not less than 2 years.

Mont.Code Ann. § 46–18–303 (1985). Subsection (8) was not part of the statute when it was originally enacted in 1977.

**22.** *Mitigating circumstances.* Mitigating circumstances are any of the following:

(1) The defendant has no significant history of prior criminal activity.

(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) The defendant acted under extreme duress or under the substantial domination of another person.

(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(5) The victim was a participant in the defendant's conduct or consented to the act.

(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

(8) Any other fact that exists in mitigation of the penalty.

Mont.Code Ann. § 46–18–304 (1985).

whether to order the execution of a convicted defendant. Mont.Code Ann. § 46–18–305 (1985).[23] According to this section, where at least one aggravating circumstance exists, the court must impose the death penalty unless there are mitigating circumstances that are sufficiently substantial to warrant leniency.

The statutory scheme thus requires that the trial court considering capital punishment first establish the existence of at least one of the listed aggravating circumstances. The court then must consider any of the specifically-enumerated mitigating circumstances as well as any other fact that might exist in mitigation of the penalty. Having found at least one aggravating circumstance and having tabulated all the facts or circumstances in mitigation, the trial court must then decide whether the mitigating circumstances are "sufficiently substantial to call for leniency." *Id.* If they are not, the trial court must order the execution of the accused. Otherwise, the trial court may impose a sentence of imprisonment for life or for any term authorized by law.

In section 95–2206.11, the legislature requires explicit, written findings of fact as to the existence or nonexistence of aggravating and mitigating circumstances. Mont.Code Ann. § 46–18–306 (1985).[24] The statute thus requires the trial court to specify, in writing, the grounds underlying its decision to impose the death penalty.

Finally, incorporating another constitutional requirement, the statute provides in section 95–2206.7 that before any sentence is imposed: "The state and the defendant shall be permitted to present argument for or against sentence of death." Mont.Code Ann. § 46–18–302 (1985).

3. *The Resentencing of Coleman*

After the Montana Supreme Court reversed as unconstitutional Coleman's first death penalty, the prosecution decided to invoke the newly enacted 1977 death penalty statute in order once again to seek Coleman's execution. The first proceeding under the new statute took place on June 14, 1978. The trial court set the hearing to consider "the matter of mitigation of punishment." The court expressly reserved the sentencing to a subsequent date.

The judge asked Coleman's counsel whether he agreed with proceeding "with the hearing at this time on the matter of mitigation." Coleman's attorney responded in the negative and made an extensive statement in which he argued that the hearing should focus instead on whether the court could lawfully apply the 1977 death penalty statute retroactively to his client. He had previously filed a motion to quash and had submitted a brief on the issue. Unquestionably, the issue was a substantial one—*see infra* section IV.A.3—and its outcome would determine whether a mitigation hearing was even necessary. Coleman's attorney recommended that, as the next step, the court permit the prosecution to respond to his brief. The court, he added, should thereafter give the defense five days to reply to the prosecution's response and then decide the retroactivity issue.

23. *Effect of aggravating and mitigating circumstances.* In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 46–18–303 [formerly 95–2206.8] and 46–18–304 [formerly 95–2206.9] and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 46–18–303 [formerly 95–2206.8] exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.

Mont.Code Ann. § 46–18–305 (1985).

24. *Specific written findings of fact.* In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances set forth in 46–18–303 [formerly 95–2206.8] and 46–18–304 [formerly 95–2206.9]. The written findings of fact shall be substantiated by the records of the trial and the sentencing proceeding.

Mont.Code Ann. § 46–18–306 (1985).

Counsel for Coleman then suggested that if the issue of mitigation became material (i.e., if an adverse ruling were issued on the retroactivity question) it be taken up at a later date—at the time of sentencing. Counsel said that the sentencing proceeding could be conducted simply on the basis of the presentence investigation report and oral arguments to be made at that time by both parties. He said:

> we have to present here at this time, no mitigating factors at all. It would be a matter of simply argument. There is a presentence investigation report.... I take the view that unless Mr. Forsythe [the prosecutor] wishes to present witnesses, that at the time of sentencing is just simply a statement by Mr. Forsythe pointing out what he thinks relevant, and a statement pointing out what I think is relevant.

Thus, Coleman's attorney advised the court that, unless the prosecutor wished to call witnesses, no factual hearing would be necessary and that oral arguments as to the sentence to be imposed would be presented at the time of sentencing.

Neither the court nor the prosecution objected to counsel's statements. The judge simply said "All right" and asked the prosecutor whether he had anything to say. The prosecutor addressed the issue of retroactivity, arguing that the 1977 death penalty statute could be applied retroactively to Coleman. The court then told Coleman's attorney:

> the Court has two matters to sentence on [the capital offense and the related noncapital crime], and there is always a possibility that after the Court has considered your brief, it might rule favorably on your motion, and in that event there would be no necessity for the Court to make any finding or anything else under the—under the existing statute.

The court appeared to be saying that if it decided the retroactivity issue favorably to defendant, there would be no need for further proceedings on the death penalty question but that if it decided the issue against Coleman, further proceedings on that matter would be in order.

The trial court then noted the defense's statement that it did not intend to present any evidence on the mitigating circumstances. It also called for a responsive brief from the prosecutor on the *ex post facto* issue. The trial court next filed the presentence report and made Thomas Lofland, the reporting officer, available for interrogation. Both parties declined to question Lofland. In regard to the presentence report, the trial court noted: "The significant part of it relative to mitigating circumstances, is that the defendant has never been convicted of any felony prior to this charge."

The court again noted that the defense did not intend to "call any witnesses to establish any mitigating circumstances" and asked the prosecutor whether he wished "to make any statement relative to aggravating circumstances." At that point, the prosecution tried unsuccessfully to call Coleman to the stand but the court declined to compel him to testify.

The court then said: "the Court will render its findings of fact and will go up on the record that is present in the absence of any mitigating circumstances presented by the defendant at this hearing," and gave the prosecution ten days to file its brief on the question of the retroactivity of the 1977 death penalty statute. The prosecution told the court that it wished to identify specific pages in the trial transcript that had "a bearing ... on the sentencing" and started to do so orally. The judge, at the defense's request, advised the prosecution he would prefer it to identify the relevant pages in writing and that it could do so in the previously ordered responsive brief, although it had the option to continue with its oral recitation of page numbers as well. The prosecutor said, "Okay"—and terminated his oral recitation. The court then told the defense attorney that he would have five days to respond to the prosecution's brief and adjourned the hearing. He also told the parties, "Both parties of course understand that you may also present any proposed findings if you wish to do so."

By the end of the hearing, both the court and the parties seem to have agreed that the defense would present no witnesses on the issue of mitigation and would rely exclusively on the facts set forth in the presentence investigation report. They further agreed that the prosecution would include in its brief on the *ex post facto* question a statement identifying the particular parts of the record it considered relevant to the issue of aggravating and mitigating circumstances and that the defense would have an opportunity to respond. However, at no point did the defense attorney retreat from his earlier position that he intended to present his oral argument regarding mitigating circumstances at the time of sentencing, nor did he otherwise waive his right to present oral argument on the question whether Coleman should be sentenced to life or death. In fact, both defense counsel and the prosecution appeared at the next hearing anticipating, and prepared for, oral argument both on the issue of mitigation and the appropriateness of a death sentence.

The parties next met in court on July 10, 1978, this time for the sentencing proceeding. However, prior to the court session, the judge had already made his decision to order Coleman executed and had reduced it to its final written form. He distributed his written "Findings, Conclusions, Judgment and Order" to the parties at the outset of the proceeding. Subsequently, after counsel for the defendant again requested the opportunity to speak, the court allowed the parties to present their respective statements for and against the imposition of the death penalty.

The defense attorney made an emotional plea to the court. He pointed out that Nank—a white person who under his own version of the facts had participated equally in the crime—had been permitted to plea bargain and would be required only to serve a life sentence. Coleman, the defense reminded the court, had offered a similar plea which the prosecution had turned down. The defense attorney also reminded the court of the weakness of the case against Coleman, pointing out that it was based almost exclusively on testimony of a codefendant that was hardly corroborated, if at all, by sparse and inconsequential circumstantial evidence. The defense urged the sentencing court to consider Coleman's spotless record prior to the events of July 4, 1974 and the information set forth in the presentence report. That document contained highly favorable reports by residents of Great Falls where Coleman had lived and worked. The defense finally called the court's attention to several aspects of Coleman's personality that were inconsistent with the crime he had been accused of committing, including his homosexuality and his nondominant personality.

The trial court then permitted the prosecution to make a statement. After the prosecution concluded, the court claimed to have considered "many of the arguments raised by the defense." It also said that "the one mitigating circumstance [was] that defendant ha[d] not prior to this time been convicted of any felony" but added "that this one circumstance [did] not overcome the aggravating circumstances...." The court next simply read out loud the Conclusions and Judgment contained in the "Findings, Conclusions, Judgment and Order" that had previously been distributed. The Judgment the court read explicitly contradicted the court's oral statement that it had considered Coleman's lack of a criminal record as a mitigating factor and had concluded that it did not outweigh the aggravating circumstance. In the Judgment the court expressly stated that Coleman should be sentenced to death because it found that an aggravating circumstance (kidnapping resulting in death) existed beyond a reasonable doubt and "that *no* circumstances exist[ed] in mitigation [emphasis supplied]." In its written decision, the court explicitly denied Coleman the mitigation credit that subsection (1) of the statute affords to all defendants who do not have a "significant history of prior criminal activity." [25] It de-

25. The finding reads:

> That the State has been unable to prove by means of record checks that the defendant

nied such mitigation credit on account of an alleged burglary which codefendant Nank at one point in his trial testimony claimed he had perpetrated with Coleman in Roundup, Montana, on the morning of the day of the Harstad murder.[26]

In the "Findings, Conclusions, Judgment and Order," the court stated that none of the other mitigating circumstances enumerated in the statute, including the catchall provision embodied in subsection (8), were present in Coleman's case.[27] This statement, of course, meant that the court found that no mitigating circumstances at all existed, including those mitigating factors not explicitly listed in the statute but which the court is nevertheless required to consider; this despite the clear and unambiguous listing in the presentence report of a good number of mitigating facts and circumstances.

### C. *Constitutional Deficiencies of Coleman's Sentencing*

Coleman contends that his sentencing did not comport with the constitutional requirements imposed by the eighth and fourteenth amendments. He claims that he was deprived of his right to present argument at the time of sentencing and that as a result the court failed to "listen" to his views as to mitigating circumstances and the appropriateness of the death sentence. He also claims that the court did not consider the mitigating circumstances contained in the record. We must examine Coleman's contentions with special consideration and care. "When a defendant's life is at stake, [we must be] particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia,* 428 U.S. at 187, 96 S.Ct. at 2931–32 (plurality) (citations omitted).

#### 1. *The Right to Present Argument at the Time of Sentencing.*

The trial judge committed constitutional error by deciding upon his Findings, Conclusions, Judgment, and Order, reducing them to writing in final form prior to the sentencing hearing, and distributing his written decision to the parties at the outset of that proceeding. After the judge distributed his written decision, counsel for Coleman asked the court for an opportunity to make an oral statement. The court acquiesced. The oral presentation that took place, however, constituted only a meaningless formality inasmuch as the court's decision had already been made.[28]

> has any other history of criminal activity. The only other criminal act which appears in the trial record in this cause is the aggravated burglary of a home in Roundup, Montana, where certain guns were stolen by the defendant and Robert Nank on July 4, 1974 [the date of the Halstad murder]. By reason of the foregoing, the credit in mitigation allowed by Section 95–2206.9(1) is not appropriate to this defendant.

*Reprinted in Coleman II,* 185 Mont. 299, 390, 605 P.2d 1000, 1048 (1979) (Shea, J., dissenting), *cert. denied,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980).

**26.** Moreover, the written document given to the parties at the outset of the hearing and thereafter filed was internally inconsistent. In the Findings section, the court wrote that the credit in mitigation provided in section 95–2206.9(1) [currently 46–18–304(1) ] for having no significant history of prior criminal activity was not appropriate to Coleman. In the Conclusions section, however, the court stated "[t]hat the only mitigating circumstance technically present in this cause [was] that the defendant had no record history of prior criminal activity." On the basis of the document, therefore, it is not entirely clear whether or not the court gave Coleman credit in mitigation, as required by the death penalty statute, for having no significant history of prior criminal activity. However, the most reasonable reading is that of the Montana Supreme Court. That court concluded that the sentencing judge found that Coleman was *not* entitled to mitigation credit under subsection (1) because of the alleged Roundup burglary. *Coleman II,* 185 Mont. at 331–32, 605 P.2d at 1019–20. *See infra* section III.C.2.b.11.

**27.** The finding reads:

> That there is no evidence appearing, either in the record of the trial held in this cause or the special sentencing hearing accorded, supporting a finding of any of the circumstances in mitigation under the other numbered paragraphs of Section 95–2206.9, namely paragraphs (2) through (8). There is, likewise, no evidence of any facts which are operative in this case to mitigate the penalty in this cause.

*Reprinted in Coleman II,* 185 Mont. at 390, 605 P.2d at 1048 (Shea, J., dissenting).

**28.** At the earlier June 14th hearing, the court did, as the majority points out, indicate that it would "render its findings of fact and go up on the record that is present in the absence of any

After counsel concluded their remarks, the judge uttered a few comments and proceeded to read aloud the conclusions and judgment contained in the previously distributed written decision.

The eighth and fourteenth amendments require that capital sentencing proceedings afford a "*meaningful* opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 333–34, 96 S.Ct. 3001, 3006, 49 L.Ed.2d 974 (1976) (plurality) (emphasis supplied). The empty charade that took place on July 10, 1978, did not provide Coleman with a meaningful opportunity to present his arguments regarding the existence of, and weight to be given to, his individual mitigating circumstances; nor did it permit him to advise the court why, in his view, the death penalty was not an appropriate punishment in his case.

The simple fact is that the trial court decided to have Coleman executed without the benefit of any argument by his attorney. The Supreme Court has rejected as erroneous the "premise that the participation of counsel is superfluous to the process of evaluating the relevance and significance of aggravating and mitigating facts." *Gardner v. Florida,* 430 U.S. at 360, 97 S.Ct. at 1206 (plurality). In *Gardner,* the Supreme Court stated that the adversary nature of our system of criminal justice requires that the trial court listen to the defendant on the issue of mitigating circumstances.

> Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases.

*Id.* In capital sentencing, where the judicial system has a paramount interest in ensuring that the right decision is made, the trial court must use, to the utmost extent, its most effective weapon in the quest for truth: adversarial exchange.

In *Eddings v. Oklahoma,* the Supreme Court underscored the importance of the defendant's participation when the sentencing court considers the existence of mitigating circumstances. After noting that the Oklahoma death penalty statute properly permits the defendant to present evidence "as to any mitigating circumstances", the Supreme Court declared that this is not enough. "*Lockett,*" the Court said, "requires the sentencer to *listen.*" *Id.* at 115 n. 10, 102 S.Ct. at 877 n. 10 (emphasis supplied). *See also Sumner v. Shuman,* 107 S.Ct. at 2721–23 ("Beginning with *Lockett v. Ohio,* a plurality of the Court recognized that in order to give meaning to the individualized-sentencing requirement in capital cases, the sentencing authority must be permitted to consider '*as a mitigating factor,* any aspect of a defendant's character or record, and any of the circumstances of the offense.' " *Id.* at 2722 (quoting *Lockett v. Ohio,* 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original)).

In the present case, one could hardly contend that the trial court "listen[ed]" to the defendant's position on the issue of mitigating circumstances. The trial judge made up his mind and determined both the form and substance of the sentence before defense counsel had an opportunity to speak on the subject. The sentencing court's failure to "listen" is particularly

mitigating circumstances presented by the defendant at this hearing." Shockingly, this comment seems to suggest that the court had already reached its decision at that time—long before the parties had any opportunity to comment on the issues—since the only way the decision would "go up" would be if capital punishment were imposed. The majority relies on the statement, however, to support the remarkable conclusion: "[g]iven the court's statement that it would prepare its Findings, we find unpersuasive the argument that the court's preparation of those findings for the July 10th hearing violated due process." Maj. op. at 460. The majority conveniently fails to mention that Coleman's attorney had requested, during that same June 14th hearing, an opportunity to make an oral argument on the issue of mitigation at the sentencing hearing, that no oral argument of any kind had been made by either party regarding the appropriateness of a capital sentence, and that the right to present oral argument at a capital sentencing hearing is fundamental.

troublesome in this case because the defense had decided not to call any witnesses and to rely exclusively on oral argument on the critical issues of mitigation and imprisonment vs. execution.[29] The procedure followed by the judge in determining to impose the death penalty effectively eliminated *any* role for Coleman's counsel.

In *Coleman III* the Montana Supreme Court appears to have recognized that counsel was not afforded any opportunity to make an oral argument before the decision to execute was made. It described what occurred after the judge distributed his findings and conclusions as follows: "thereafter counsel for petitioner read into the record a prepared statement in mitigation." *Coleman III,* 633 P.2d 624, 632 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). Permitting counsel to read a statement into the record after a decision has already been made and reduced to final written form does not comport in any respect with the requirements of due process. The essential mandate of *Gardner,* that counsel have the "opportunity" at least to "influence the sentencing decision" necessitates reversal on this ground alone.

Though recognizing that Coleman was deprived of an opportunity to present oral argument at the time of sentencing, *see Coleman III,* 633 P.2d 624, 632 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982), the Montana Supreme Court apparently believed that there was no right to such form of advocacy. The court's position in *Coleman III* appears to be that Coleman was given a chance to comment on the appropriate sentence in writing and that such an opportunity satisfies all constitutional and statutory requirements.

The problem with this analysis is, of course, that it does not recognize that Coleman has a right to *oral* argument at sentencing. Due process requires, even in a noncapital case, that the sentencing court grant defendant's request to comment orally on the appropriate sentence. *Ashe v. State of North Carolina,* 586 F.2d 334, 336 (4th Cir.1978) ("[W]hen a defendant effectively communicates his desire to the trial judge to speak prior to the imposition of sentence, it is a denial of due process not to grant defendant's request."), *cert. denied,* 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1978). Defendant may exercise his right to speak at sentencing through his attorney. For "[t]he right to be heard would be, in many cases, of little avail if it did not

29. The defense counsel's failure to present any direct testimony on the issue of mitigation necessarily raises the question whether Coleman's right to counsel was preserved at the sentencing stage. The sixth amendment "right to counsel is 'the right to the effective assistance of counsel.'" *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970)). A claim of ineffective assistance of counsel requires a showing (a) "that counsel's performance was deficient" and (b) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. *See also Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986). These standards apply to capital sentencing proceedings as well as to the trial itself. *Strickland v. Washington,* 466 U.S. at 686, 104 S.Ct. at 2063.

In some cases, the failure to present evidence in mitigation in a capital sentencing proceeding has been held to constitute inadequate representation. *Jones v. Thigpen,* 788 F.2d 1101 (5th Cir.1986); *Blake v. Kemp,* 758 F.2d 523 (11th Cir.1985), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985); *Tyler v. Kemp,* 755 F.2d 741 (11th Cir.1985), *cert. denied,* 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985); *King v. Strickland,* 748 F.2d 1462 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985); *Douglas v. Wainwright,* 739 F.2d 531 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). These courts have distinguished the cases before them from *Strickland v. Washington* by concluding that counsel performed inadequately and that the ineffective representation did, in fact, prejudice the defendant. The present case may be equally distinguishable. Here, defense counsel's performance may well have been inadequate and not simply a strategic choice. *Compare Strickland v. Washington,* 466 U.S. at 699, 104 S.Ct. at 2070; *Darden v. Wainwright,* 106 S.Ct. at 2475; *Burger v. Kemp,* — U.S. —, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). Also, in light of the weakness of the evidence against Coleman and the substantial testimony regarding mitigating circumstances that was available, the deficient performance may well have prejudiced Coleman. Coleman, however, has not made a claim of ineffective assistance of counsel in this habeas proceeding. This court, therefore, cannot reach that issue at this time.

comprehend the right to be heard by counsel." *Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932). *See also* Note, *Procedural Due Process of Judicial Sentencing for Felony,* 81 Harv.L.Rev. 821, 833 (1968) ("[T]he right to make allocutory and other legal claims should be made effective by a right to counsel at sentencing, which may be regarded as the modern descendant of the right to allocution.").

Here, Coleman had requested in advance an opportunity to speak, through his counsel, at the sentencing hearing but his request was effectively denied when prior to the hearing the judge made his decision in favor of execution. The sentencing judge thus in effect denied both Coleman and his counsel the right to speak on the subject of the sentence to be imposed.

The right to oral argument is a fundamental component of a fair sentencing hearing, especially when capital punishment is at stake. As the Supreme Court has said, " '[a] hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument, however brief, and, if need be, by proof, however informal.' " *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 16 n. 17, 98 S.Ct. 1554, 1564 n. 17, 56 L.Ed.2d 30 (1978) (quoting *Londoner v. Denver,* 210 U.S. 373, 386, 28 S.Ct. 708, 714, 52 L.Ed. 1103 (1908)). In *Londoner,* the Court held that an "opportunity ... to submit in writing all objections ... and complaints" is not enough, that the person entitled to a hearing has a right to make an oral argument. 210 U.S. at 386, 28 S.Ct. at 714. The right to oral argument certainly cannot be denied in a hearing as critical as the one that takes place at the time of sentencing and particularly when that sentencing involves the issue of capital punishment.

The right to oral argument at sentencing goes hand in hand with the right to effective assistance of counsel. The Supreme Court has explicitly recognized the right to counsel during sentencing. *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed. 2d 336 (1967). In the capital punishment context, the Court has stated: "the sentencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel." *Gardner v. Florida,* 430 U.S. at 358, 97 S.Ct. at 1205 (plurality) (citing *Mempa v. Rhay* and *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967)). The right to counsel obviously entitles the defendant to more than the mere presence of a defense attorney.

> If the values inherent in *Mempa* and *Gideon* are to be realized, the mere presence of counsel in the courtroom during sentencing will be inadequate. Counsel at the sentencing stage must be allowed to perform some of the functions which justify his presence.

Note, *Procedural Due Process at Judicial Sentencing for Felony,* 81 Harv.L.Rev. 821, 835 (1968). As the Seventh Circuit said in *Baker v. United States,* a noncapital case, the right to the effective assistance of counsel entitles defense counsel "to make any meaningful statement" during sentencing. 407 F.2d 618, 620 (7th Cir. 1969). Thus, there can be little doubt that the right to counsel implies, at the very least, the right to make an oral argument on the question whether a sentence of death should be imposed.

The majority opinion does not directly address this argument. Rather, the majority seems to suggest that Coleman waived his right to oral argument at the sentencing hearing. No other court has previously suggested that he did so. The majority's argument seems to be premised upon the fact that at the June 14th hearing Coleman's attorney told the court that Coleman would not present any witnesses to establish mitigating factors at the sentencing hearing. *See* maj. op. at 452–453, 461. The majority also relies on the fact that at this same June 14th hearing the court told Coleman's counsel that it "will render its findings of fact and go up on the record that is present ...," and defense counsel did not object.

The simple fact is that at no time during the hearing did either party waive its right to oral argument. To the contrary, Cole-

man's counsel explicitly declared that both sides should be given an opportunity to make an oral argument during the July sentencing hearing. Moreover, as mentioned *supra,* both parties appeared at the July sentencing hearing anticipating, and prepared for, oral argument on the issue of mitigation and the proper sentence to be imposed.[30] While defense counsel did not intend to present witnesses at the sentencing hearing, he nevertheless intended to make, and did indeed make, arguments relevant to Coleman's sentence—but only after the court had distributed its final written Findings, Conclusions, Judgment, and Order. Surely no waiver of oral argument can be implied from the fact that a party does not desire to present witnesses.

Nor can a waiver be implied from the court's statement that it intends to make findings of fact and go up on the present record, and Coleman's failure to object. The majority takes the court's statement out of context. It was made after a long exchange between defense counsel and the court regarding whether Coleman would have to testify, since the prosecution asked that Coleman be subject to cross-examination. The court agreed with defense counsel that Coleman need not be compelled to testify, stating that the court would render its findings of fact and go up on the present record. That Coleman's counsel did not object is understandable given this context, for the judge was making a ruling in his favor wholly unrelated to his right to present oral argument. Furthermore, the court's statement, even taken out of context, would be insufficient to provide a waiver, since the waiver of a fundamental right must be explicit, intelligent, and voluntary.

The majority does not contend that because the distributed Findings were unsigned they were simply proposed rather than final findings.[31] Nor does the majori-

**30.** In an apparent attempt to support its waiver argument, the majority notes that "[t]he trial court ... agreed to accept a brief from the State and from Coleman's counsel specifically discussing the relevant aggravating and mitigating circumstances," and cites *Coleman III.* Maj. op. at 455. Presumably, the majority intends to imply that the parties proposed commenting on the aggravating and mitigating circumstances by brief rather than by oral argument. *Coleman III,* however, does not support this implication. The Montana Supreme Court never suggested that Coleman had waived his right to oral argument. Instead, that court, as explained *supra,* incorrectly assumed that Coleman had no right to *oral* argument at sentencing. Furthermore, it is clear from the record that Coleman did not waive his right to oral argument. In fact, defense counsel stated at the June hearing that he wanted to make an oral argument at the sentencing hearing. The trial court and the prosecution did not object to the defense's proposal that the issue of mitigation be decided at a later date on the basis of oral argument. At no point did Coleman's counsel agree to forego oral argument. Rather, when the prosecutor agreed to incorporate his page citations (to the portions of the trial transcript he intended to rely on for his sentencing argument) in his reply brief on the *ex post facto* issue, instead of reading them aloud at the hearing then in progress, Coleman's counsel was afforded an opportunity to do likewise. Finally, it appears from the record that Coleman's counsel did not file a brief on the issue of mitigation. Certainly, none is contained in the record we received. The Montana Supreme Court made inconsistent statements on this issue. *Compare Coleman II,* 185 Mont. at 329, 605 P.2d at 1018 ("the defendant ... did not take advantage of the District Court's offer to accept proposed findings and conclusions from the parties with respect to the sentence") *with Coleman III,* 633 P.2d 624, 632 (1981) ("Both the petitioner and the State ... submitted their briefs and findings and conclusions...."), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). In *Neuschafer v. McKay,* "the district court was presented with conflicting, or at least inconsistent, conclusions by two state courts on the critical point in the case. It could not render a decision on the record before it without second-guessing at least one state tribunal." 807 F.2d 839, 841 (9th Cir.1987). In *Neuschafer,* we decided that the district court should have held a hearing on the issue. *Id.* at 841–42. Here, in the absence of a hearing, we must assume the version of the disputed facts that is most favorable to petitioner. We must, consequently, assume that the defendant did not file a brief on the issue of mitigation.

**31.** The judge at all times treated his written findings as final, and never as proposed or somehow tentative. Indeed, at the beginning of the sentencing hearing, the judge handed the parties a written document in final form containing its Findings, Conclusions, Judgment, and Order, and not just a draft of proposed or tentative findings. Furthermore, the Montana Supreme Court stated that "[a]t the beginning of the July 10 hearing, the trial judge submitted to petitioner's counsel and State counsel his findings and conclusions and thereafter counsel for

ty contend that Coleman does not possess the right under the Constitution to present oral argument. Rather, the majority simply disregards the evidence showing that Coleman did not waive his rights and instead in a conclusory fashion assumes that he did. In an equally cavalier manner, the majority disregards the mandate of the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 525–26, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972): "Courts should 'indulge every reasonable presumption against waiver,' *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937), and they should 'not presume acquiesence in the loss of fundamental rights,' *Ohio Bell Tel. Co. v. Public Utilities Comm'n,* 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937)." The waiver of a fundamental right must be explicit, intelligent, and voluntary. Here, at the very most, the majority can point to a few ambiguous phrases in the record. Under the exacting *Barker* standards, it seems apparent that the majority's suggestion that Coleman waived his right to oral argument is patently erroneous.

Coleman like all persons facing capital punishment has a constitutional right to have the sentencer listen to his arguments before deciding on his punishment. He was improperly deprived of that fundamental right. The death penalty imposed on him violates the due process clause as well as the eighth amendment and, consequently, cannot stand.

2. *Mitigating Circumstances.*

Even had the trial court delayed deciding on the death sentence until after it had heard counsel's arguments, we would be compelled to reverse—both on the ground that it failed to consider a number of mitigating circumstances and on the ground that it unlawfully considered a highly prejudicial adverse circumstance. The court inadvertently or deliberately failed to consider the evidence regarding Coleman's character and background (other than that relating to the presence or absence of a criminal record) and improperly based its decision in part on his alleged commission of an unadjudicated offense.

a. *Character and Background as Mitigating Factors*

(i) General Rule

The Supreme Court has recently reiterated that the Constitution requires that the capital defendant be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense. *California v. Brown,* — U.S. ——, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). "Consideration of such evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death' ". *Id.* (quoting *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991 (plurality)). In *Eddings,* the Supreme Court stated unequivocally that "the state courts must consider *all relevant mitigating evidence* and weigh it against the evidence of aggravating circumstances." 455 U.S. at 117, 102 S.Ct. at 878 (emphasis supplied). Last year, the Court posited, as a well-established rule "that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.' " *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (quoting *Eddings,*

petitioner read into the record a prepared statement in mitigation." *Coleman III,* 633 P.2d at 632. In an earlier opinion, the Montana Supreme Court put it even more clearly. The court said: "The District Court handed counsel for defendant and the State, a copy of its written findings, judgment and order." *Coleman II,* 185 Mont. at 307, 605 P.2d at 1006. At no time did the Montana Supreme Court characterize the judge's written decision as tentative or proposed.

The majority, too, seems to recognize that when the trial judge arrived at the July 10th hearing he had already made his decision. The majority tells us that, after the written decision was distributed, "[d]efense counsel then read into the record a statement he had prepared on Coleman's behalf." Maj. op. at 453. That characterization of the events makes it clear that the oral argument that took place on July 10 was, for purposes of sentencing, nothing more than an empty gesture, and that its only function, if any, was to permit counsel to preserve the record for appeal.

455 U.S. at 114, 102 S.Ct. at 877). *See also Hitchcock v. Dugger,* — U.S. —, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987).

The sentencing court has an obligation to consider mitigating factors even though it has no duty to give them overriding weight. "The sentencer, and the Court of Criminal Appeals on review," the Supreme Court declared in *Eddings,* "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 114–15, 102 S.Ct. at 876–77. *See also id.* at 117, 102 S.Ct. at 878. By the same token, the sentencing court, under Montana's death penalty system, may decide whether the mitigating factors are sufficiently substantial to call for leniency. But it must consider those factors, not exclude them from its deliberations.

The Supreme Court has repeatedly and specifically held that a capital sentencing court must consider the character and background of the accused. *See, e.g., Sumner v. Shuman,* 107 S.Ct. at 2721–26; *California v. Brown,* 107 S.Ct. at 839; *Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. at 2744; *Eddings v. Oklahoma,* 455 U.S. at 112, 102 S.Ct. at 875; *Lockett v. Ohio,* 438 U.S. at 604–06, 98 S.Ct. at 2964–65 (plurality); *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991 (plurality); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. at 333, 96 S.Ct. at 3006 (1976) (plurality). In *Woodson,* the Court said,

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

428 U.S. at 304, 96 S.Ct. at 2991 (plurality).

As Justice O'Connor explained in *California v. Brown,* "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 107 S.Ct. at 841 (O'Connor, J., concurring). Accordingly, a sentencing judge must take these factors into account when deciding whether to order that a defendant be executed. In *Hitchcock v. Dugger,* the Court held that, unless the state proves the error to be harmless, the failure to consider mitigating evidence pertaining to the defendant's character and background "renders the death sentence invalid." 107 S.Ct. at 1824.

(ii) Specific Mitigating Circumstances in Coleman's Case

The presentence investigation report addressed the mitigating circumstances in Coleman's background. In his dissent in *Coleman II,* Justice Shea summarized the pertinent contents of that report. Because I consider the mitigating circumstances to be substantial and deserving of thoughtful consideration before a decision is made that Coleman should or should not be hanged, I quote Justice Shea's summary in its entirety.

> Dewey Coleman is a black man, born October 26, 1946, in Missouri, the son of a boilermaker and housewife. There were nine brothers and sisters in his family. At the age of fourteen, he ran away from home, but some time later he returned to Missouri. He graduated from high school in 1964. His father died in 1964 and his mother died in 1972. As of January 20, 1975, only four brothers and sisters were known by him to be alive. He apparently has had no contact with his family since that time.
>
> From 1965 to 1972, he was in the United States Navy. He was discharged in 1969 but was recalled to active duty very shortly thereafter. He attained the rank of E–5 and was primarily involved in doing clerical work. During this time he

also received approximately two years of education at a junior college and through correspondence courses. He received his discharge from the Navy in 1973 and apparently is on disabled classification as a result of a service-connected activity.

In 1973, he came to Great Falls, Montana, in part because he wanted to remove himself from the drug scene. He had used drugs on and off since the young age of 12 or 13 when he and his friends smoked marijuana that was growing wild near his home in Missouri. He later became involved with using cocaine, amphetamines and heroine [sic].

Upon his arrival in Great Falls, Montana, he became actively involved with Opportunity Incorporated, a community action low income coalition of individuals who worked for welfare rights and the betterment of low income people. While associated with Opportunity Incorporated he became founder and president of L.I.N.C. (Low Income Neighbors Coalition). He helped organize a Christmas program for low income youngsters in the Great Falls area, and provided the time and initiative to get several projects developed before he left in May 1974 for the Veteran's Hospital in Sheridan, Wyoming.

Insofar as can be determined, defendant had never been convicted of even a misdemeanor charge. Indeed, he has not even been arrested for any offense. The parole and probation officer spoke with several individuals in Great Falls concerning Coleman, and he stated in his report:

> This writer spoke with several individuals associated with the subject and familiar with his work in the Great Falls area and everyone that I talked with was complimentary of this individual's work and viewed with some disbelief the crime this individual has committed.

After his arrest, several persons performed psychological testing of defendant, and their diagnoses ranged from such determinations as paranoid schizophrenia; schizodal personality; organic brain syndrome; depressive reaction; a patient with passive-aggressive personality; aggressive personality disorders; and depressive reaction with anxiety (Depressive Neurosis).

*Coleman II*, 185 Mont. 299, 356–57, 605 P.2d 1000, 1032–33 (1979) (Shea, J., dissenting), *cert. denied*, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980).

Although, as Justice Shea acknowledged, the profile is not complete, the contents of the presentence report make it clear that many of Coleman's personal circumstances (in addition to his lack of a criminal record) were relevant to the issue of mitigation and should have been taken into account by the sentencing judge. For example, the sentencing court had a constitutional obligation to take into account Coleman's underprivileged and harsh childhood and adolescence, his military service, his good reputation in his neighborhood, his community service, and his psychological disorders. However, it is clear from the record and from the written findings that the judge failed to give any consideration whatsoever to any of those mitigating circumstances.

The majority states that the judge made the presentence investigation report part of the record and that we can assume, therefore, that he took Coleman's background into account. That assumption runs counter to the court's own findings as well as to the mandate of *Gardner*.

(iii) The Trial Court's Failure to Consider Coleman's Character and Background

In the present case, while the sentencing court considered Coleman's prior criminal "record," it clearly did not consider Coleman's character and background. Nothing in the sentencing hearings or in the written "Findings, Conclusion, Judgment and Order" warrants the conclusion that the judge recognized, or gave any consideration to, the mitigating character and background factors described in the presentence investigation report and in the defense's oral statement. There is no mention of any of those elements in the written sentencing decision or in the oral comments the judge made at the sentencing hearing. At no point did the judge make any refer-

ence to the mitigating circumstances in Coleman's background or character. Instead, he mentioned only an entirely different category of mitigating circumstance when he said: "The *one* mitigating circumstance is that the defendant has not prior to this time been convicted of any felony [emphasis supplied]...."[32] Moreover, in the "Findings, Conclusions, Judgment and Order", the judge asserted "[t]hat the *only* mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity [emphasis supplied]."

Under the Montana capital punishment statute a defendant's criminal record is different than and treated separately from mitigating circumstances relating to his character and background. The statute requires the court to consider a defendant's criminal record under subsection (1) and character and background under the catchall provision, subsection (8). The catchall provision requires the court to consider any fact or circumstance that "exists in mitigation of the penalty" excluding only those already covered by subsections 1–7. An analysis of the statutory framework reveals that the catchall provision includes most of the mitigating circumstances that Justice O'Connor expressly described in *Brown* and that the Court in *Hitchcock* held must be considered if the death penalty is to stand.

After completing its discussion of Coleman's prior criminal record under subsection (1), the sentencing court expressly found that there was *no evidence* of *any* mitigating circumstances under the catchall provision. The Court found:

> That there [was] *no evidence* appearing, either in the record of the trial held in this cause or the special sentencing hearing accorded, supporting a finding of any of the circumstances in mitigation under the other numbered paragraphs of Section 95–2206.9, namely paragraphs (2) through *(8)*. There is, likewise, *no evidence* of any facts which are operative in this case to mitigate the penalty in this cause [emphasis supplied].

It seems clear that the reason the court failed to find any evidence of any mitigating circumstances under subsection (8) was either that the judge was not aware that the mitigating facts set forth in the presentence report existed or that he did not recognize that those facts constitute mitigating circumstances under *Lockett.* Whatever the reason, the court failed to consider the mitigating circumstance relating to Coleman's character and background when performing the crucial function of weighing aggravating and mitigating factors.

To put it clearly, the issue is not whether the judge weighed the circumstances properly or gave them sufficient significance. Had the judge considered the mitigating factors that were present under subsection (8) and found them "not sufficiently substantial to call for leniency," 95–2206.10, no constitutional violation would have occurred. That, however, is simply not what transpired here. The record before us reveals that the court simply was unaware of or failed to consider Coleman's character and background.

### (iv) The Errors in the Majority's Analysis

The majority chooses to ignore the overwhelming specific evidence showing that the trial court did not consider Coleman's background and character and instead accept uncritically the trial judge's general boilerplate assertions that he reviewed and considered all relevant materials. The majority states that during both the June 14th and the July 10th hearings, "the court stated several times, without challenge, that it had read and considered all materials submitted." Maj. op. at 455.[33] During the June 14th hearing, however, the court only

32. Despite having said this, the court did not give Coleman any mitigation credit in his findings. *See supra* notes 25–26 and accompanying text.

33. Since Coleman apparently did not file a brief on the issue of mitigation, *see supra* note 30, and since his oral argument took place after the court had decided to impose the death penalty, it is far from clear what the majority is referring to by "all materials submitted."

declared that it had "before it all matters during the course of the trial [and had] heard the testimony relating to the aggravating circumstances and also some to mitigating circumstances." (There was of course no such testimony before the judge other than that which was offered at the time of trial for the purpose of establishing Coleman's guilt or innocence.) The trial court also stated that it had "called for and received a presentence report, which [it then] cause[d] to be filed in accordance with law." The court did not say, however, that it had considered the parts of such report pertaining to Coleman's character and background. The trial court simply noted that "[t]he significant part of [the report] relative to mitigating circumstances, is that the defendant has never been convicted of any felony prior to this charge." At no time did the court specifically assert that it had read the entire presentence report.

In the July 10th hearing the trial judge told the parties before the oral arguments: "I want you to know that I have considered all of—everything that you have submitted and have given it thought, and that this isn't just a matter that the court takes lightly." (It is significant that at this point the defendant apparently still had submitted nothing to the court—he had filed no brief or other written document on the subject of mitigating circumstance or the appropriateness of punishment, *see supra* notes 28 & 30, and had made no oral argument on that subject.) It does not appear that this statement refers to the presentence investigation report since that report was not submitted by either of the parties.

After counsel made their oral remarks, the judge again stated: "I have not looked at the points that have been raised lightly, but many of the arguments raised by the defense, of course have been considered heretofore."[34] Finally, in its "Findings, Conclusions, Judgment and Order" the court stated that it had "reviewed all matters submitted." Such boilerplate statements are entitled to little weight in a capital punishment case.

What is most important is that the trial court never specifically claimed to have read the portions of the presentence investigation report pertaining to Coleman's background and character, let alone to have *considered* any of the relevant aspects of his life. Nor is there any indication in any of the court's remarks of any awareness of any facts or circumstances relating to Coleman's history. The court's formalistic general assertions that it had considered all the arguments are insufficient to overcome the absence of any reference to the various mitigating facts and circumstances mentioned in the presentence report and the court's own specific findings and conclusions to the contrary. The written findings demonstrate that the *only* mitigating circumstance the court considered was the absence of a criminal record; they further show that the court was cognizant of *no* mitigating circumstances relating to Coleman's character and background.

The majority cites from *Coleman II* to support the proposition that the trial court considered all of the evidence and materials presented in rendering its Findings regarding mitigation. Maj. op. at 454. The majority's reliance on *Coleman II* is misplaced. *Coleman II* does not say, anywhere, that the trial court considered any of the evidence in mitigation other than Coleman's lack of a prior record. To the contrary, *Coleman II* seems to support the conclusion that the trial court did *not* consider the other evidence in mitigation—i.e., Coleman's character and background. The Montana Supreme Court in *Coleman II,* though recognizing that the presentence investigation report included information both on Coleman's record of no prior convictions and on his character and background states only that the sentencing court considered the former. "[T]he District Court," *Coleman II* says, "did consid-

34. If one were to give this statement any weight at all, it would have to be noted that some, if not most, of the arguments had not previously been raised; moreover, as I have already mentioned, the points made in the oral presentation could not have been considered, since the court had made its decision prior to the time the presentation occurred.

er the mitigating circumstance of defendant's lack of a criminal record but concluded this circumstance was offset by evidence that defendant had committed a burglary on the same day the kidnap, rape and homicide occurred." 185 Mont. at 332, 605 P.2d at 1019. The opinion makes no claim that the trial judge considered Coleman's character or background and nowhere discusses any of *those* mitigating circumstances. The majority thus is simply in error when it states that the Montana Supreme Court found that the sentencing court considered *all* of the mitigation evidence, including that pertaining to Coleman's character and background.[35]

(v) Even Were it Only "Unclear" Whether the Trial Court Considered the Mitigating Factors, Reversal Would be Required.

While it is relatively clear that the judge failed to consider Coleman's character and background, it is not necessary that we be certain that such was the case. Reversal is required where there is any *doubt* as to whether the judge actually considered the mitigating evidence pertaining to the defendant's character and background. *Lockett* establishes that even the "risk [of] the death penalty [being] imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompati-

35. In this part of its opinion the majority relies entirely on several cases decided by the eleventh circuit: *Johnson v. Wainwright,* 778 F.2d 623 (11th Cir.1985); *Funchess v. Wainwright,* 772 F.2d 683 (11th Cir.1985), *reh'g denied en banc,* 776 F.2d 1057, *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986); *Raulerson v. Wainwright,* 732 F.2d 803 (11th Cir.1984), *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984); *Palmes v. Wainwright,* 725 F.2d 1511 (11th Cir.1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *Dobbert v. Strickland,* 718 F.2d 1518 (11th Cir.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). *See* maj. op. at 455. The eleventh circuit's view appears to conflict with *Gardner, see infra* discussion in subsection (vi), and with *Lockett* and Justice O'Conner's clear statement in *Eddings, see infra* discussion subsection (v). Equally important, however, the cases are all readily distinguishable. In each of the eleventh circuit cases the court held that the sentencing judge was not required to specify mitigating circumstances when it was clear from the record that he had taken those circumstances into account. In *Johnson v. Wainwright,* the eleventh circuit expressly agreed "with the district court that the sentencing order read in its entirety, combined with the court's instructions to the jury, indicates that the trial court gave adequate consideration to the evidence presented [pertaining to non-statutory mitigating circumstances]." 778 F.2d at 629. Similarly, in *Funchess v. Wainwright* the eleventh circuit stated:

> The trial court considered this evidence [relating to non-statutory mitigating circumstances] but was *obviously* not persuaded that it justified the establishment of any non-statutory mitigating factors. Consequently, the trial judge did not include a detailed discussion regarding these alleged circumstances in his findings of fact.

772 F.2d at 693 (emphasis supplied). In *Raulerson v. Wainwright,* the eleventh circuit declared: "*it is evident* from the record before us that the trial judge did consider the evidence but concluded that it did not outweigh the factors militating in favor of the death penalty." 732 F.2d at 806 (emphasis supplied). In *Palmes v. Wainwright,* the court wrote:

> Here the trial judge patiently heard all of the evidence appellant had to offer.... *There is no indication whatsoever* that the trial judge did not conscientiously consider everything presented. 725 F.2d at 1523 (emphasis supplied). Finally, in *Dobbert v. Strickland,* the eleventh circuit announced: "our analysis of the record reveals that both the order of the trial court and the decision of the Florida Supreme Court reflect consideration of all mitigating evidence put on by Dobbert, statutory and nonstatutory." 718 F.2d at 1523.
>
> Contrary to the circumstances in the case before us, in each of the eleventh circuit cases the defendants had actually introduced evidence on the mitigating circumstances during the sentencing proceedings. Thus, in each case the judge had personally admitted all of the evidence in question and had listened to all of the pertinent testimony. In none of the eleventh circuit cases was the only source of mitigating evidence a written document. The eleventh circuit's conclusion that the mitigating factors were actually considered thus finds some actual support in the record in each case. Unlike the majority, the eleventh circuit relied on the facts and circumstances in the record and not solely on boilerplate statements as its basis for concluding that the judge had considered the mitigating circumstances not specifically mentioned. Finally, in none of those cases did the trial judge specifically make findings that indicated an unfamiliarity with the existence of the pertinent mitigating circumstances and that directly contradicted the undisputed facts in the presentence report with respect to the existence of those circumstances.

ble with the commands of the Eighth and Fourteenth Amendments." 438 U.S. at 605, 98 S.Ct. at 2964 (plurality). *See also Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986) (plurality). Justice O'Connor stated expressly that ambiguity or doubt regarding the question whether the judge considered all the mitigating factors requires reversal.

> [We] may not speculate as to whether the trial judge ... actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances.... *Woodson* and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the trial court.

*Eddings v. Oklahoma,* 455 U.S. at 119, 102 S.Ct. at 879 (O'Connor, J., concurring), *cited in Sumner v. Shuman,* 107 S.Ct. at 2722 n. 4. Similarly, in the present case we should not hesitate to reverse the death penalty in light of "mitigating information that *may not have been considered* by the trial court in deciding whether to impose the death penalty or some lesser sentence." *Eddings,* 455 U.S. at 119, 102 S.Ct. at 879 (O'Connor, J., concurring) (emphasis supplied).

(vi) The Constitution Requires the Court to Specify the Mitigating Factors Considered

In my view, the constitution requires that the court specify the mitigating circumstances considered when a death penalty is imposed. I believe that *Gardner* requires such a rule:

> Since the State must administer its capital sentencing procedures with an even hand, *see Proffitt v. Florida,* 428 U.S. [242,] 250–253 [96 S.Ct. at 2965–67] [(1976)], it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed. Without full disclosure of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia.*

*Gardner v. Florida,* 430 U.S. at 361, 97 S.Ct. at 1206 (plurality). The majority seems to believe that *Gardner* means only that the reviewing court must be able, from looking at the record, to discern considerations present that could *in theory* have been relied on by the sentencing court in reaching its decision to impose a capital sentence—regardless of what factors the judge *actually* relied on. I think that *Gardner* quite clearly demands more. In my opinion, it requires the sentencing judge to specify the considerations that *actually* motivated his decision—those that militated in favor of his decision and those that weighed in favor of leniency. Only then can a reviewing court determine whether the judge considered those factors —as the Constitution requires him to.

When the Supreme Court asks for a "full disclosure of the basis for the death sentence," it is obviously requiring an affirmative act by the sentencing judge. It is telling sentencing judges to make their death penalties lawful and reviewable by specifying the considerations upon which they relied. This does not mean mentioning only those factors that support the court's decision. It means also identifying the considerations that support leniency but are insufficient in the judge's view to warrant that result. Here, the judge simply said there were no such considerations, although clearly a number of them were set forth in the record and not disputed.

In short, to comply with *Gardner,* the sentencing court must explicitly discuss the evidence in mitigation. The court need not provide an extensive excursus into each mitigating circumstance but must at least identify those which affect its decision, including those it finds insufficient to warrant leniency.

Inasmuch as the Constitution makes unacceptable the *risk* of imposing the death penalty without certitude that the sentencing judge has considered the mitigating circumstances, *see supra* subsection (v), there seems to be no reasonable alternative to requiring sentencing judges to specify the factors actually taken into account. In the absence of such a requirement, review-

ing courts would be required to speculate as to what factors the sentencing judge considered in deciding to impose the death penalty. That is precisely what the majority does here: speculate—in all probability erroneously—as to what the sentencing judge actually considered.

Supreme Court decisions "indicate that the discretion of the sentencing authority [in death penalty cases] must be limited and *reviewable.*" *Spaziano v. Florida,* 468 U.S. 447, 462, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984) (emphasis supplied). In *Woodson,* the Court established that *Furman* imposes on the state, as a "basic requirement", the obligation to "make rationally reviewable the process for imposing a sentence of death." 428 U.S. at 303, 96 S.Ct. at 2990 (plurality). *See also McKenzie v. Risley,* 801 F.2d 1519, 1528 (9th Cir.1986) ("The primary concerns the Supreme Court has expressed in discussing the death penalty have been the need for guidance of the fact finder's discretion and an opportunity for review of the exercise of that discretion."), *petition for reh'g en banc granted,* 815 F.2d 1323 (9th Cir.1987). Requiring the sentencing judge to specify each of the mitigating circumstances present provides courts of appeal with a *reviewable* record. In addition, such a rule forces the sentencer to consider the mitigating factors individually and to be more conscientious than he might otherwise be.

The majority cites two Supreme Court cases in which jury imposed death penalties were affirmed although the juries were not required to specify the aggravating and mitigating circumstances that served as a basis for their decisions. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In neither of those cases, however, did the defendant raise the issue of the need for specific findings as to aggravating and mitigating circumstances and the Court, not surprisingly, did not rule on the question. Moreover, both of these cases were decided prior to *Gardner,* in which the Court first expressly required a "full disclosure of the basis for the death sentence," 430 U.S. at 361, 97 S.Ct. at 1206.[36] Thus, *Gregg* and *Jurek* in no way derogate from the *Gardner* requirement. Accordingly, we need not consider here whether the constitution would permit the application of different standards in jury ordered death penalty cases.

None of the three other Supreme Court cases which the majority cites supports the view that the trial judge need not specify the mitigating circumstances considered in deciding to impose the death penalty. *Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). All of these cases involved statutes that required the sentencing judge to make written findings on the mitigating circumstances. The Alabama statute in *Baldwin* required courts imposing a death sentence "to set forth in writing the factual findings from the trial and sentencing hearing, including the aggravating and mitigating circumstances that formed the basis for the sentence." *Baldwin v. Alabama,* 472 U.S. at 376, 105 S.Ct. at 2730. The Florida statute in *Spaziano* required the trial judge "to conduct an independent review of the evidence and to make his own findings regarding aggravating and mitigating circumstances. If the judge imposes a sentence of death, he must set forth in writing the findings on which the sentence is based." 468 U.S. at 466, 104 S.Ct. at 3165. In *Proffitt,* the death penalty statute also required the judge to file written findings on the aggravating and mitigating circumstances. 428 U.S. at 250, 96 S.Ct. at 2965 (plurality). In none of these cases did the defendant allege that there were mitigating circumstances which the sentencing judge had failed to discuss in his findings. The majority simply mis-

36. It is worth noting that in *Gregg* the Court by way of dictum took its first step toward the *Gardner* requirement, saying, "[w]here the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available...." 428 U.S. at 195, 96 S.Ct. at 2935 (plurality).

reads these cases when it states that in all of them the trial judge failed to discuss "factors dealing with a defendant's personal history considered by the judge but rejected." Maj. op. at 457–58. In short, the majority simply errs both with respect to the law and the facts. The issue whether the sentencing court must discuss mitigating circumstances relating to character and background was neither presented nor considered in any of these cases.

In sum, it is constitutionally required that judges who decide to impose the death penalty make specific findings on the mitigating circumstances presented.

b. *Consideration of the Unadjudicated Offense*

(i) Introduction

The trial court's decision to order Coleman's execution was based in part on its assumption that he had committed an unadjudicated offense. Because of the importance of the "quality" of the information relied on by a capital sentencer, *Gardner v. Florida,* 430 U.S. at 359, 97 S.Ct. at 1205 (plurality), and because of the centrality of the defendant's record in capital sentencing, the Constitution does not permit the capital sentencer to rely on unadjudicated offenses. Coleman's death penalty should be reversed for this reason alone. Moreover, the use of the unadjudicated offense by the judge in this case violates the notice requirement of the due process clause.

(ii) The Judge Based Coleman's Sentence in Part on an Unadjudicated Offense

During cross-examination at trial, Nank declared that on the day of the Harstad murder, Coleman had participated with him in the burglary of a home in Roundup, Montana. Although the sentencing court's statements are somewhat contradictory, it seems reasonably clear that, as the Montana Supreme Court found, the judge based his decision to impose the death penalty partially on Nank's allegations—in other words on an unadjudicated offense.

In the findings portion of the "Findings, Conclusions, Judgment and Order", the sentencing judge declared unequivocally that he was relying on the Roundup burglary as the basis for denying Coleman his statutory credit in mitigation under subsection (1)—credit for not having any prior criminal convictions. In the Findings, the judge declared:

> The only other criminal act which appears in the trial record in this cause is the aggravated burglary of a home in Roundup, Montana, where certain guns were stolen by the defendant and Robert Nank on July 4, 1974. By reason of the foregoing, the credit in mitigation allowed by Section 95–2206.9(1) is not appropriate to this defendant.

*Reprinted in Coleman II,* 185 Mont. at 390, 605 P.2d at 1050 (Shea, J., dissenting). In the conclusions the judge was more equivocal. He stated:

> That the only mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity.

*Reprinted in Coleman II,* 185 Mont. at 391, 605 P.2d at 1051 (Shea, J., dissenting). The only reasonable reading of the two statements is that the judge concluded that whether or not Coleman had a technically clean record the unadjudicated offense served to deprive him of the mitigation credit he would otherwise have received.

The clear import of the sentencing judge's written findings and conclusions is not affected by the fact that after counsel read his oral argument into the record the judge mischaracterized his own findings and conclusions. In his comment made just prior to reading the sentence and judgment the judge directly contradicted his written findings. He said "[t]he one mitigating circumstance is that the defendant has not prior to this time been convicted of any felony but in view of the enormity of the crime committed, and the Court's feeling that this one circumstance does not overcome the aggravated circumstances, I have made findings to this effect, written findings as required by the law [emphasis added]." In fact, his "written findings" bore no similarity to his oral description of them. The judge did not make written findings that the mitigating circumstance

was outweighed by the aggravating circumstance. To the contrary, he found that no mitigating circumstance existed under subsection (1) or any other subsection. As the Montana Supreme Court accurately explained it, the sentencing judge found that the Roundup incident outweighed the defendant's prior clean record and therefore the subsection (1) mitigation credit would not be afforded. *Coleman II,* 185 Mont. at 332, 605 P.2d at 1019–20. Thus, the judge found there was no mitigating circumstance to weigh against the aggravating circumstance. Under these circumstances, imposition of the death penalty became *mandatory.*

We review the sentencing judge's written findings and conclusions and not his oral statements. As we said in *Hong v. United States,* when "the [trial court] make[s] and enter[s] detailed findings of fact and conclusions of law, we are of the view that we need not, and should not, on ... appeal, review [the court's oral] statements." 363 F.2d 116, 120 (9th Cir.1966). *See also E.E.O.C. v. Exxon Shipping Co.,* 745 F.2d 967, 974 (5th Cir.1984) ("to the extent the [trial] court's statements from the bench conflict with its formal findings and conclusions, we do not consider them"); *Harbor Tug & Barge v. Belcher Towing,* 733 F.2d 823, 827 n. 3 (11th Cir.1984) ("The trial judge was not bound by his off-hand remarks. In its search for error, the reviewing court looks to the formal findings and conclusions...."); *White v. Washington Public Power Supply System,* 692 F.2d 1286, 1289 n. 1 (9th Cir.1982) ("the rule of this circuit is that the formal findings of fact and conclusions supersede the oral decision").

The Montana Supreme Court found that the sentencing court had considered the Roundup burglary and, on account of it, gave Coleman no mitigation credit for his record of no prior convictions. *Coleman II* states that "the District Court did consider the mitigating circumstance of defendant's lack of a criminal record but concluded this circumstance was offset by evidence that the defendant had committed a burglary on the same day the kidnap, rape and homicide occurred." 185 Mont. at 332, 605 P.2d at 1019. Thus, the Montana Supreme Court acknowledged that the unadjudicated offense served to deprive Coleman of the one mitigating factor the sentencing court found otherwise to exist and thereby eliminated the only consideration that, under the sentencing court's approach, could have overcome the aggravating factor and permitted Coleman's life to be spared.

Any doubt as to whether the judge improperly denied Coleman mitigation credit on the basis of an unadjudicated offense must be decided in favor of the defendant. For, as noted *supra,* even the "risk [of] the death penalty being imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio,* 438 U.S. at 605, 98 S.Ct. at 2965 (plurality).

The use of the unadjudicated, and wholly uncorroborated, offense here served to deprive Coleman of his only chance for leniency. On the basis of that offense the judge denied him the mitigation credit that he would otherwise have received as a result of his lack of a prior criminal record. Under the statute, this was tantamount to classifying Coleman as a defendant with a "significant history of prior criminal activity." Even more important, in light of the court's other rulings, it left Coleman without any statutory mitigating circumstance and made imposition of the death penalty mandatory.

(iii) Unconstitutionality of Relying on Unadjudicated Offenses

The majority relies on *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), in support of its contention that the sentencer in a capital punishment case may rely on uncharged and untried offenses. In that case, the majority tells us, "the Court upheld the trial court's consideration, in imposing the death sentence, of some thirty burglaries allegedly committed by the defendant, even though he had not been convicted of these crimes." Maj.Op. at 459 (citing *Williams v. New York,* 337 U.S. at 244, 69 S.Ct. at 1081).

In *Gardner,* however, the Supreme Court expressly rejected the approach underlying *Williams.* The court explained its reasons:

> In 1949, when the *Williams* case was decided, no significant constitutional difference between the death penalty and lesser punishments for crime had been expressly recognized by this Court. At that time the Court assumed that after a defendant was convicted of a capital offense, like any other offense, a trial judge had complete discretion to impose any sentence within the limits prescribed by the legislature. As long as the judge stayed within those limits, his sentencing discretion was essentially unreviewable and the possibility of error was remote, if, indeed, it existed at all. In the intervening years there have been two constitutional developments which require us to scrutinize a State's capital-sentencing procedure more closely than was necessary in 1949.

430 U.S. at 357, 97 S.Ct. at 1204 (plurality). The two developments that the court was referring to were (a) the recognition that "death is a different kind of punishment from any other which may by imposed in this country" and (b) the acceptance of the notion "that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause." *Id.* at 357, 358, 97 S.Ct. at 1204, 1204.

The objection to the sentencer's reliance on the alleged Roundup burglary is based on the due process clause and rests, in great part, on the notion that capital punishment is a unique and an ultimate sentence. Thus, the majority's use of *Williams* as a basis for rejecting Coleman's claim is, in my view, not appropriate. As in *Gardner,* the "two constitutional developments ... require us to scrutinize [the] state's capital sentencing procedure more closely than in 1949" when *Williams* was decided.

Because, as already mentioned, the Supreme Court has repeatedly held that capital sentencing is *sui generis,* the admissibility of evidence of unadjudicated crimes in ordinary sentencing hearings is not dispositive here. *Compare United State v. Hull,* 792 F.2d 941 (9th Cir.1986) (per curiam) (imputed thefts properly relied upon in determining noncapital sentence).[37] We must decide as a matter of first impression whether unadjudicated offenses can play any role in the decision to impose the death penalty. In light of the strict due process requirements that the Supreme Court has imposed on capital sentencing, I believe that such offenses may not be so used.

*Gardner* tells us that in death penalty cases, "consideration must be given to the quality, as well as the quantity, of the information on which the sentencing judge may rely." *Id.* at 359. In *Zant v. Stephens,* the Supreme Court held that the capital sentencer could rely upon evidence of prior criminal *convictions.* 462 U.S. at 886–87, 103 S.Ct. at 2748. The Supreme Court, noted, however, that the accuracy of all the evidence at issue was unchallenged and pointed out that reliance on a prior conviction that was "uncounselled" might require the setting aside of even a noncapital sentence. *Id.* at 886 and n. 23. In my view, evidence of unadjudicated offenses is not of the quality required in capital sentencing and causes undue prejudice to the defendant. The use of such evidence runs afoul of the "fundamental principles of procedural fairness" that are applicable to capital sentencing proceedings. *Presnell v. Georgia,* 439 U.S. 14, 16, 99 S.Ct. 235, 236, 58 L.Ed.2d 207 (1978). Moreover, given the constitutional significance that attaches to a capital defendant's criminal record or

37. Of course, even in noncapital cases, the sentencer must find that the underlying "facts provide[ ] sufficient indicia of reliability of the inference that [the defendant] committed [the imputed offense]." *United States v. Hull,* 792 F.2d at 943. *See also Brothers v. Dowdle,* 817 F.2d 1388, 1390 (9th Cir.1987) ("the court must satisfy itself that the defendant in fact committed the acts in question"). In the present case, not even these more lenient noncapital standards could justify the sentencing judge's reliance on the Roundup burglary. At no point did the court "satisfy itself that the defendant in fact committed the acts in question." *Id.* The judge simply assumed that Nank's uncorroborated and dubious allegation was true and could be relied on as a basis for ordering Coleman's execution.

lack thereof—*Sumner v. Shuman,* 107 S.Ct. at 2721–22; *California v. Brown,* 107 S.Ct. at 839; *Eddings v. Oklahoma,* 455 U.S. at 110–12, 102 S.Ct. at 874–75; *Lockett v. Ohio,* 438 U.S. at 604–05, 98 S.Ct. at 2964–65 (plurality); *Woodson v. North Carolina,* 428 U.S. at 303–04, 96 S.Ct. at 2990–91 (plurality); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. at 333, 96 S.Ct. at 3006 (plurality)—we should not allow the sentencing authority to rely on unadjudicated offenses when assessing that factor.

The Supreme Court of Pennsylvania took a clear-cut and enlightened approach to the issue before us. Even before the spate of United States Supreme Court cases defining the constitutional restrictions on the imposition of the death penalty, the highest court of Pennsylvania had already concluded:

> In a capital case where a man's life is at stake, it is imperative that the death penalty be imposed only on the most reliable evidence. Prior convictions of record, and constitutionally valid admissions and confessions of other crimes meet this standard of reliability; piecemeal testimony about other crimes for which [the defendant] has not yet been tried or convicted can never satisfy this standard.

*Commonwealth v. Hoss,* 445 Pa. 98, 118, 283 A.2d 58, 69 (1971). Since then other state courts have considered the issue and a majority, like Pennsylvania, have forbidden the use of unadjudicated offenses in capital sentencing. *See, e.g., State v. Bartholomew,* 101 Wash.2d 631, 633–40, 683 P.2d 1079, 1082–85 (1984) (admitting evidence of uncharged or unadjudicated criminal activity violates due process); *Scott v. State,* 297 Md. 235, 245–47, 465 A.2d 1126, 1135–36 (1983) (rejecting on state-statutory and federal constitutional grounds the use of evidence of unadjudicated offenses during capital sentencing); *State v. McCormick,* 272 Ind. 272, 279–80, 397 N.E.2d 276, 279–81 (1979) (introducing, at the capital sentencing phase, evidence of an unrelated murder, for which defendant was neither tried nor convicted, violates due process); *Provence v. State,* 337 So.2d 783, 786 (Fla. 1976) (state statute intended to meet the requirements of *Furman* "excludes the possibility of considering mere arrests or accusations as factors in aggravation"). Only a minority of states, two in number, has adopted a contrary view. *See People v. Balderas,* 41 Cal.3d 144, 204–05, 222 Cal.Rptr. 184, 219–20, 711 P.2d 480, 515–16 (Cal.1985) (uncharged crimes may be used in deciding whether to impose the death penalty); *Milton v. State,* 599 S.W.2d 824, 827 (Tex.Crim.App.1980) (upholding "use of unadjudicated offenses at the [capital] punishment phase"). However, in both minority states it is required that the unadjudicated offense be proved "beyond a reasonable doubt". No court has previously held, as does the majority here, that an unadjudicated offense can be established by a lesser standard.

The states that have refused to permit use of unadjudicated offenses in capital cases have done so both in cases barring their use in order to establish the existence of an aggravating circumstance and in cases precluding their use as a means of depriving the defendant of mitigation credit.[38] The two minority states that have permitted their use have done so in cases in which the prosecution sought to rely on them as aggravating circumstances. While, in my view, their use in either fashion is constitutionally impermissible, because of the difference in the allocation of the burden of proof their use to deprive a defendant of credit in mitigation is clearly far more egregious.

Because the majority holds that the defendant bears the burden of proof as to the existence of mitigating factors, the sentencing court's reliance upon an unadjudi-

38. In *Scott v. State,* a case in which the unadjudicated offense was used in the latter manner, the Court of Appeals of Maryland reasoned in language remarkably pertinent here:

> ... the admission of [evidence of unadjudicated offenses] may well have resulted in the mitigating circumstance of the absence of prior convictions being outweighed or, in essence, "wiped out" or eliminated. Because this inadmissible evidence was significantly prejudicial to the accused, its admission constituted reversible error.

297 Md. at 252–53, 465 A.2d at 1136.

cated offense in the mitigation phase meant that Coleman was required to prove by a preponderance of the evidence that he did not commit a crime. In the end the consequence of his failure to prove that he was not guilty of an unadjudicated offense was the death sentence. It is in all likelihood for this reason that no other court has heretofore approved of the use of a prior unadjudicated offense where its existence or nonexistence was, under the applicable state statute, relevant to a defendant's attempt to establish mitigating circumstances.

Only one circuit court decision, *Autry v. Estelle,* 706 F.2d 1394 (5th Cir.1983), appears to lend any support to the use of unadjudicated offenses in capital cases. However, on close examination it is clear that even *Autry* supports Coleman's position rather than the state's. In *Autry,* the Fifth Circuit upheld the admission of evidence "of jail records reflecting that [the defendant] was in jail on a charge of felony theft and was released on the afternoon of the robbery [during which the capital offense took place]." *Id.* at 1404. *See also Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984); *Rault v. State of La.,* 772 F.2d 117, 135 n. 32 (5th Cir.1985) (dictum). However, the Fifth Circuit then emphasized the fact that "[t]he evidence was not used in an effort to prove that [the defendant] committed the extraneous offense." *Id.* at 1405. The court recognized but distinguished the state court decisions condemning the introduction of proof of extraneous offenses in the sentencing phase of capital case unless conviction had been obtained. *Id.* (citing *Provence v. State,* 337 So.2d 783 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977); *State v. Bartholomew,* 98 Wash.2d 173, 654 P.2d 1170 (1982); *State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276 (1979)). All the arguments relied upon by the Fifth Circuit to distinguish these decisions are equally applicable to distinguish the present case:

> Unlike the Texas statute, the death penalty statutes of Florida, Washington, and Indiana do not require a determination that the accused would commit criminal acts of violence that would constitute a continuing threat to society. Rather they require a determination that one or more particularized aggravating circumstances exists, including that the accused has previously committed other crimes or other murders. *When the effort is to prove that a defendant committed a particular crime on an earlier occasion, insisting in the capital case that such proof be only by a prior conviction may not be unreasonable.* The effort here, however, was not to prove that [the defendant] had committed theft or that he was a thief. Indeed, the jury already had before it two previous convictions for theft-type offenses.

*Autry,* 706 F.2d at 1406. (emphasis supplied). Whatever one might conclude about the validity of the *Autry* holding, it clearly has no relevance to cases expressly distinguished. Perhaps most important of all is the Fifth Circuit's concluding caveat:

> We do not here open wide the door to proof of extraneous offenses at the sentencing hearing. To the contrary, we also are wary of their use, particularly in a capital case.

*Id.* at 1407. Where, as here, the only evidence of the unadjudicated offense is that offered by a codefendant seeking to escape capital punishment, and where that evidence was not even relevant to the issue of punishment under the statute in effect at the time it was offered, *see infra* section IV.A.3, that caveat seems particularly compelling.

(iv) Notice

The sentencing judge's reliance on the alleged Roundup burglary also presents serious notice problems under the due process clause. Even though the presentence investigation report refers to the alleged burglary, the defense cannot be presumed to have known that the judge would rely on Nank's uncorroborated allegation to deny Coleman mitigation credit for his clean record. To the contrary, in the immediately preceding hearing the judge led Coleman to believe that the alleged burglary would not be relied upon and that he would get

mitigation credit for having no prior convictions. During that hearing, the judge, upon filing the presentence investigation report, unequivocally declared: "The significant part of it relative to mitigating circumstances, is that the defendant has never been convicted of any felony prior to this charge."

The mention of the Roundup burglary in the decision that was distributed at the second hearing afforded Coleman no useful notice whatsoever. The majority's statement to the contrary is, to say the least, odd. Notice seconds before a hearing, let alone after the decision has been distributed, is grossly inadequate. The proceeding began immediately after the distribution of the sentencing court's decision. Coleman and his attorney may well not have learned that the judge intended to rely on the alleged Roundup burglary until after he read the sentence aloud. In any event, any comments they could have made after the decision was distributed would unquestionably have been futile. *See supra* discussion at subsection III.C.1.

In *Memphis Light, Gas & Water v. Craft,* the Supreme Court held that notice, in general, must "apprise the affected individual of, and permit adequate preparation for, an impending 'hearing'." 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978) (footnote omitted). These principles become all the more compelling in capital sentencing hearings. For, as mentioned earlier, *see supra* section III.C.1, the constitution demands that defense counsel have the opportunity to participate meaningfully in such hearings. *See Gardner v. Florida,* 430 U.S. at 360, 97 S.Ct. at 1206 (plurality). The notice afforded in this case that the court would consider the unadjudicated crime certainly was not adequate and clearly did not give Coleman's counsel an opportunity to comment effectively. As in *Gardner,* we should conclude that defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." 430 U.S. at 362, 97 S.Ct. at 1207 (plurality). *See also Skipper v. South Carolina,* 106 S.Ct. at 1671 n. 1.; *id.* at 1674 (Powell, J., concurring in the judgment).

D. *Conclusion*

In my view, the sentencing procedures were constitutionally inadequate and require that the death penalty be vacated. The sentencing judge deprived Coleman of his right to present oral argument regarding the sentence to be imposed, failed to comply with his constitutional obligation to listen to the defendant's contentions, and failed to consider Coleman's character and background. In addition, he based his decision in part on a constitutionally impermissible consideration and failed to afford the defendant adequate notice of a charge on which his sentence was, in part, based. All of these constitutional errors, individually and collectively, require a reversal of Coleman's capital sentence.

## IV. THE DEATH PENALTY STATUTE

A. *Introduction*

Coleman challenges the death penalty statute under which he was resentenced both on its face and as applied to him. He claims that the statute is facially unconstitutional because it imposes on the defendant the burden of proof on the existence of mitigating circumstances and on whether mitigating circumstances outweigh aggravating circumstances. He also contends that both the due process and *ex post facto* clauses preclude his resentencing under a death penalty statute that was enacted only after he had been tried, convicted, and sentenced under an earlier statute. With one possible exception, it is clear that none of these questions has yet been resolved by the Supreme Court or any circuit court.

B. *Burden of Proof on Mitigating Circumstances*

Coleman claims that the 1977 Montana statute under which he was sentenced to death violates the eighth and fourteenth amendments by imposing on the defendant the burden of proof on the existence of mitigating circumstances and on whether such circumstances are sufficiently substantial to warrant leniency.

The majority states that the 1977 death penalty statute, as interpreted in *Fitzpatrick v. State,* 638 P.2d 1002 (Mont. 1981), imposes on the defendant only the burden of production, not the burden of persuasion. Maj. op. at 445 n. 5. However, that is not what *Fitzpatrick* says. In *Fitzpatrick,* the Montana Supreme Court decided that the 1977 death penalty statute imposes on the defendant both the burden of production *and* the burden of persuasion. The court's opinion first placed the burden of production on the defendant by requiring him "to bring forth the evidence pertinent to the question of mitigation." 638 P.2d at 1013. The opinion did not end at that point, however. The defendant claimed that, under the 1977 death penalty scheme, "he was required to prove that his life should be spared, because the burden rests on him to show mitigation." *Id.* The Montana Supreme Court responded unequivocally: "The statute undoubtedly places the burden on the defendant to show that his life should be spared...." *Id.* Put another way, under the Montana statute, in order to prevail on the issue of capital punishment, the defendant must prove both the existence of mitigating circumstances and that the mitigating circumstances outweigh the aggravating circumstances, i.e., that they are sufficiently substantial to call for leniency. As stated in the dissent: "The majority [in *Fitzpatrick* ] admits that the statute does shift the burden of persuasion, but holds that it is not unconstitutional." *Id.* at 1047 (Shea, J., dissenting).

My colleagues here also err in failing to recognize that Coleman's claim consists of two parts. First, Coleman complains that the statute unconstitutionally forces him to prove, by a preponderance of the evidence, the existence of mitigating circumstances. Second, Coleman contends that the statute violates due process by placing on him the burden of proving that capital punishment is not the appropriate penalty—that the mitigating circumstances are sufficiently substantial to call for leniency. These two issues should be addressed separately. I will discuss them in reverse order.

The question the sentencing court is required to answer under the Montana statute—whether mitigating circumstances are sufficiently substantial to call for leniency —is similar in nature to that posed under a number of other states' statutes—whether the mitigating circumstances outweigh the aggravating ones. In both cases, the issue is which party should bear the burden of proof on the ultimate question—whether the facts and circumstances in the record before the court, properly construed and evaluated, warrant a decision for life or for death. Surprisingly, the Supreme Court has not yet decided which party should bear that burden, although some members have made it clear that in their view the Constitution requires that it be placed on the prosecution.[39] Equally odd, no circuit

39. In the cases on which certiorari has been sought thus far, the state courts have not said, as did Montana's, that the burden rests on the defendant. Nevertheless, in his dissent from the denial of *certiorari* in one of those cases, *Thomas v. Maryland,* Justice Marshall, joined by Justice Brennan, addressed the underlying issue, saying: "To my mind, the Constitution requires that the State bear the burden of proving that a death sentence is appropriate in a given case." 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985) (Marshall, J., dissenting from denial of *cert.*). *See also Stebbing v. Maryland,* 469 U.S. 900, 906–07, 105 S.Ct. 276, 281, 83 L.Ed.2d 212 (1984) (Marshall, J., dissenting from denial of *cert.*). In *Thomas,* even though the Maryland Court of Appeals had not decided which party bore the burden of persuasion, the death penalty statute required that the capital sentencer determine whether mitigating circumstances outweighed aggravating circumstances. Justice Marshall concluded that that language implicitly imposed on the defendant the burden of proving that his life should be spared. He said that because the Maryland statute placed on the defendant the burden of proving "the ultimate question" Thomas' death sentence should be vacated. 470 U.S. at 1088, 105 S.Ct. at 1856. In subsequent cases, Justice Marshall argued that the language of the statute impermissibly shifted the risk of nonpersuasion even though the Maryland Court of Appeals by then had held that the statute does not impose the burden of proof on the defendant. *Calhoun v. Maryland,* — U.S. —, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987) (Marshall, J., dissenting from denial of *cert.*); *Huffington v. Maryland,* — U.S. —, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986) (Marshall, J., dissenting from denial of *cert.*). In *Gacy v. Illinois,* Justice Marshall argued that a statute which "impos[ed] on the defendant the burden of adducing mitigating evidence 'sufficient' to

court has yet spoken definitively on the question.[40]

I believe that, in capital cases the Constitution requires the prosecution to bear the risk of nonpersuasion on the ultimate issue of life or death—on the question whether leniency is called for, whether the mitigating circumstances in a particular case are sufficiently substantial, whether they outweigh the aggravating circumstances. Because of the extraordinary nature of the death penalty, there is an overwhelming "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality) (footnote omitted). In *Sumner v. Shuman,* the Supreme Court recently underscored once again "the heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case." 107 S.Ct. at 2720 (1987) (citing *Gregg v. Georgia,* 428 U.S. at 189–95, 96 S.Ct. at 2932–35 (opinion of Stewart, Powell, and Stevens, J.J.); *Proffitt v. Florida,* 428 U.S. at 252–53, 96 S.Ct. at 2966–67 (same); *Jurek v. Texas,* 428 U.S. at 271–72, 96 S.Ct. at 2956 (same); *Woodson v. North Carolina,* 428 U.S. at 303–05, 96 S.Ct. at 2990–91 (plurality opinion); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. at 333–35, 96 S.Ct. at 3006–07 (plurality opinion)). We therefore must go "to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence is not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma,* 455 U.S. 104, 117–18, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1976) (O'Connor, J., concurring).

Under these exacting standards, in my view, the state may not constitutionally impose on defendants the burden of proof on the ultimate issue in the capital sentencing proceeding. The Constitution requires "state courts [to] consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Eddings v. Oklahoma,* 455 U.S. at 117, 102 S.Ct. at 878. This comparative weighing of aggravating and mitigating factors is the most important determination courts make in deciding whether a defendant shall live or die. In fact it may be the most important decision courts make—period. Certainly, the sentencer should not resolve so crucial a question against the defendant unless the prosecution has carried the burden of persuasion. It is important to note here that the Supreme Court has characterized the decision as to whether mitigating circumstances are such as to warrant imposition of a life rather than a death sentence as the type of "line drawing that is commonly required of a factfinder in a lawsuit." *Proffitt v. Florida,* 428 U.S.

'preclude imposition' of the death penalty" unconstitutionally "plac[ed] on the defendant the burden of proving that death is not appropriate in his particular case." 470 U.S. 1037, 105 S.Ct. 1410, 84 L.Ed.2d 799 (1985), (Marshall, J., dissenting from denial of *cert.*). It is worth noting that the language of the Illinois statute in *Gacy* is similar to that of the statute challenged here, but in that case the Illinois courts, unlike Montana's, had not made it clear that the burden falls on the defendant. *See also Jones v. Illinois,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983) (Marshall, J., dissenting from denial of *cert.*).

40. The Fifth and the Eleventh Circuits have decided cases involving claims by defendants that a death penalty statute unconstitutionally placed on them the burden of persuasion on whether the mitigating circumstances outweighed the aggravating ones. *Songer v. Wainwright,* 733 F.2d 788, 792 (11th Cir.1984). *cert. denied,* 469 U.S. 1133, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985); *Gray v. Lucas,* 677 F.2d 1086, 1106 (5th Cir.1982), *cert. denied* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983). In both cases the courts held that the statute invoked did not place the burden on the defendant. While both suggest that the defendant may be required to produce evidence in mitigation, neither suggests that the burden of persuasion on the weighing of aggravating and mitigating circumstances may be shifted to the defendant. The two Eleventh Circuit cases cited by the majority do not stand for that proposition either. Both address the entirely different question whether the prosecution should bear a beyond-a-reasonable-doubt burden on the appropriateness of the death penalty. *Foster v. Strickland,* 707 F.2d 1339, 1345 (11th Cir.1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *Ford v. Strickland,* 696 F.2d 804, 817–18 (en banc) (per curiam) (11th Cir.1983), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

242, 257, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976). *See also Jurek v. Texas,* 428 U.S. 262, 275–76, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). The question, thus, is one as to which the proper allocation of the burden of persuasion is of great importance. *See generally Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) ("A capital sentencing proceeding [resembles] a trial in its adversarial format and in the existence of standards for decision...."); *Spaziano v. Florida,* 468 U.S. 447, 483, 104 S.Ct. 3154, 3174, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part) ("In many respects capital sentencing resembles a trial on the question of guilt, involving as it does a prescribed burden of proof of given elements through the adversarial process.") Here, the burden was placed on the wrong party. I believe that the eighth and fourteenth amendments require that the defendant's life be spared when the evidence or the arguments on mitigation and aggravation are in balance. The Constitution does not allow the risk of error to fall on the individual, on the side of death. Rather, that risk must be born by the state, by those urging execution.

These principles become even more critical when statutes such as Montana's *require* the sentencing judge to impose the death penalty if one of a number of aggravating circumstances is present and the mitigating circumstances are not sufficiently substantial to call for leniency. Under those circumstances the sentencer does not have the ultimate discretion to determine independently the appropriateness of the death penalty.[41] Its evaluation of the relative weight of the mitigating and aggravating circumstances is the sole determinant of whether the death penalty will be imposed. Since the outcome may be determined by which party has the burden of proof, there can be little doubt where that burden must lie. *See Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed. 2d 973 (1978) (plurality).

The majority opinion purports to establish the facial validity of the statute by citing wholly inapplicable Supreme Court cases—*Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)—cases which uphold death penalty statutes that, according to the majority, do not impose a burden of persuasion on the prosecution.

Even were the majority correct, however, the argument misses the mark. For the majority does not suggest that any of the statutes involved in these cases places the burden, as Montana does, on the defendant. There is, of course, a significant difference between simply allowing the court to resolve an issue as to which no allocation of the burden has been made and placing the burden on the defendant. In *Proffitt,* the Court considered the facial validity of a death penalty statute that did not specify which party bore the burden of persuasion as to mitigating factors. There is no mention in *Proffitt* of where the burden rests under state law. Nor is there any suggestion in the opinion that the normal burden of proof in making such judgments should be, or was, reversed under the Florida statute. In any event, the petitioner did not complain that the burden was imposed on him, and the Supreme Court, unsurprisingly, did not discuss the issue.

The majority's reliance on *Jurek* is equally misplaced. In *Jurek,* the statute required the jury to answer in the affirmative three questions before imposing the death penalty. The second question was: " 'whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society ...' " 428 U.S. at 269, 96 S.Ct. at 2955. Texas has interpreted the statute as requiring the jury to consider mitigating circumstances under this second

41. Other states allow the sentencing authority to impose a life sentence even if it finds that aggravating circumstances outweigh the mitigating factors. For instance, under the Mississippi death penalty statute involved in the Fifth Circuit case that discusses burden allocation in capital sentencing, *see supra* note 39, "even if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it is not required to impose the death penalty." *Gray v. Lucas,* 677 F.2d at 1106.

question. Under the statute the jury must find "that the State has proved beyond a reasonable doubt that the answer to each of the three questions is yes". *Id.* Thus, the Texas statute, as a practical matter, imposed on the prosecution, albeit indirectly, the burden of proving beyond a reasonable doubt that the mitigating factors were not sufficient to exclude defendant from the category of individuals that constituted a continuing threat to society. Moreover, in *Jurek,* as in *Profitt,* the Court carefully noted the similarity between the jury's ordinary task as a factfinder and its task in answering the questions it was required to answer under the Texas capital punishment statute. 428 U.S. at 275–76, 96 S.Ct. at 2958 (plurality). It seems likely from this observation that the Court would not have permitted Texas to shift the burden of proof to the defendant. The majority consequently errs when it says that in *Jurek* the statute did not impose on the state the burden to prove the absence of mitigating circumstances. Maj. op. at 446. Finally, in *Jurek,* as in *Proffitt,* the burden of proof issue was neither raised by the petitioner nor decided by the court.

The majority also invokes *Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982) (per curiam), *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), to support the facial adequacy of the statute. However, *Harris* decided the different issue whether "a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." *Id.* at 1195. In *Harris* we held that a death penalty statute was not unconstitutional simply because it did not impose on the prosecution the burden of proving *beyond a reasonable doubt* that the aggravating circumstances outweighed the mitigating ones. The holding in *Harris* does not address or resolve the question presented here: whether the prosecution or defense has the burden of persuasion on whether mitigating circumstances outweigh aggravating circumstances.[42] Moreover, in *Harris,* as in *Proffitt* and *Jurek,* the defendant did not allege that the risk was unconstitutionally imposed on him and there is no mention in the opinion of where the risk of nonpersuasion rests as a matter of state law.

Coleman's second claim regarding the burden of proof issue is that the 1977 death penalty statute unconstitutionally imposed on him the burden of persuasion on the *existence* of mitigating circumstances. In *Lockett v. Ohio,* the Supreme Court failed to reach the question of the constitutionality of "requir[ing] defendants to bear the risk of nonpersuasion as to the existence of mitigating circumstances in capital cases." 438 U.S. at 609 n. 16, 98 S.Ct. at 2967 n. 16.[43]

I believe that the special need for reliability in determining that the death penalty is

42. *Harris* contains the following dictum:

> If the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of the many modern cases dealing with the death penalty.

*Harris v. Pulley,* 692 F.2d at 1195 (per curiam). The question presented in *Harris* was whether in capital sentencing, unlike in ordinary criminal sentencing, the prosecution had to bear a beyond-a-reasonable-doubt burden of proof. The statement quoted above not only is entirely suppositious but constitutes patent dictum that sweeps far too broadly. The Supreme Court has assiduously avoided making unnecessary pronouncements in death penalty cases and has carefully limited its discussions to issues properly before it. Any guess, by way of dictum, as to why the Supreme Court has not said something when the issue has not been properly before it is just that—a guess by way of dictum.

43. In the noncapital context, *Patterson v. New York* holds that the state may require a defendant to carry the burden of persuasion on mitigating circumstances presented as affirmative defenses as long as such circumstances do not serve to negate any of the elements of the criminal offense. 432 U.S. 197, 206–07, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977). *See also Martin v. Ohio,* — U.S. ——, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (not unconstitutional to impose on the defendant the burden of proving affirmative defenses, including self-defense). If the state may impose on a defendant the burden of persuasion on mitigating circumstances presented as affirmative defenses, it certainly may, in a noncapital case, impose the same burden on the existence of mitigating factors during the sentencing proceeding. However, as discussed *supra,* the Supreme Court has repeatedly held that capital punishment is qualitatively different from other sentences and, therefore, must meet stricter constitutional standards.

appropriate requires that the burden of persuasion on the *existence* of mitigating circumstances rest on the prosecution. Consideration of mitigating circumstances "is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *California v. Brown,* — U.S. —, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987) (quoting *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991 (plurality)). The existence of a mitigation circumstance may very well be the determining factor in deciding whether or not to impose capital punishment. The Constitution, accordingly, requires that when the evidence as to the existence of a mitigating circumstance is in equipoise, we decide the question in favor of the capital defendant.[44]

Whatever the general rule, in this case the burden was allocated in a manner that is patently unconstitutional. Because the state placed the burden on Coleman to prove the absence of a criminal record, he was required to prove that he had not committed the unadjudicated offense testified to by Nank, i.e., the alleged Roundup burglary.[45] On account of that burglary, Coleman was denied mitigation credit for his spotless criminal record. Thereafter, because the judge found no other mitigating circumstances, imposition of the death penalty was mandatory. Placing the burden on Coleman with respect to the Roundup burglary was wholly inconsistent with the presumption of innocence which lies at the heart of our system of criminal justice.

In sum, I believe that the Constitution prohibits states from imposing on defendants the burden of persuasion on the existence of mitigating circumstances as well as on the issue whether the mitigating circumstances outweigh the aggravating ones. In my view, both burdens must be placed on the prosecution. Certainly that is the case where the effect of placing the burden on the defendant is to require him to prove his innocence of an uncharged and unadjudicated offense. Certainly, also, that is the case where the determination of the mitigation-aggravation issue mandates the answer to the ultimate question—life or death.

### C. *Retroactive Application of the 1977 Death Penalty Statute*

Montana's Supreme Court held, in *Coleman I,* 177 Mont. 1, 579 P.2d at 741–42, that the mandatory death penalty statute under which Coleman was convicted and originally sentenced violated the eighth and fourteenth amendments of the federal constitution. The court found the statute inconsistent with the rulings in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). Coleman was then resentenced to death in 1978 under a new statute enacted in 1977, two years after his conviction

44. In his dissent from the Court's denial of certiorari in *Stebbing v. Maryland,* Justice Marshall set forth a compelling argument as to the unconstitutionality of placing on defendants the burden of persuasion on the existence of mitigating circumstances:

> [T]he mitigating factors set out in the statute are not matters of historical fact—they are matters of legal and moral judgment. These factors do not "exist," and thus, unlike matters of historical fact, they are not easily proved or disproved. Each one rests on evidence that easily might influence the conclusion that death is proper, even if that evidence does not conclusively *prove* the statutory mitigating factor.... As a result, *the sentencer would be prevented from considering any of the evidence adduced in an effort to meet the burden of proof,* because the statute permits consideration only of the factors proved by a preponderance of the evidence. To preclude the sentencer from considering such potentially influential evidence—as does the statute by denying any weight to evidence if the defendant does not convince the jury that a factor "exists" by a preponderance of the evidence—is to bar, as a matter of law, consideration of all mitigating evidence and influence and thus to violate *Lockett* and *Eddings.* Such a result can only enhance "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." [*Lockett v. Ohio,*] 438 U.S. at 605, 98 S.Ct. at 2965 [ (plurality) ].

469 U.S. 900, 902–03, 105 S.Ct. 276, 278, 83 L.Ed.2d 212 (1984) (Marshall J., dissenting from denial of *cert.*) (emphasis in original).

45. *See supra* section III.C.2.b(iii) for discussion of unconstitutionality of considering unadjudicated offenses in capital sentencing proceedings.

and original sentencing. He contends that in these circumstances the state's retroactive application of the new statute violates the due process and *ex post facto* clauses of the Constitution. I believe we are required to reverse on the basis of the due process clause.

Again, the majority opinion glosses over an issue the Supreme Court has not previously decided. The Court has never considered whether a subsequently-passed death penalty statute may be applied to defendants *who have previously been tried, convicted, and sentenced* under unconstitutional statutes. Equally important, as far as I am aware every court that has considered the issue has refused to permit the imposition of capital punishment on defendants under such circumstances.[46]

Montana insists that *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), legitimates the resentencing of Coleman under its 1977 death penalty statute. While *Dobbert* may arguably preclude Coleman from objecting to his resentencing on *ex post facto* grounds, it in no way invalidates his due process claim.[47] In fact, there is language in *Dobbert* that strongly supports Coleman's contention that the due process clause is applicable here.

In *Dobbert*, the petitioner was convicted and sentenced under the Florida death penalty statute in effect *at the time of his trial* rather than the one in effect when he committed the crime. The petitioner there argued that his conviction and sentence violated the *ex post facto* clause.

The *Dobbert* majority rejected the claim. The Court held that a defendant who had not yet been tried could be prosecuted and sentenced under a death penalty statute adopted after he had committed the crime as long as the death penalty statute in effect at the time of the offense provided adequate notice of the severity of the offense and the punishment that would be meted out for its commission.

Respondent now urges us to go well beyond *Dobbert*. Montana asks that we allow it to apply its new death penalty statute retroactively not only to individuals who have not yet been tried, but also to individuals who have already been subjected to trial, convicted, and sentenced under the former statute. The majority in *Dobbert* expressly refused to approve such an all-inclusive application of a subsequently

46. The courts of at least seven states have so held. California, *People v. Harvey*, 76 Cal.App. 3d 441, 445–49, 142 Cal.Rptr. 887, 889–92 (1978) (on double jeopardy grounds); Idaho, *State v. Lindquist*, 99 Idaho 766, 589 P.2d 101 (1979) (on *ex post facto* grounds); Nevada, *Meller v. State*, 94 Nev. 408, 581 P.2d 3 (1978) (grounds not stated but *Dobbert* distinguished); South Carolina, *State v. Rodgers*, 270 S.C. 285, 292–93, 242 S.E.2d 215, 217–18 (1978) (on due process grounds) and even Florida, the source of the *Dobbert* decision itself, *State v. Lee*, 340 So.2d 474 (Fla.1976) (on equal protection grounds). In these cases the state attempted to resentence people, like Coleman, who had already been tried and previously sentenced to death but whose sentences had been set aside. At least two states have gone even further and have refused to apply subsequently passed capital statutes in the case of defendants who were first convicted and sentenced to death under unconstitutional statutes, but were *retried* after constitutional capital punishment statutes had been enacted. Illinois, *People v. Hill*, 78 Ill.2d 465, 36 Ill.Dec. 676, 401 N.E.2d 517 (1980) (on statutory grounds); Pennsylvania, *Commonwealth v. Story*, 497 Pa. 273, 440 A.2d 488 (1981) (on equal protection and due process grounds).

47. In *Knapp v. Cardwell*, 667 F.2d 1253 (9th Cir.1982) *cert. denied*, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982), we decided that defendants tried and sentenced under an Arizona death penalty statute which was unconstitutional as initially *interpreted* by the Arizona Supreme Court had no *ex post facto* claim upon being resentenced under a subsequent and constitutional *reinterpretation* of the same statute. We expressly limited our discussion to the *ex post facto* clause. We concluded that "[t]he *Dobbert* opinion makes it clear that [the] distinction [between defendants tried and sentenced before the new scheme was in force and those tried and sentenced afterwards has no] ex post facto implications." *Id.* at 1262. "Thus," we held, "no ex post facto problems arise even with respect to [the former category of defendants]." *Id.* at 1263. We did not decide, however, whether *the due process clause* imposed any constraints on a state's attempts to resentence, under a *new death penalty statute*, defendants who were tried and originally sentenced under an unconstitutional death penalty statute.

In view of the conclusion I reach under the due process clause, I find it unnecessary to express any view as to whether the *ex post facto* provision also precludes the imposition of the death penalty on Coleman.

enacted statute and, as stated *supra,* every court that has considered the question since *Dobbert* has refused to do so (with the exception, of course, of the Montana Supreme Court in the case before us).

The operating assumption in *Dobbert* was that newly enacted statutes could *not* be applied retroactively to defendants previously tried and sentenced under the prior unconstitutional statute—i.e., to individuals like Coleman. The dissent articulated that assumption:

> Of the hundreds of prisoners on death row at the time of [*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)], none was resentenced to death.... [O]ur state courts and state legislatures uniformly acted on the assumption that none of them could be executed pursuant to a subsequently enacted statute.

432 U.S. at 309, 97 S.Ct. at 2306 (Stevens, J., dissenting). The dissenters took the circumstances under which Coleman has now been resentenced to death as a paradigm of unconstitutionality and tried to show that Dobbert's situation was not significantly different.

The majority rejected the comparison that the dissenters were trying to make but not the underlying assumption. In fact, then-Justice Rehnquist, speaking for the Court, painstakingly distinguished the circumstances presented by cases such as the one before us from the circumstances in *Dobbert.* He did so in dealing with Dobbert's contention that the equal protection clause required that Florida treat him in the same way it treated individuals who had been tried, convicted, and sentenced under the old statute—i.e., those who were in precisely the same position as Coleman. Florida had resentenced all those individuals to life imprisonment. *Anderson v. State,* 267 So.2d 8 (Fla.1972); *In re Baker,* 267 So.2d 331 (Fla.1972). The *Dobbert* court emphatically stated that Dobbert was

> not similarly situated to those whose sentences were commuted. He was neither tried nor sentenced prior to *Furman,* as were they, and the only effect of the former statute was to provide sufficient warning of the gravity Florida attached to first-degree murder so as to make the application of this new statute to him consistent with the *Ex Post Facto* Clause of the United States Constitution.

432 U.S. at 301, 97 S.Ct. at 2302. The Supreme Court itself thus distinguished *Dobbert* from our case. But the majority did not simply distinguish the Coleman situation in order to answer Dobbert's equal protection claim. The language of the opinion suggests strongly that applying the death penalty to those previously sentenced under the former statute would have violated their constitutional rights.

*Dobbert* says,

> Florida obviously had to draw the line at some point between *those whose cases had progressed sufficiently far in the legal process as to be governed solely by the old statute,* with the concomitant unconstitutionality of its death penalty provision, and *those whose cases involved acts which could properly subject them to punishment under the new statute.* There is nothing irrational about Florida's decision to relegate petitioner to the latter class, since the new statute was in effect at the time of his trial and sentence.

*Id.* (emphasis supplied). According to the Court, Florida properly decided that Dobbert's case—which had not yet reached trial, let alone sentencing, when the new statute was enacted—had not progressed far enough in the legal process to be exempt from the new statute. Nevertheless, the implication in *Dobbert* is clear: After a case has reached a certain point in the legal process under the old statute, the state may not order the defendant's execution under a newly enacted statute.

Coleman's case is surely one that "had progressed sufficiently far enough in the legal process as to be governed solely by the old statute." Indeed, Coleman had already been tried, convicted, and sentenced when the new statute was enacted. Moreover, he had already unsuccessfully filed a motion for a new trial, obtained a stay of

execution, and appealed to the highest court of the state when the Montana legislature passed the new death penalty statute.

What is perhaps most significant about *Dobbert* is the majority's statement that Florida was required to divide its death penalty cases into two categories—those which could be processed under the new statute, with death as a possible penalty, and those which had progressed too far for such treatment. Any line-drawing by Montana to define a category of cases which would be "governed solely by the old statute, with the concomitant unconstitutionality of its death penalty provision," necessarily would place Coleman's case in that category. The only other significant group of cases that had progressed as far as Coleman's would be that group of cases in which the defendant had received a noncapital sentence initially under the old statute. With respect to those cases, however, no line-drawing would be required since the defendants could not, consistent with the Double Jeopardy Clause, have been resentenced to death under the new statute in any event. *See Arizona v. Rumsey,* 467 U.S. 203, 209, 104 S.Ct. 2305, 2309, 81 L.Ed. 2d 164 (1984) ("[T]he Double Jeopardy Clause prohibits the State from resentencing the defendant to death after the sentencer has in effect acquitted the defendant of that penalty.").[48]

In *Dobbert,* then, "the only effect of the former statute was to provide sufficient warning of the gravity Florida attached to first-degree murder ..." *Dobbert v. Florida,* 432 U.S. at 301, 97 S.Ct. at 2302. Here, the former statute had been relied on by Coleman, and applied to him, in every possible respect (save his actual execution). The state's abrupt invocation of the new statute against Coleman, after he had been originally tried and sentenced under a different procedure, contravenes fundamental notions of fair play and violates the due process clause.

The sentencing of Coleman under a death penalty statute that was passed after his trial, conviction, and original sentencing constitutes the type of arbitrary state action that the due process clause was intended to invalidate. Retroactive application of the statute to cases like Coleman's would tend to create instability and uncertainty. It would make it impossible for capital defendants to know at the time of trial the nature of the death penalty statutory scheme under which they may ultimately be sentenced. If capital defendants may be sentenced under laws that have not been passed at of the time of their trials, they must decide on trial strategy and tactics without knowing with any certainty what factors will be taken into account at the time a sentencing court makes the final decision whether to impose the death penalty.

The retroactive application of a new death penalty statute upon *resentencing* is particularly unfair where, as is the case here, the old and new statute may cause defendants to make different decisions regarding trial tactics or strategy. In defending Coleman, counsel necessarily relied on the capital punishment statute as it then existed. For example, decisions concerning the evidence Coleman would offer at trial, the evidence he would challenge, and his appellate strategy were all necessarily affected by the fact that Montana had a mandatory death penalty statute for the offense on which he was being tried. Thus, all that mattered to Coleman and his counsel during the trial was the ultimate jury determination of guilt or innocence on the capital charge. The degree of culpability was irrelevant. Yet under the subsequently enacted statute the degree of culpability is highly relevant to the sentencing decision. Thus different strategies and tactics would clearly be appropriate under

48. There could also conceivably be a few cases which had been previously reversed for reasons other than the unconstitutionality of the death penalty and in which the defendants were awaiting retrial or resentencing. No relevant distinction can be made for due process purposes between those cases and Coleman's. Similarly, there might have been one or two cases in which the death sentence had already been

the former and current statutes.[49]

Coleman has provided another very clear example of the type of prejudice that resulted from the change in law. At the time of trial, under the mandatory death penalty statute then in effect, Coleman had no reason to be concerned about evidence pertaining to mitigating or aggravating circumstances. Thus, he had no reason, at the time of trial, to challenge or rebut Nank's story about the alleged Roundup burglary, other than simply to deny it. When the 1977 statute was later applied to Coleman's resentencing, that testimony became critical. *See supra* subsection III.C.2.b(ii).

The majority seems to suggest that for Coleman's retroactivity claim to succeed, he would have to show that the fact of the Roundup burglary would not have been disclosed at the trial or sentencing *but for* Coleman's cross-examination of Nank at trial. *See* maj. op. at 441–43.[50] The majority offers no justification for imposing such a burden on Coleman. Instead, it stresses that Coleman did have a motive to scrutinize Nank's testimony since Nank and Coleman testified to conflicting accounts of the events of the day the murder occurred and that Coleman also had ample opportunity to refute Nank's charges. *Id.* at 442. My colleagues seem to imply that there was no constitutional violation because Coleman suffered no substantial harm as a result of the retroactive application of the statute.

Yet for the court to require that Coleman carry the burden of proving that the evidence of the burglary would not have been introduced but for his questioning of Nank is contrary to a fundamental principle of constitutional law: when there has been constitutional error, the burden to show that it was harmless falls on "someone other than the person prejudiced by it." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). As the Court explained in *Chapman,* "the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Id.* (footnote omitted). Here, the state, not Coleman, is benefitting from the retroactive application of the 1977 statute, and Coleman has shown actual prejudice as a result of Nank's testimony—the denial of his statutory credit in mitigation that might have spared his life. It is the prosecution's burden therefore to show beyond a reasonable doubt that evidence of the burglary would have come in even had Coleman not invited Nank's testimony. *See id.* The prosecution made no effort to meet this burden.

### D. *Summation*

The 1977 death penalty statute under which Montana has sentenced Coleman to be hanged is unconstitutional both on its face and as applied to him. The statute impermissibly imposes on the defendant the burden of persuasion as to the existence of mitigating circumstances and the burden of showing that the mitigating circumstances are sufficiently substantial to mandate leniency. It also compelled Coleman in this case to prove that he did not commit an unadjudicated offense. Accordingly, the statute on its face and as applied violates the due process clause of the Constitution. Furthermore, the retroactive application of the statute to a defendant who had already been tried, convicted, and sen-

upheld on appeal. Here, too, however, the distinction is irrelevant.

49. The sentencing judge in fact included in his findings a reference to the degree of Coleman's culpability. The reference was based entirely on brief portions of Nank's testimony that Coleman had no particular reason to challenge or to attach special significance to during trial.

50. The Roundup burglary was mentioned in the presentence report, but only because of Nank's testimony.

The majority considers this retroactivity claim only in terms of the *ex post facto* clause and not in the context, of due process. Its arguments are, however, equally applicable, or for that matter, equally inapplicable to a due process claim. The majority offers no suggestion that it believes the evidentiary burden would be any different for claims based upon the *ex post facto* clause and those based upon due process.

tenced prior to its enactment independently violates that constitutional provision. Every court that has previously considered the issue has so held. In the case of Coleman, the retroactive application of the statute was particularly unfair since his death sentence was based in significant part on testimony that he had no reason to believe was of any significance when it was introduced under the former statute at the time of trial. For all these reasons, Coleman's death penalty should be vacated.

## V. CRUEL AND UNUSUAL PUNISHMENT CLAIM

### A. *Arbitrary and Extraneous Factors*

As discussed in section II, Coleman's participation in the Harstad murder was not significantly different from that of his white codefendant Nank. With respect to the relevant aspects of their character, background, and criminal record, Coleman was clearly a more deserving candidate for leniency than Nank. While in my view, there can be little question that the prosecution's conduct during plea bargaining raises a strong inference of racial discrimination, for purposes of this part of the analysis I will assume *arguendo* that race played no part in the state's decision-making process. Even under that assumption, however, imposition of the death penalty on Coleman was arbitrary, and reversal of that sentence is required by the eighth and fourteenth amendments.

The Supreme Court has stated that "it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (plurality). The decision must be individualized; it must rest on the "relevant facets of the character and record of the individual offender [and on] the circumstances of the particular offense." *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991; *see Sumner v. Shuman,* 107 S.Ct. at 2723 ("[A] departure from the individualized capital-sentencing doctrine is not justified and cannot be reconciled with the demands of the Eighth and Fourteenth Amendments."); *Booth v. Maryland,* — U.S. —, 107 S.Ct. 2529, 2532, 96 L.Ed.2d 440 (1987) ("a jury must make an *'individualized* determination' of whether the defendant in question should be executed, based on 'the character of the individual and the circumstances of the crime' " (quoting *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983) (emphasis in original)); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 333, 96 S.Ct. 3001, 3006, 49 L.Ed.2d 974 (1976) (plurality) ("Lack of focus on the circumstances of the particular offense and the character and propensities of the offender" constitutes "constitutional vice."); *Jurek v. Texas,* 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (plurality) (Sentencing authority must concentrate on "the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death."); *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (plurality) (Sentencing authority must "focus on the particularized circumstances of the crime and of the defendant.").

The Supreme Court recently vacated a death sentence as violative of the eighth amendment where the sentencer was permitted to consider an extraneous factor, a Victim's Impact Statement. The Court said:

> While [we have] never said that the defendant's record, characteristics, and the circumstances of the crime are the *only* permissible sentencing considerations, a state statute that requires consideration of other factors must be scrutinized to ensure that the evidence has some bearing on the defendant's "personal responsibility and moral guilt." *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982).

*Booth v. Maryland,* — U.S. —, 107 S.Ct. 2529, 2532–33, 96 L.Ed.2d 440 (1987) (emphasis in original). As *Booth* makes clear, the Constitution does not permit the state to impose the death penalty on the basis of considerations unrelated to the "defendant's 'personal responsibility and

moral guilt.'" *Id.* Permitting the introduction of extraneous factors into the sentencing process "creates an unacceptable risk that the capital sentencing decision will be made in an arbitrary and capricious manner." *Id.* In *Sumner v. Shuman,* the Court reinforced this point by quoting in a footnote the following passage from Justice O'Connor's concurrence in *California v. Brown:*

> "*Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character and crime."

107 S.Ct. at 2723 n. 5 (quoting *California v. Brown,* 107 S.Ct. at 839 (O'Connor, J., concurring) (emphasis in original)).

Where two persons are jointly responsible for a crime, we should carefully examine any claim that a decision to execute one and spare the other's life is based on improper considerations.[51] Here, the decision that Coleman should be executed rather than afforded a noncapital sentence was based in large part on considerations unrelated to his record, character and background, or to the degree of his culpability. I reach this conclusion in two ways. One is by examining the reasons given by the state throughout the process by which it determined that Coleman should be executed. The other is by comparing the facts and circumstances relating to Coleman's case with those that apply with respect to Nank's.

The state offered several reasons for its insistence on pursuing capital proceedings in Coleman's case. Most of the state's reasons related to the alleged unreliability or lack of voluntariness that might attach to any guilty plea by Coleman. The state argued that his plea would lack a factual basis, that it would not be voluntary because he secretly still believed he was innocent, that the plea would be subject to being set aside because he could later claim he was motivated solely by his fear of the death penalty or by his belief that he could not get a fair, nondiscriminatory trial. The state also complained that a guilty plea would be unreliable because Coleman had undertaken a sodium amytal test prior to pleading, because defense counsel had claimed to be incompetent, and because Coleman had previously requested and been granted a change of venue. Assuming *arguendo* that these contentions would have justified the state's rejection of Coleman's plea and its insistence that he proceed to a jury trial, under no circumstances could any of them serve as a basis for a decision by the state that Coleman should die. That a plea might be unreliable or involuntary, and even that a trial was required in order to prove guilt, is not a proper reason for ordering a defendant's execution. Such considerations are "wholly unrelated to the blameworthiness of a particular defendant." *See Booth v. Maryland,* 107 S.Ct. at 2534.

In addition to its "major" reasons for seeking to try Coleman on capital charges, the state mentioned two additional contentions. It weakly suggested at one point that Coleman was the more culpable defendant. It did not press that suggestion in the pretrial proceedings and does not contend in its brief before us that Coleman was more culpable than Nank. Moreover, my independent review of the record persuades me that the contention was wholly unmeritorious.[52]

51. This proposition is far different from saying that the state must justify its conduct on the basis of a general proportionality review. *Compare Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). General statistics may not adequately reflect the various individual judgments properly made as part of the exercise of prosecutorial discretion. On the other hand, unequal treatment of capital codefendants may occur regardless of what any general proportionality study may show with respect to other cases in general and the individual judgments are readily identifiable and reviewable.

52. In his sentencing decision, the judge said that Coleman was the dominating influence and the decision maker. He offered no explanation for this rather surprising statement. The court's conclusion is wholly at odds with the strong comments it made both during the pretrial proceedings and at the close of the prosecution's case. After listening to Nank's testimony, the

The state also advanced a more substantial contention during the plea bargain proceedings, one that raises an important issue with respect to capital punishment. The state claimed that Nank had confessed to the crime and entered his plea some time before Coleman expressed his willingness to do so. Although the fact that one defendant begins to cooperate first may justify leniency, and thus disparate sentences, in noncapital cases, I believe that a decision to execute a person may not constitutionally be based on that circumstance. Again we are faced with an issue of first impression and again we must proceed from the premise that capital punishment is singularly different from other forms of punishment. The fact that a defendant offers to plead at a later date than his codefendant bears no relation whatsoever to the criminal conduct involved or to the other aggravating and mitigating circumstances that the court may properly consider. Consequently, in my opinion, if the state decides whom to execute on the basis of which person began to cooperate first, it imposes the death penalty in an arbitrary manner that violates both the eighth and fourteenth amendments.[53]

Admittedly, there are valid reasons for offering leniency to defendants who are willing to cooperate with law-enforcement authorities. Were such a bargaining tool not available, the state would be unable to prosecute many perpetrators of serious crimes whom it is now able to convict. Moreover, I believe that the technique must be available with respect to capital as well as noncapital offenses. The difference, I suggest, is only that in capital cases, when an equally culpable or more culpable defendant is to be spared execution, then the life of any codefendant of that offender must also be spared unless the prosecution can demonstrate that there are particular factors relating to the codefendant's background, history, or character that would justify a decision to impose the death sentence on him alone.

The Supreme Court said in *Spaziano v. Florida:* "If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can properly distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." 468 U.S. at 460, 104 S.Ct. at 3162. *See also Booth v. Maryland,* 107 S.Ct. at 2534. When the decision to execute Coleman is viewed in the context of the life sentence received by Nank, it is

judge told the prosecutor that he took the defendant's motion for judgment of acquittal very seriously and that the prosecution's case was not at all persuasive except on the issue of "this black boy'[s] ... opportunity". More important, the Court's conclusion is not supported by any fair reading of the record, even when viewing all of the testimony in the light most favorable to the prosecution. Nank was clearly an equal participant, and was at the least equally culpable. The few brief and equivocal comments by Nank that could lend any support to a contrary view are wholly unpersuasive. Nank's statements not only are inadequate to support the judge's comments, but his testimony in this regard is highly suspect. Nank, of course, had every reason to attempt to make Coleman appear to be more blameworthy. Aside from Nank's comments, there is no evidence whatsoever, circumstantial or otherwise, that in any way provides the slightest support for the court's statement. Under these circumstances, I do not believe that, in a capital punishment case, we should give the court's statement undue weight. As the Supreme Court has declared, "we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state

court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.'" *Haynes v. State of Washington,* 373 U.S. 503, 515–16, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963) (quoting *Stein v. New York,* 346 U.S. 156, 181, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 (1953)). Moreover, for the reasons set forth in the text, I believe that the state's decision to execute Coleman was based in substantial part on factors that are "'irrelevant to the sentencing process'", *Baldwin v. Alabama,* 472 U.S. 372, 382, 105 S.Ct. 2727, 2733, 86 L.Ed.2d 300 (1985) (quoting *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983)), and thus constitutionally impermissible.

**53.** When, after the court distributed its written decision, the prosecutor was permitted to make some remarks, he devoted most of his comments to a review of the pretrial issues, including the fact that Nank was the first to offer to plead. There was of course little reason for him to make an argument as to the appropriateness of the sentence, since the court had already advised the parties of its decision and its reasons.

evident that the basis on which the state has selected Coleman for death is an improper one.

A civilized society could not rationally conclude that death is an appropriate punishment for Coleman but not for Nank because Nank confessed first and cooperated earlier, because the state was required to conduct a trial in Coleman's case in order to build a record, or because the prosecutors were uncertain as to the voluntariness or reliability of his plea. Those factors do not serve to distinguish "those individuals for whom death is an appropriate sanction [from] those for whom it is not." *Spaziano v. Florida,* 468 U.S. at 460, 104 S.Ct. at 3162. Thus, the mere fact that Coleman was forced to trial on a capital charge and convicted of that offense while Nank was permitted to escape trial on that count by pleading guilty to other offenses cannot—without more—serve as a basis for a judicial determination that one man shall live and the other shall die. There is no "more" present in this case. *See supra* note 53. In my opinion, Coleman's death sentence should be vacated as contrary to the eighth and fourteenth amendments.

B. *Unreliability of the Evidence*

One final point deserves serious attention. There is much merit to Justices Shea and Morrison's pleas to the federal courts to interdict capital punishment in Coleman's case because of the unreliability of the evidence on which both the conviction and the decision to execute were based. There was little, if any, corroboration of Nank's version of the crime. Only the possible existence of negroid pubic hairs in the car is potentially inconsistent with Coleman's story, and the expert testimony on that point was far from conclusive. Nank is a convicted felon. He made numerous contradictory statements regarding how the crime occurred, and he had every motive to lie, not the least being his desire to escape being hanged. Unquestionably, it is Nank's testimony on which both the conviction and the sentencing decision must rest. In my view, his testimony lacks the degree of certainty that we should require before a capital sentence may be imposed.

The Supreme Court has made it clear that there is a difference in the degree of certainty we require to uphold a conviction of a noncapital sentence and that which we require to send a man to his death. Objective reliability of the evidence, and not just a jury's decision as to its reliability, is a prerequisite to the imposition of capital punishment. As Justice Stewart wrote for the Court with respect to a closely related question:

> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for *reliability* in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina,* 428 U.S. at 305, 96 S.Ct. at 2991 (plurality) (emphasis supplied). Similarly, as the Court said in *Gardner,* "[c]onsideration must be given to the quality as well as the quantity of the information on which the sentencing judge may rely." 430 U.S. at 359, 97 S.Ct. at 1205 (plurality). I fully agree with Justices Shea and Morrison that the standard of reliability that is required in capital punishment cases is not met here, and that, accordingly, the sentence of death violates both the eighth and fourteenth amendments.

## V. CONCLUSION

I have examined only some of the most compelling claims presented by Coleman. I have divided them into four categories: the equal protection claim, the constitutional challenge to the sentencing procedure followed, the due process issues raised by the death statute on its face and as applied, and the eighth amendment claims. I express no view on the other points Coleman raises. The equal protection claim requires, at the least, that a hearing be con-

ducted on the habeas petition. The claims pertaining to the sentencing hearing call for vacation of the sentence and a new hearing on the appropriateness of the sentence to be imposed. The due process claims relating to the unconstitutionality of the statute, on its face and as applied, as well as the eighth amendment claims, also require vacation of the sentence but would additionally preclude reimposition of the death penalty.

The record in this case is replete with evidence of serious constitutional violations, including discriminatory treatment on the basis of race. Some of these violations are afforded only the most cursory treatment in the majority opinion. There can be little doubt that in its eagerness to ensure Coleman's execution Montana failed to afford him the fundamental rights guaranteed to all persons by our Constitution. Whatever one's view of the death penalty in general, it is clear that it cannot be imposed in an arbitrary and lawless manner. Yet that is precisely what Montana did here. I dissent, in the firm hope and expectation that the majority decision will not long survive.